UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ramon Rodriguez | |
| Petitioner | Case No.: |
| vs. | PETITION FOR WRIT OF HABEAS CORPUS |
| Christopher SHANAHAN, in his official capacity as New York Field Office Director for U.S. Immigration and Customs Enforcement; Scott MECHKOWSKI, in his official capacity as Assistant New York Field Office Director for U.S. Immigration and Customs Enforcement; Jeh JOHNSON in his official capacity as Secretary of Homeland Security; Eric HOLDER, in his official capacity as the Attorney General of the United States; and the U.S. DEPARTMENT OF HOMELAND SECURITY | |
| Respondents | |

14 CV 9838

JUDGE PAULEY

RECEIVED
DEC 12 2014
U.S.D.C. S.D.N.Y.

## PRELIMINARY STATEMENT

1. Petitioner Mr. Ramon Rodriguez ("Mr. Rodriguez"), a lawful permanent resident since the age of seven, was detained by Immigration and Customs Enforcement ("ICE") agents just as he was about to start a new job, a full seven years after spending five days in jail for a nonviolent offense. The Government takes the position that it is required to continue to detain Mr. Rodriguez without any consideration of his flight risk or danger to the community, even though his arrest history ended with that incident in 2007.

COPY RECEIVED
DEC 12 2014
David Louison
US ATTORNEY'S OFFICE

2.     Under the Government's view, no Immigration Judge can even consider that, in the seven years since his last arrest, Mr. Rodriguez has voluntarily undergone rehabilitation, secured steady housing, received his GED, completed college coursework, and played a supporting role in the lives of his family and friends, most of whom are U.S. citizens.

3.     Numerous courts across the country, including courts in this District as well as the First Circuit Court of Appeals, have rejected the Government's claim that persons such as Mr. Rodriguez are subject to mandatory detention, and that the Government is barred from holding a bond hearing. These courts have found that mandatory detention applies only at the time of release from criminal custody, or at the very least, within a reasonable time after such release.

4.     Some courts have ruled that mandatory detention ties the Government's hands no matter how removed the immigration arrest is from the time that the person was in criminal custody. That view is contrary to the Government's statutory detention authority and violates the Due Process Clause of the Fifth Amendment.

5.     The Immigration and Nationality Act ("INA") generally authorizes immigration officials to arrest, detain, and release immigrants pending their removal proceedings upon an individualized assessment for bond, parole, or other forms of supervised release. *See* 8 U.S.C. § 1226(a).  An exception to this general authority to release applies to a narrow subset of immigrants who are detained by immigration officials "when . . . released" from criminal custody for certain enumerated offenses. 8 U.S.C. § 1226(c) (commonly referred to as "mandatory detention"). Mr. Rodriguez does

not fall within the limited class of persons who are subject to mandatory detention under 8 U.S.C. § 1226(c).

6.  Mandatory detention is unlawful as applied to Mr. Rodriguez because he was not detained by immigration officials "when . . . released" from criminal custody, but seven *years* after his alleged conviction for offenses included in 8 U.S.C. § 1226(c)(1)(B). Plain reading of the statute shows that "when" unambiguously means "immediately after" or "at the time of;" even several courts that have disagreed with this specific, bright line construction have ruled that in light of the constitutional issues raised by a rule that deprives persons of liberty without an individual look at their circumstances, "when" can *never* mean "at any time after," the interpretation that the Government urges.

7.  To subject Mr. Rodriguez to mandatory detention without a bond hearing is arbitrary in the extreme, and bears no relation to the twin justifications for the mandatory detention system detailed by the Supreme Court – a presumption that *upon their release,* noncitizens who had committed a crime were flight risks and posed a danger to their communities. Through all the hard work he has put in to turning his life around in the years since his release, Mr. Rodriguez has decisively proven that that presumption cannot apply in his case. Stripping Mr. Rodriguez of his liberty, without even providing him the chance to present his case to a judge, thus raises serious constitutional concerns, especially given his substantial challenges to removal because of his eligibility for cancellation of removal. Interpreting the "when. . . released" clause so that mandatory detention does not apply years after release from custody would recognize that a person cannot be presumed to be a recidivist when they have proven otherwise,

3

allow consideration of positive equities gained in the years since release, and follow the canon of constitutional avoidance.

8.     This very issue is currently before the Second Circuit Court of Appeals in *Lora v. Shanahan*, No. 14-2343 and *Araujo-Cortes v. Shanahan*, No. 14-3719. However, as the issue will not be resolved until well into 2015, every day that Mr. Rodriguez is detained without bond violates his constitutional right to liberty.

9.     For any or all of these reasons, this Court should grant Mr. Rodriguez's habeas petition and order the Government to either release Mr. Rodriguez on reasonable conditions of supervision or provide him with a constitutionally adequate bond hearing before an impartial adjudicator, where the Government bears the burden of establishing that his continued detention is justified.

## PARTIES

10.     Petitioner, Mr. Rodriguez, came to the U.S. as a legal permanent resident at the age of seven and was living in Staten Island, New York, prior to his detention. He is currently being detained under the direction of Respondents Christopher Shanahan and Scott Mechkowski of the New York Field Office. Mr. Rodriguez is facing removal proceedings at Varick Street Immigration Court in New York, New York.

11.     Respondent Christopher Shanahan is named in his official capacity as the Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security. In this capacity, he is also responsible for the administration of immigration laws and the execution of detention and removal determinations, supervises Respondent Mechkowski, and is legal custodian of Petitioner.

4

Respondent Shanahan's address is Office of Enforcement and Removal Operations, New York Field Office Director, 26 Federal Plaza, New York, New York 10278.

12.     Respondent Scott Mechkowski is named in his official capacity as the Assistant Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, and is legal custodian of Petitioner. Respondent Mechkowski's address is Office of Enforcement and Removal Operations, New York Field Office Director, 26 Federal Plaza, New York, New York 10278.

13.     Respondent Jeh Charles Johnson is named in his official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, he is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; supervises Respondents Shanahan and Mechkowski; is legally responsible for pursuing Petitioner's detention and removal; and as such is the legal custodian of Petitioner. Respondent Johnson's address is U.S. Department of Homeland Security, Washington, District of Columbia 20528.

14.     Respondent Eric Holder is named in his official capacity as the Attorney General of the United States. In this capacity, he is responsible for the administration of the immigration laws as exercised by the Executive Office for Immigration Review, pursuant to INA § 103(g), 8 U.S.C. § 1103(g), routinely transacts business in the Southern District of New York, is legally responsible for administering Petitioner's

removal proceedings and the standards used in those proceedings, and as such is the legal custodian of Petitioner. Respondent Holder's address U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, District of Columbia 20530.

15.     Respondent Department of Homeland Security ("DHS") is the federal agency responsible for enforcing Petitioner's continued detention pending his removal proceedings. DHS' address is U.S. Department of Homeland Security, Washington, District of Columbia 20528.

## JURISDICTION

16.     Petitioner is currently detained by Respondents at 201 Varick Street, New York, New York, 10014. On the date of the filing of the present petition, December 12, 2014, Petitioner was physically present within the Southern District in Respondents' custody during his proceedings.

17.     This Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 2241, 28 U.S.C. § 1331, and Article I, § 9, cl. 2 of the United States Constitution; the All Writs Act, 28 U.S.C. § 1651; the Administrative Procedure Act, 5 U.S.C § 701; and for injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. Petitioner's current detention as enforced by Respondents constitutes a "severe restraint[]" on [Petitioner's] individual liberty," such that Petitioner is "in custody in violation of the . . . laws . . . of the United States." See *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); 28 U.S.C. § 2241.

18.     While the courts of appeals have jurisdiction to review removal orders directly through petitions for review, *see* 8 U.S.C. § 1252(a)(1), (b), the federal district courts have jurisdiction to hear habeas claims by noncitizens challenging the lawfulness

or constitutionality of their detention by ICE. *See, e.g., Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.     There is no statutory requirement of exhaustion of administrative remedy where a noncitizen challenges the mandatory nature of his detention. *See Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180 (S.D.N.Y. 2009). To the extent that any "prudential" considerations lead the Court to require exhaustion as a matter of discretion, Mr. Rodriguez has exhausted any and all effective administrative remedies available to him by seeking release from the Government through his motion for determination of bond, held before an immigration judge on December 12, 2014. *See* Exhibit N, Decl. of Eva Yung. At that hearing, the immigration judge heard the argument that Mr. Rodriguez should be eligible for bond, but held that Mr. Rodriguez is subject to mandatory detention under current agency precedent. *Id*. None of these efforts have resulted in his release. No further administrative remedies are required. Moreover, it is well established that where the agency has predetermined a dispositive issue—here, the proper interpretation of the mandatory detention statute—no further action with the agency is necessary. *See, e.g., Araujo-Cortes v. Shanahan*, No. 14 Civ. 4231 (AKH), 2014 WL 3843862 at *3 (S.D.N.Y. 2014) (holding that appeal to Board of Immigration Appeals regarding noncitizen's classification under the mandatory detention statute would be futile given consistent BIA precedent on the issue); *Monestime v. Reilly,* 704 F. Supp. 2d 453, 456-57 (S.D.N.Y. 2010) (same).

<u>VENUE</u>

20.    The Southern District of New York is the proper venue to resolve Mr. Rodriguez's petition for a writ of habeas corpus. The federal venue statute, 28 U.S.C. § 1391(e) states that a "civil action in which a defendant is an officer or employee of the United States… may be brought in any judicial jurisdiction in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of the property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.

21.    This case meets the § 1391(e) requirements for venue. Mr. Rodriguez is being detained under the authority of Respondents Christopher Shanahan and Scott Mechkowski, and both share the official address of the ICE Field Office at 26 Federal Plaza, New York, New York, within the Southern District. Most of the substantial events relevant to the present case occurred within the District, including the original convictions on which the Government invokes mandatory detention, Mr. Rodriguez's bond hearing, and his ongoing removal proceedings at 201 Varick Street, New York, New York. Furthermore, this Petition is being filed on December 12, 2014, while Mr. Rodriguez is physically present within the Southern District of New York at 201 Varick Street, New York, New York.

## <u>STATEMENT OF FACTS REGARDING MR. RODRIGUEZ AND HIS CURRENT DETENTION</u>

22.    Mr. Rodriguez is a 32-year-old national of the Dominican Republic who first came to the United States at the age of seven as a legal permanent resident. He has lived, studied and worked continuously in the New York City area ever since, and has an

extensive network of family and friends – including his LPR father, U.S. citizen sisters and close friends that have known him all his life. *See* Exhibit A, Aff. of Ramon Antonio Rodriguez Jimenez; Exhibit B, Aff. of Richard Ramirez; Exhibit C., Aff. of Zoraida Rodriguez.

23.     As the only son in the family, Mr. Rodriguez has played a role in both financially and emotionally supporting his family and friends, whether it is sending money to members who had need, providing counsel, or protecting his sisters. *See* Exh. B at ¶ 4-5; Exh. C at ¶ 9-10.

24.     On the morning of September 26, 2014, Mr. Rodriguez was preparing to hand in his paperwork at the local Western Beef supermarket on Staten Island. He was looking forward to starting a second job there to supplement his income from a local deli and save up more money towards continuing his college education. *See* Exhibit D, Declaration of Marco Antonio Barrajan Lopez at ¶ 15; Exhibit E, Declaration of Luisa Mariyat Lopez Gomez at ¶ 8. Instead, he was torn away from the new life he had so painstakingly built up when Immigration and Customs Enforcement ("ICE") agents arrested him.

25.     Approximately seven years ago, when he was a much younger man, Mr. Rodriguez had been arrested several times for nonviolent offenses. *See* Exh. B at ¶ 10; Exh. C at ¶ 8. On August 23, 2006 he was arrested and pled guilty on April 23, 2007 to attempted criminal possession of a controlled substance under NYPL § 110/220.09, receiving five years of probation. *See* Exhibit F, Certificate of Disposition for Case No. 2006NY057128. Additionally, on October 31, 2007 he was arrested and pled guilty on November 1, 2007 to possession of marijuana under NYPL § 221.10, and received a

custodial sentence of 5 days. *See* Exhibit G, Certificate of Disposition for Case No. 2007NY082624.

26.     Based on these sentences for nonviolent convictions dating back seven years ago, Mr. Rodriguez was placed in mandatory, no-bond detention under the authority of ICE New York Field Office Director Christopher Shanahan and Assistant Field Office Director Scott Mechkowski and has been charged with deportability. *See* Exhibit K, Notice to Appear. Mr. Rodriguez faces removal proceedings at Varick Immigration Court, 201 Varick Street, New York, New York.

27.     On December 1, 2014, Mr. Rodriguez's attorney Stephanie Lopez submitted a motion for bond determination to Immigration Judge Alan Page, incorporating Exhibits A-C and F-I supporting the present petition and arguing that Mr. Rodriguez was not subject to mandatory detention. *See* Exhibit M, Motion for Bond Redetermination. This motion was later supplemented by Exhibits D-E on December 9, 2014.

28.     This bond redetermination motion shows how Mr. Rodriguez's five-day sentence in 2007 became a pivotal point in his life. Immediately after his release, he voluntarily joined and successfully completed a rehabilitation program. *See* Exhibit H, Proof of Completion of NRI Outpatient Program; Exh. B at ¶ 12.

29.     Instead of depending on friends and family, he sought out jobs to be financially independent, so that he could be better placed to continue helping them instead. *See* Exh. B at ¶ 15; Exh. D at ¶ 3, 9-15; Exh. E at 5. Moreover, Mr. Rodriguez also continued to pursue his academic goals, finally earning his GED and taking college courses. *See* Exhibit I, GED Certificate; Exhibit J, Kingsborough Community College

transcript; Exh. C at ¶ 14. He successfully completed his probation on September 18, 2012. *See* Exhibit L, Rap Sheet Showing Completion of Probation.

30.    Throughout this busy time in his life, Mr. Rodriguez maintained strong bonds with his family and friends, continuing to provide emotional and mental support for the friends who looked up to him as a role model still and visiting his many nephews and nieces despite living far from them. *See* Exh. A at ¶ 11; Exh. B at ¶17, Exh. C at ¶ 10; Exh. E at ¶7.

31.    Determined to bounce back from his mistakes made as a younger man, he actively pursued employment opportunities, and was regularly employed over the last several years. *See* Exh. B at ¶ 15; Exh. D at ¶ 3, 9-15; Exh. E at ¶ 5. He sought a second job at Western Beef Supermarket in September 2014 in order to be able to return to school in the future. *See* Exh. D at ¶1 5; Exh. E at ¶ 8.

32.    On December 12, 2014, Immigration Judge Page denied the bond redetermination motion, unable to consider any evidence presented by Mr. Rodriguez because he was bound by agency precedent in *Matter of* Rojas, 23 I. & N. Dec. 117 (BIA 2001). *See* Exh. N.

33.    Mr. Rodriguez's sudden detention and denial of even a chance at bond not only deprives him of his liberty, but also his home, his possessions, his job, and his connections with his family and friends. *See* Exh. A at ¶ 13-14; Exh. B at ¶ 19, 22; Exh. D at ¶ 16.

34.    On the same date, while Mr. Rodriguez remained in Respondents' custody at the Varick Street Court, the present petition for a writ of habeas corpus was filed.

## CLAIMS FOR RELIEF

35.     The Government is holding Mr. Rodriguez without an opportunity for an individualized bond hearing based on the erroneous assertion that he is subject to mandatory detention under 8 U.S.C. § 1226(c). The Government does not have a statutory basis for this claim, and the nature of this mandatory detention offends the Due Process Clause of the U.S. Constitution because it deprives Mr. Rodriguez of his liberty and is divorced from the purposes of the statute.

36.     Because Congress inserted specific language limiting the scope of the mandatory detention exception from bond hearings, 8 U.S.C. § 1226(c) requires that an individual subject to no-bond detention be taken into immigration custody *when released* for offenses specified by the statute. Mr. Rodriguez does not fall under the statute because he was taken into immigration custody approximately *seven years* after his last alleged conviction for an enumerated offense. Given these elements of his case, Mr. Rodriguez is not legally subject to mandatory detention under the terms of § 1226(c).

## FIRST CAUSE OF ACTION

## MR. RODRIGUEZ WAS NOT DETAINED "WHEN ... RELEASED" FROM CRIMINAL CUSTODY UNDER 8 U.S.C. § 1226(C).

37.     The foregoing allegations are realleged and incorporated herein.

38.     The mandatory detention statute provides in relevant part that the Attorney General "shall take into custody an alien who—[is inadmissible or deportable by reason of having committed any enumerated offense] *when the alien is released* . . . for the same offense." 8 U.S.C. § 1226(c)(1) (emphasis added). An "alien described in paragraph (1)"

is ineligible to be released on bond except in limited circumstances inapplicable in the present case. 8 U.S.C. § 1226(c)(2).

39.    Mr. Rodriguez does not fall within the provisions of § 1226(c) because he was not detained "when . . . released" from custody for an enumerated offense. In contrast to the language of the statute, Mr. Rodriguez was detained by ICE *seven years after* his last conviction.

40.    The Government's position, described in *Matter of Rojas*, 23 I. & N. Dec. 117 (B.I.A. 2001), is that the "when...released" clause in § 1226(c)(1) does not impose any temporal limit on the application of mandatory detention. In this decision, the Board of Immigration Appeals found that the "when . . . released" clause was not part of the description of the "alien described in paragraph (1)," but rather exclusively part of a statutory command to the Attorney General to take the alien into custody.

41.    This interpretation is unreasonable because it is contrary to the plain language of the statute, the legislative history governing the "when...released" clause's insertion into the statute, and the statutory context in which it appears. The Government's reading has the effect of reading the "when...released" clause out of the statute or converting it into mere surplusage.

42.    Courts examining whether the "when...released" clause in § 1226(c) requires a nexus between release from criminal custody and an immigration arrest have ruled in three different ways, two of which are favorable to Mr. Rodriguez's position.

43.    Many district courts in this District and across the country have refused to defer to the government's temporally unlimited position, finding that the statute is unambiguous and holding that the word "when" clearly requires immediacy between

release and immigration detention in order to trigger no-bond detention. *See, e.g., Araujo-Cortes v. Shanahan*, No. 14 Civ. 4231 (AKH), 2014 WL 3843862 (S.D.N.Y. Aug. 5, 2014); *Preap v. Johnson*, 2014 WL 1995064 (N.D. Cal. May 15, 2014); *Lora v. Shanahan*, 15 F.Supp.3d 478 (S.D.N.Y. 2014); *Khoury v. Asher*, 3 F.Supp.3d 877 (W.D. Wash. 2014); *Rosciszewski v. Adducci*, 983 F.Supp.2d 910 (E.D. Mich. 2013); *Baquera v. Longshore*, 948 F.Supp.2d 1258 (D. Colo. 2013); *Pujalt-Leon v. Holder*, 934 F.Supp.2d 729 (M.D. Pa. 2013); *Valdez v. Terry*, 874 F.Supp.2d 1262 (D.N.M. 2012); *Louisaire v. Muller*, 758 F. Supp. 2d 229 (S.D.N.Y. 2010); *Monestime v. Reilly*, 704 F. Supp. 2d 453 (S.D.N.Y. 2010).

44.     Several courts, and most prominently the First Circuit, have found that "when" is ambiguous as a matter of statutory construction, but that application of the constitutional avoidance canon rendered the government's interpretation that mandatory detention applies at any time to be clearly unreasonable. *See, e.g. Castaneda v. Souza*, 769 F.3d 32, 45 (1st Cir. 2014) ("'[W]hen…released' cannot mean 'any time after release.'"); *Martinez-Done v. McConnell*, No. 14 Civ. 3071(SAS), 2014 WL 5032438 at * 7 (S.D.N.Y. Oct. 8, 2014) (adopting a time-limiting construction which does not require immediacy).  Under this interpretation, the Government has some latitude to determine how flexibly "when" must be interpreted, but is not at liberty to simply read it out of the statute; the delay in this case of seven years followed by non-bond detention falls well outside this flexibility.

45.     Finally, some district courts, along with the Third and Fourth Circuits, have held that mandatory detention applies no matter how much time passes between release from criminal custody and an immigration arrest. *See, e.g. Sylvain v. Att'y Gen.*,

714 F.3d 150 (3d Cir. 2013); *Hosh v. Lucero*, 380 F.3d 375(4th Cir. 2012); *Straker v.*

*Jones*, 986 F.Supp.2d 345 (S.D.N.Y. 2013); *Johnson v. Orsino*, 942 F.Supp.2d 396, 405

(S.D.N.Y. 2013). These courts have largely done so on grounds that the *Rojas* decision

itself rejected – alleged ambiguities in the definition of the word "when". *See, e.g., Hosh,*

380 F.3d at 379-80 ("deferring" to the BIA's construction, but discussing only the

ambiguities in the word "when"); *Straker*, 986 F.Supp.2d at 355 (discussing alternative

interpretations of the word "when"); *Johnson v. Orsino*, 942 F.Supp.2d 396, 405

(S.D.N.Y. 2013) (same).

    46.    The Government advances an interpretation that simply stops reading the

statutory paragraph just before reaching the "when...released" clause, yet claims that

such a reading reflects the entire description provided in the paragraph. In doing so, it

runs roughshod over the principle that "a statute should . . . be construed so that, if

possible, no clause, sentence or word is rendered superfluous, void or insignificant."

*TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted);

*Araujo-Cortes*, 2014 WL 3843862 at *7 ("[*Rojas*'s reading] violates the cardinal rules of

statutory interpretation: as it renders the "when ... released" clause superfluous by giving

the clause no meaning.").

    47.    Just as it is clear and unambiguous that the "when...released" clause is an

integral portion of the description of those subject to mandatory detention, it is equally

clear that the word "when" requires immediacy. The Government's key case interpreting

the statute itself concedes that "when" here means "immediate." *Rojas*, 23 I. & N. at 122

("[t]he statute does direct the Attorney General to take custody of aliens *immediately*

*upon release* from criminal confinement.") (emphasis added). Courts both within and

outside this District have agreed with this interpretation of "when" requiring "immediacy." *See, e.g., Araujo-Cortes*, 2014 WL 3843862, at *7 (stating that Congress intended such criminal non-citizens to be placed in detention "*immediately* upon their release...before the non-citizen[s] return[ ] to their community"); *Louisaire*, 758 F. Supp. 2d at 236 ("The clear purpose of § 1226(c)(1) is to authorize the mandatory detention of immigrants... *immediately* upon their release from criminal sentences. ..."); *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 182 (S.D.N.Y. 2009) (holding that "the plain language of the statute...manifests Congress' clear intent that there must be a nexus between the date of release and the removable offense"); *Anderson v. ICE Field Dir.*, No. C13-281 MJP, 2013 WL 4049007 at *2 (W.D. Wash Aug. 9, 2013) (noting "an avalanche of district court rulings" in line with this interpretation (internal citations omitted)).

48.    In contrast, the alternative interpretation that "when" can mean "at any time after" is inconsistent with both its plain meaning and contravenes Congress's intent to subject only those individuals who are presumed to be a flight risk or danger to the community at the time of their release.

49.    However, even if this Court finds that § 1226(c) is ambiguous, it should reject the Government's extreme reading that "when" can mean "at any time after" a release. For example, in light of the constitutional problems with no-bond detention, the First Circuit held that while "when" clearly connoted immediacy, "what constitutes immediacy is to be determined by context." *Castaneda*, 769 F.3d at 44 (granting habeas relief after finding that a delay of four-and-a-half years was not reasonable). While the *Castaneda* court agreed with the Government that the practical difficulties of detaining criminal aliens at the exact moment of their release made it unlikely that Congress

16

required literal immediacy to invoke § 1226(c), it labeled the imposition of mandatory detention several years after release to be presumptively unreasonable, irrelevant to the objectives of the statute, and "arbitrary in the extreme." *Id.* at 45.

50. In sum, reading the word "when" in statutory context leads to an inescapable conclusion – the mandatory detention statute cannot possibly apply to Mr. Rodriguez, whether or not the statute is deemed to be unambiguous. An individual such as Mr. Rodriguez, who has been detained seven years after his release and has re-integrated into his community, is instead subject to discretionary detention and release under § 1226(a), and is entitled to an individualized bond hearing.

## SECOND CAUSE OF ACTION

### <u>APPLICATION OF THE MANDATORY DETENTION STATUTE TO MR. RODRIGUEZ SEVEN YEARS AFTER HIS RELEASE AND SUCCESSFUL REINTEGRATION INTO HIS COMMUNITY IS A VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT</u>

51. The foregoing allegations are realleged and incorporated herein.

52. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas v. Davis*, 533 U.S. 678, 690–691 (2001); *Diop v. ICE*, 656 F.3d 221, 233–234 (3d Cir. 2011). The Supreme Court has never authorized a reading of the statute that would permit DHS to detain noncitizens without bond in cases where flight risk and danger, the justifications which make mandatory detention constitutionally permissible, cannot be reasonably presumed. *See Demore v. Kim*, 538 U.S. at 528 (finding that § 1226(c) "serv[ed] the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered

removed, the aliens will be successfully removed"); *id.* at 533 (Kennedy, J., concurring) ("If the government cannot satisfy [the minimal threshold burden of showing the relationship between detention and its purpose] then permissibility of continued detention pending deportation proceedings turns solely upon the alien's ability to satisfy ordinary bond procedures . . . .").

53.     Serious constitutional concerns are implicated in this case because Mr. Rodriguez's "freedom from imprisonment . . . lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. In the "special and narrow nonpunitive circumstances" of immigration detention, due process requires "a special justification . . . [that] outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (internal quotation marks omitted) (internal citations omitted). "As a constitutional matter, mandatory detention can only be justified by the presumption of dangerousness and flight risk poses by newly released criminal defendants." *Castaneda*, 769 F.3d at 47.

54.     The detention of Mr. Rodriguez seven years after his release from five days of criminal custody is arbitrary on its face. These years of study, work and support for his family and friends with no adverse contact with law enforcement put him in a dramatically different position than that of an individual recently released from criminal custody, and the Fifth Amendment mandates that he be given the opportunity to rebut any presumption of flight risk and dangerousness. *Castaneda*, 769 F.3d at 43 ("When the government has delayed several years before arresting an alien, the presumption of dangerousness and flight risk is eroded by the years in which the alien lived peaceably in the community."). Indeed, any presumption that Mr. Rodriguez is likely to be a recidivist

in light of his criminal convictions is belied by the fact that he has not been arrested, much less convicted for any offense since his last release seven years ago.

55.      Several courts in this District have found that similar applications of mandatory detention have amounted to violations of the Fifth Amendment. *See Martinez-Done*, 2014 WL 5032438 at *9 ("[T]he government's construction of section 236(c) would confer limitless authority on the Attorney General to pluck immigrants from their families and communities with no hope of release pending removal—even decades after criminal confinement. This construction threatens immigrants'…constitutional rights."); *Araujo-Cortes*, 2014 WL 3843862 at *14 ("[Petitioner's] continued detention without an individualized hearing to determine whether he is a flight risk or a danger to the community is inconsistent with the United States Constitution.").

56.      Because Mr. Rodriguez's detention has been unaccompanied by the procedural protections that such a significant deprivation of liberty requires under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, his continued detention without a bond hearing is unlawful.


## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

(1)   Assume jurisdiction over this matter;

(2)   Enjoin Respondents from transferring the Petitioner outside the jurisdiction of this Court pending the resolution of this case;

(3)   Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately on his own recognizance or under parole, bond, or reasonable

conditions of supervision, or, in the alternative, ordering Respondents to provide Mr. Rodriguez with a constitutionally adequate, individualized hearing before an impartial adjudicator at which Respondents bear the burden of establishing that Petitioner's continued detention is justified;

(5)  Award Petitioner his costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or other statute; and

(6)  Grant such further relief as the Court deems just and proper.

Dated: New York, NY
December 12, 2014

Respectfully submitted,

NANCY MORAWETZ, Esq.
   (NM1193)
Eva Yung, Legal Intern
Andrew Lyubarsky, Legal Intern
Immigrant Rights Clinic
Washington Square Legal Services, Inc.
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430

*Counsel for Petitioner*

# EXHIBIT LIST

Exhibit A       Affidavit of Ramon Antonio Rodriguez Jimenez

Exhibit B       Affidavit of Richard Ramirez

Exhibit C       Affidavit of Zoraida Rodriguez

Exhibit D       Declaration of Marco Antonio Barrajan Lopez

Exhibit E       Declaration of Luisa Mariyat Lopez Gomez

Exhibit F       Certificate of Disposition for Case # 2006NY057128 (Sept. 19, 2007)

Exhibit G       Certificate of Disposition for Case # 2007NY082624 (Nov. 01, 2007)

Exhibit H       Proof of Completion of NRI Outpatient Treatment Program

Exhibit I       GED Certificate (Aug. 12, 2009)

Exhibit J       Kingsborough Community College Transcript

Exhibit K       Notice to Appear (Sept. 26, 2014)

Exhibit L       Rap Sheet Showing Completion of Probation

Exhibit M       Bond Submission Packet (Dec. 1, 2014)

Exhibit N       Declaration of Eva Yung (Dec. 12, 2014)

# Exhibit A

| | |
|---|---|
| Affidavit in Support of<br>Ramon A. Rodriguez | Declaration of<br><br>Ramon Antonio Rodriguez Jimenez |

## AFFIDAVIT OF RAMON ANTONIO RODRIGUEZ JIMENEZ

1. My name is Ramon Antonio Rodriguez Jimenez. I was born on ▓▓▓▓▓▓▓ in Vicente Noble, Barahona, Dominican Republic. I am the father of Ramon Rodriguez, as well as of his six sisters – Evelin, Celeny, Priscilla, Nancy, Angie and Zoraida. I know that my son Ramon is not a danger to the community or a flight risk, and I believe that he should be released from immigration detention while his case is ongoing.

2. I immigrated to the United States on or around 1986, and am currently a Legal Permanent Resident. I live at 1049 Grand Concourse, Apt. 2E, Bronx, NY 10452 with my daughter, Zoraida Rodriguez. I have lived in the New York City area continuously since 1986, with the exception of a brief six-month period in which I lived in Puerto Rico.

3. Ramon Rodriguez is my one and only son in the United States. I am also the father of Ramon's six sisters – Evelin, Celeny, Priscilla, Nancy, Angie and Zoraida. All of the children except Zoraida were born in the Dominican Republic, when I was in a relationship with their mother, Altagracia Rosario Paniagua. By the time I had immigrated to the United States in 1986, I was already separated from Ms. Rosario Paniagua.

4. In or around 1990, Ms. Rosario Paniagua was able to immigrate to the United States based on a family petition from her mother, Angela Paniagua, who was residing in Brooklyn at the time. She brought all of the children, including my son Ramon over with them, and they resided with Angela Paniagua in Brooklyn upon their arrival.

5. When they first arrived, I attempted to play an active role in the lives of my children, especially Ramon because he was my only son. I briefly entered into a relationship with Ms. Rosario Paniagua again, and our seventh child, Zoraida Rodriguez, was born in 1993. However, the our relationship did not work and I obtained custody over Zoraida. I raised her separately.

6. Eventually, the family moved up to 3675 Broadway, #4H, and I lived with Zoraida just a few blocks away at 611 W. 158th Street. This allowed me to stay in closer touch with my other children, including my son Ramon. I always supported him when he needed any kind of financial help with anything, such as groceries, clothes, or other necessities. I didn't see Ramon on a day-to-day basis, because he was living with his mother, but he was still important to me and I made sure that his needs were provided for.

7. I remember Ramon being a good kid growing up, and I would go to his elementary school to receive his report cards and meet with teachers. However, it was really his mother who was in charge, and I didn't get to spend as much time with Ramon as I would have liked.

8. I did take Zoraida out to see Ramon and her sisters. I remember taking Zoraida and Ramon down to the parks in Upper Manhattan, and watch as they played around me as I practiced the trumpet. Ramon really loved music, and that made me proud as a musician.

9. I am not exactly sure why Ramon decided to drop out of high school. I tried to convince him to study and finish his education, but I saw that he had grown already and was trying to become more and more independent. He worked with me doing some porter duties, but then told me that he wanted to find another job.

10. Around 2006, Ramon's mother Altagracia was arrested and eventually deported to the Dominican Republic. That was really a terrible, terrible occurrence. She was the main authority figure for all of the children, and losing her in that way at a young age was a really big blow for them. After this happened, Zoraida and I moved into their apartment, and I tried to support my children as much as I possibly could. But the rent was too much to pay and I had to move out with Zoraida.

11. After we lost that apartment, Ramon moved down to Staten Island. I know he was working down here, and that he had studied and received his GED. I would see Ramon whenever he would visit his sisters; his eyes would light up whenever he would play with his nieces and nephews, and he really liked being an "uncle" to them.

12. I think that Ramon may have had some tough times growing up, and I know that I wasn't always able to be there to give him guidance. But I know that he is a hard working young man who is always looking for work, who has tried to better himself by studying, and whose presence is important for his sisters and his nephews and nieces. The last time I saw him was at a family gathering at my daughter Celeny's house. We hugged, we talked and danced and had a great time.

13. I miss my son and do not understand why he has been arrested by immigration. To my knowledge, he has had no problems with the police for over seven years and has never committed any crime that has hurt anybody. I know he has been working, that he had obtained housing in Staten Island, and that he had achieved some stability in his life. It hurts me to know that he is all alone in detention, and that his life has been interrupted in this way.

14. Ramon would never run away from his immigration case. I am here in New York City, all of his sisters are here, all of his friends are here. All of his life is here. With God as my witness, I believe that he will prove himself before the immigration court, put all of this behind him, and be my hardworking son once again.

I, Ramon Rodriguez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

Ramon Rodriguez

Sworn to before me
This 26th day of November, 2014

NOTARY PUBLIC

STEPHANIE F LOPEZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LO6296461
Qualified In Bronx County
My Commission Expires February 03, 2018

## AFFIDAVIT OF TRANSLATION

1. My name is Andrew Lyubarsky. I am a law student intern at Washington Square Legal Services, Inc., 245 Sullivan Street, 5th Floor, New York, NY, 10012.

2. I am fluent in both English in Spanish.

3. Ramon Rodriguez Sr. is fluent in Spanish.

4. I translated the contents of this declaration to Ms. Lopez Gomez into Spanish, and she verified that the contents of the declaration were true and correct before signing it.

5. I attest that I gave a true and correct translation.


I, Andrew Lyubarsky, declare under penalty of perjury that the foregoing is true and correct.


Sworn to me this _10th_ day of _December_, 2014

New York, New York


NOTARY PUBLIC


NANCY MORAWETZ
Notary Public, State of New York
Reg. No. 02MO5001385
Qualified in New York County
Commission ... Feb. 9, 20, 5

# Exhibit B

Affidavit in Support of
Ramon A. Rodriguez

Affidavit of

Richard Ramirez

## AFFIDAVIT OF RICHARD RAMIREZ

1. My name is Richard Ramirez. I was born on ███████ 1985 in New York City and am a US Citizen by birth. My current address is 3675 Broadway #5D, New York, NY 10031. I strongly believe that Ramon Rodriguez should not be detained during his immigration case because his conduct and lifestyle over the last seven years shows that he is neither a flight risk nor a danger to the community. Accordingly, I am submitting this statement in support of his request for bond.

2. I have known Ramon Rodriguez since I was eight years old, and consider him to be like a brother to me. Ramon and his family lived a floor below me in the same building, in apartment 4H. Because Ramon was raised by his mother and only had sisters in the house, he spent a lot of time at my apartment, hanging out with my brother Eduardo Ramirez and I. We were an inseparable trio, the three of us, whether we were playing video games in the apartment, playing basketball, or helping each other with our homework.

3. Ramon is about two years older than me, and that made all the difference when we were growing up. I looked up to Ramon and saw him like a big brother.  Growing up he took me under his wing and looked out for me.

4. I remember family life being a little rough for Ramon. His father had separated from his mother when Ramon was just a baby, and his mother Altagracia was raising all six children in the home. It was hard for him not to have a male figure in the home, and I think that's why he spent so much time with me and Eduardo. However, I saw that Ramon loved his mother and his sisters. As he was growing up, I saw him play more of a protector role, always making sure that the doors were locked and the windows were secure, and talking to his sisters about making sure not to hang out with the wrong guys. That was a lot of responsibility for a child his age and he took it seriously, he was very involved.

5. Ramon was also a great big brother for his youngest sister, Zoraida, who was the only one who stayed with Ramon's father. Even though they didn't live together, he would take her out around the neighborhood and make an effort to spend time with her.

6. Those were happy times for both me and Ramon; I remember coming over to his house where his mother Altagracia would be cooking over the holiday seasons and spending time with his sisters.

7. When he got older, things got more difficult for Ramon. Around high school, he started working at a local movie theater as well as going to school, just to have a little extra money. Many of us in our neighborhood did that. He always tried to have money to buy his own clothes and take care of his personal needs, and he helped take care of the nieces that were beginning to appear around the house – his sister Evelin had already had a daughter by that time.

8. I think the need to make money, and maybe the fact that he was the only boy in a household of six women and wasn't getting enough attention and support, pushed Ramon to drop out of school. He was sad to give up school, and he always told me that he wanted to go to college, but he felt that he needed to work. He would do all kinds of jobs, helping his dad out with his porter tasks, doing some carpentry – whatever kinds of jobs that he could find.

9. A lot of things changed when Ramon's mother got deported to the Dominican Republic. I don't remember when it happened, but I think I was in my early twenties, and Ramon was in his mid-twenties at the time. At first, Ramon wouldn't talk to me about it, and tried to keep quiet. But I knew that Ramon was hurting. I confronted him about it and he opened up to me. I saw Ramon have his depressed moments and cry about losing his mother. Ramon's father and sisters stepped in and tried to help out, but losing a mother is irreplaceable. All of a sudden an important support for the family wasn't there anymore and that really hurt Ramon.

10. We were still in regular touch in those years, talking every day or every other day. I was really shocked to find out, however, that Ramon had been arrested around 2006 or 2007. I don't know very much about the arrest, and I didn't push him on it, because I know that was a stressful issue for him. While he always put on a happy exterior, I did see that his early twenties were a pretty tough time for Ramon.

11. After his arrest, Ramon told him that he felt that he had reached a certain age and needed to be more independent, and could no longer be living in the family home. He told me that he needed a change of pace and a change of scenery.

12. The first thing that I know that Ramon did was finish a rehab program. He talked to me very positively about this program, telling me that it was like a "group of people helping

each other out" and that he was doing it of his own free will. He told me that they would sit down in a room to discuss the issues together and that he had access to good counselors. He told me that he needed a change, that he needed to structure himself so that he could promote a better atmosphere for himself and those around him.

13. One of the happiest moments that I spent with Ramon in this period was when he got his GED degree in 2009. Ramon was ecstatic – it was like seeing someone graduate from college. We cooked, we had a couple drinks together, and celebrated all night. I was going through a divorce at that time, so seeing Ramon advancing was really uplifting for me personally.

14. I also know that Ramon was taking college classes after he got that GED. I don't really know what exactly he was studying, but I was really happy that he was doing something positive for himself.

15. As always, Ramon was willing to do any job he could find. He really wanted to be independent and get himself to a place where he would be able to take care of a family, and support his sisters. It was difficult for him to hold down a job for a long time, though—I think that his criminal conviction hurt him in the eyes of the managers.

16. During this time, he started dating a Japanese student named Rei Itoh, who had a young daughter named Victoria. Ramon really treated Rei's daughter as if she was his own, and they stayed with him for long periods of time. It really showed how family-oriented he was.

17. I know he also loved his nieces and nephews. With so many sisters, he had more of those than I could count. He was always telling me of how he loved hang out with them and being called *tio*, and would post pictures on Facebook of him hugging them.

18. All in all, I think things were going well for Ramon. He had his GED, he had gotten some college classes under his belt, and he had stable housing for the last couple of years down in Staten Island. Finding work was hard, but he had told me that he had just gotten another job at a Western Beef supermarket near his house. Life wasn't easy for him, but he always kept a good attitude and tried to be the best that he could for his family, and he was always there for me as well.

19. Ramon called me after he was detained by ICE, and asked me to help him contact the rest of his friends and family. He told him that he had just gotten a second job at Western Beef and was going there that morning when he got picked up.

20. Ramon was positive in his first conversations with me because he thought he was going to get out of detention soon. Since he had stayed out of trouble and had no problems with the police since his arrest in 2007, but once he realized that he couldn't get out under the law, I could feel the sadness in his voice.

21. It hurts me personally to know that Ramon is being detained. I do not understand why someone like Ramon who was working, studying, and spending time with his family would be taken out of their community for something that he did seven years ago. I want Ramon to be able to come out, sit down, and eat with me. I always think about Ramon these days—he is like my brother. I don't even want to eat like I normally do, because I know Ramon isn't getting that in detention.

22. I know that Ramon isn't a danger to anyone. He has tried and succeeded to get his life together, and was focusing on the same things anyone else focuses on—his family, paying the bills, and working—when he was picked up by ICE. I am certain that he wouldn't try to evade his immigration proceedings. He has done everything that the government has asked of him, and all of his family and friends are in New York City. I believe that he should be eligible for bond and be out in the community with all of us who love him.

I, Richard Ramirez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

_____
Richard Ramirez

Sworn to before me
This 26th day of November, 2014

_____
NOTARY PUBLIC

STEPHANIE F LOPEZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LO6296461
Qualified in Bronx County
My Commission Expires February 03, 20??

# Exhibit C

Affidavit in Support of
Ramon A. Rodriguez

Affidavit of

Zoraida Rodriguez

## AFFIDAVIT OF ZORAIDA RODRIGUEZ

1. My name is Zoraida Rodriguez. I was born on ▆▆▆▆▆▆ 1993, and I am a citizen of the United States. I live at 1049 Grand Concourse, Apartment 2E, Bronx, New York now, but have lived in the New York City area all my life.

2. I am Ramon Rodriguez's youngest sister. As a child, he and my five older sisters took care of me.  We used to all live together as a family, but when I was around 2 years old, our parents separated and our dad took me to live with him while Ramon and my sisters remained with our mom. We moved only 6 blocks away therefore, I saw Ramon and my sisters everyday.

3. Ramon and my two sisters Priscilla and Evelin went to the same school, and I remember them saying that there was a lot of violence there. Priscilla and Evelin both ended up dropping out, but Ramon talked about how he would be the one to graduate from the family and who would make something of his life. His real passion was music though, and he always used to say that he would be a famous rapper someday. He was positive and upbeat like that all the time, and it is still hard for me to tell how he is actually feeling. He comes across to me as a bit of a loner, keeping to himself most of the time.

4. Ramon has always been closer to our dad than to our mom, even though they have their share of arguments and bumps on the road. Our dad used to travel and play the trumpet with a band, and Ramon got his love of music from him. So back then, when our dad only took me to live with him, I think that Ramon felt like he was being left behind. That was also when Ramon started distancing himself from our mom as well, where he wouldn't really talk to her much

5. Our dad was the one who told me that Ramon had dropped out of school. He was disappointed in Ramon because he had thought that Ramon was going to do better. I think he was also working at the time, but he didn't really talk about it.

6. In 2006, when I was around 12 or 13 years old, our dad told me that our mom had been arrested.  Afterwards, our mom was deported back to the Dominican Republic within the

year. Some of my sisters still call her and send her money once in a while, but I haven't spoken to her since. Her deportation had a devastating impact on our family and we are reliving this nightmare with Ramon's detention.

After my mother's deportation, I noticed that there was friction between my sisters and Ramon. He came more reserved with us, but went out a lot with his friends. After being evicted, my family moved into a shelter however Ramon went to live on his own. This was when we really lost contact with Ramon. He was moving around a lot, and would only call once in a while updating us on his new location

7. A long time ago, I found out Ramon was arrested. I was surprised that he was arrested, however the arrests didn't change my impression and love for my older brother whom I looked up to. Since then he has been out of touch since he lived with my sister Priscilla for a short time then lived in Staten Island. Because of the distance, I lost touch with Ramon for a while.

8. In September 2014, I got a call from a weird number. When I picked up, it was Ramon on the other line, saying that he had been arrested for something to do with immigration.

9. Even though we don't talk much anymore, Ramon has always been there for me and the family. While he doesn't like asking for help and prefers to do things on his own, he's always there when someone needs help. I know that he's been helping our sisters out financially here and there even though he can't really afford it.

10. Ramon has always been an important part of my life, and has supported me more than our mom ever did. He is the only one in the family who's ever told me he was proud of me, and that I should work hard to stay in school and be the first person in the family to graduate from high school. He was always the one encouraging me and telling me that I could be anything if I put my mind to it, and telling me about how hard he was working. I remember hearing about his GED, and how he was working and getting college credits as well. He called me to check up on me the moment I posted something depressing on Facebook, wanting to make sure I was okay. I would be devastated if he maintains in detention and ultimately were deported.

11. Ramon is not a danger to our community. He has committed mistakes, but he is reserved and good person. He has actively tried to get his life back on track despite the many set backs he has had in his life. I respectfully ask that he be able to defend himself in the community where he has lived for the past seven years since he has been arrested.

I, Zoraida Rodriguez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

_Zoraida Rodriguez_
Zoraida Rodriguez

Sworn to before me
This 26th day of November, 2014

_Stephanie F Lopez_
NOTARY PUBLIC

STEPHANIE F LOPEZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LO6296461
Qualified in Bronx County
My Commission Expires February 03, 2018

# Exhibit D

Declaration in Support of
Ramon A. Rodriguez

Declaration of

Marco Antonio Barrajan Lopez

## DECLARATION OF MARCO ANTONIO BARRAJAN LOPEZ

1. My name is Marco Antonio Barrajan Lopez, and I was born on ▓▓▓▓▓▓. I currently live with my mother and brother on Staten Island, and I work at a deli there as well.

2. I first met Ramon about four years ago one summer, right after I had begun working at a Subway on Staten Island near where I live. The Subway was hiring, and Ramon walked in with his GED diploma asking for a job. That was also the day my boss happened to be there, so Ramon got to talk to him. It's rare for the boss to hire on the spot, but I remember him hiring Ramon right there. I was in charge of training Ramon, and he quickly picked things up.

3. Over the next four to five months, we became really close. It was only the three of us working the afternoon shift at Subway – the two of us and one other girl – and everybody loved him, even the customers. He is older than I am, so I would go to him for advice all the time. I don't usually bring my friends home to meet my mom, but after she met him once and spoke with him, she thought that he was a good person with a lot of respect for others. After that, Ramon would come over to my house all the time to hang out and to eat with us, and soon became like a part of my family.

4. I can remember the exact moment we really became close. My brother had always had kidney problems, and my mom had already donated one of her kidneys to him. But the doctors said that my brother would be needing a new one in seven years. After hearing about this, Ramon offered to donate one of his own, if everything else was a match. He said that my family was like his family, and he would be willing to do anything to help. He started eating healthy and stopped smoking too, in case one day he would be called on to donate.

5. We would hang out together all the time, going running together and walking the dogs. Even though Ramon had never played soccer before, he would meet up with me and another good friend of mine to play every day. Ramon would come to my soccer league games, and even play for the team when we were short a player. It was at his first game with us that we started nicknaming him "Plan B."

6. Ramon was always writing music and sharing it with me and my family, mostly love songs. We would sit in the house every day listening to his latest work and he would ask me for feedback. He also told me that he had grown up with six sisters and had two close friends, one of whom he called his "brother."

7. Ramon was also very focused on his education. He would show me his GED and talk about studying at Brooklyn College one day, and said that even though he was already 29 years old, he was still trying to get in.

8. Ramon always filed his taxes. Each time, he would save the money he received on his tax return towards getting a studio, so that he could produce his music. It was partly why he started looking for a second job: when I asked him why he wanted to work so much, he said he wanted to be able to both pay the bills and be able to start saving up.

9. Around a year and half to two years after we started working at the Subway, we decided to find new jobs because getting paid every two weeks wasn't enough. I found a job down the street at a deli where I knew the owners, and after four or five months working there, I told Ramon that he should apply there too because the hours and pay were good.

10. Ramon was working then at a Dunkin' Donuts. He said that the pay wasn't that good, but he loved it because he enjoyed meeting all the customers and seeing new faces. It was only a part-time job though, for only four to five hours a week, and the pay wasn't enough to cover the bills.

11. When Ramon finally left his Dunkin' Donuts job, he came into the deli where I was working and I put in a good word for him to my boss. Ramon worked there with me at the deli until the day he got arrested, working the morning shift from 8 AM to 4 PM. Ramon was a positive, happy person working at the deli too, always being respectful to the customers even when it got hectic.

12. Ramon was always looking for work. I remember Ramon also approaching my soccer league coach for job opportunities too. My coach was a mechanic who did car work, and Ramon asked if there were any odd jobs he could help out with. Ramon then didn't even want pay, saying that he only wanted to learn, but the coach ended up paying him for his work.

13. Business started going down at the deli where we worked after about two years. The owner's son also came back for a job, so the owners cut Ramon's hours from 6 to 4. That was when he started looking for a second job. He told me about applying to Family Dollar, and how he even did one week of training there but never received a call back.

14. Ramon then told me that he had gotten to talk to the manager at our local Western Beef, who had told him to submit an application. He told me about how he wanted to work at their meat station, given his experience at the deli.

15. It was very shocking for me when Ramon was arrested by immigration authorities. I had been away from my phone for most of the day, and when I picked it up, I saw that I had several voice messages and about 20 texts, all from Ramon asking for my help. His last text said that he had been arrested. I was upset because Ramon is like a brother to me, and to hear that he had been arrested was shocking. Ramon called me back several minutes later and told me that the arrest had something to do with an earlier arrest from seven years ago. I was really surprised about that too, because the Ramon I knew wasn't the type to get into trouble – he was always respectful and kind. My mom couldn't believe it either, nor our boss at the deli when I went there to pick up Ramon's last paycheck.

16. The last time I spoke to Ramon was almost a month ago, when he told me that several people would be coming to speak with me. He sounded depressed, very different from the usual positive, happy, excited Ramon I know.

17. It's going to be very different without Ramon here – not just for the holiday season, but every day. My family, friends and I miss his company, his always being around to help and his jokes. Without him, life is never going to be same.

I, _Marco Antonio Barrajan Lopez_, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Date: _11/25/2014_
Staten Island, NY

_Marco Antonio_
Name

_[signature]_
Signature

# Exhibit E

Declaration in Support of
Ramon A. Rodriguez

Declaration of

Luisa Mariyat Lopez Gomez

## DECLARATION OF LUISA MARIYAT LOPEZ GOMEZ

1.  My name is Luisa Mariyat Lopez Gomez, and I was born on ███████████

2.  I first met Ramon Rodriguez around 2011 through my son, Marco Antonio Barrajan Lopez. At that time, my son was working at the Subway on Bay Street in Staten Island. At first, Ramon was just a customer, but they became fast friends. My son helped him get a job at Subway and during that time, he would pass by my house and say hello to me. He was very nice, sociable and polite, and I had a very positive impression of him.

3.  As he got to know my son better, he would be around the house more often. He would frequently stop by to say hello, and whenever we had holiday parties, barbecues, or gatherings. He would make sure that he was putting in money to contribute for all of the family meals.

4.  When he came to talk to me, he would always tell me about his dreams for the future. He was very interested in music, and dreamed of being a composer or working in the music industry. We used to joke with him that when if we liked his music, that means that he would surely become famous.

5.  At the same time, I knew from my son that he was always working. He changed jobs — from Subway to Dunkin Donuts, and then to a local deli nearby, but he always struck me as an active, busy young man trying to pay his bills and get ahead in life.

6.  I also spoke with Ramon about his desire to study. I told him that maybe he should look into going to a trade school or do a short program of study in a university. He told me that it was difficult for him to work and study, but that if he was able to save up some money, that would be his goal.

7.  I feel that Ramon was a positive influence for my son Antonio. They would always be playing sports or listening to music, and giving each other advice about the difficult things in life. Ramon is a bit older than Antonio, and served as another older brother for him.

8.  This year, in September 2014, Ramon was moving toward his goal of advancing in life. He told me that he decided to work two jobs — work at a local corner deli in the mornings

from 8 AM – 3 PM, and at night at a local Western Beef Supermarket at night, from about 3:30 PM – 10:30 PM. He told me that this way he might have the money to save, and eventually pursue his education. It was just at this time that he was detained by immigration authorities.

9. I do not understand why Ramon has been detained. In the approximately three years I have known him, Ramon has impressed me as being a friendly, quiet young man who worked hard for his living and was trying to advance in life. He was arrested just when he was ready to take on a second job and save up for his education. I have never known him to do anything unkind to anyone, hang out with the wrong people, or show that he could be a danger in any way.

10. Even compared to when I met him in 2011, I feel that Ramon had a lot more initiative and really showed a strong will to better himself. I have enjoyed spending time and getting to know him through my son, and I do not think that he will try to evade his immigration case. He has lived in New York since he was a small child and he has nowhere else to go.

I, _Luisa Mariyat Lopez_, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Date: _11-25-14_
Staten Island, NY

_Luisa Mariyat Lopez_
Name

Signature

## AFFIDAVIT OF TRANSLATION

1. My name is Andrew Lyubarsky. I am a law student intern at Washington Square Legal Services, Inc., 245 Sullivan Street, 5th Floor, New York, NY, 10012.

2. I am fluent in both English in Spanish.

3. Luisa Mariyat Lopez Gomez is fluent in Spanish.

4. I translated the contents of this declaration to Ms. Lopez Gomez into Spanish, and she verified that the contents of the declaration were true and correct before signing it.

5. I attest that I gave a true and correct translation.


I, Andrew Lyubarsky, declare under penalty of perjury that the foregoing is true and correct.

Sworn to me this 10th day of December, 2014

New York, New York


NOTARY PUBLIC

NANCY MORAWETZ
Notary Public, State of New York
Reg. No. 02MO5001385
Qualified in New York County
Feb. 6, 20 15

# Exhibit F

SUPREME COURT OF THE STATE OF NEW YORK        NO FEE
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION INDICTMENT

DATE: 10/23/2014                    CERTIFICATE OF DISPOSITION NUMBER: 40064

PEOPLE OF THE STATE OF NEW YORK       CASE NUMBER:            04731-2006
               VS.                    LOWER COURT NUMBER(S): 2006NY057128
                                      DATE OF ARREST:         08/23/2006
                                      ARREST #:               M06666382
                                      DATE OF BIRTH:          ██████/1982
RODRIGUEZ,RAMON                       DATE FILED:             09/11/2006

                DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 04/23/2007 THE ABOVE NAMED DEFENDANT WAS
CONVICTED OF THE CRIME(S) BELOW BEFORE JUSTICE  WILEY,M THEN A
JUSTICE OF THIS COURT.

ATTEMPTED CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE 4th DEGREE
PL  110-220.09 01 DF (DANGEROUS DRUG)

THAT ON 09/19/2007, UPON THE AFORESAID CONVICTION BY PLEA  THE HONORABLE
WILEY,M  THEN A JUDGE OF THIS COURT, SENTENCED THE DEFENDANT
TO

ATTEMPTED CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE 4th DEGREE
PL  110-220.09 01 DF (DANGEROUS DRUG)
LICENSE SUSPENDED = 6 MONTH(S)
PROBATION = 5 YEAR(S)


CVAF = $20 (JUDGMENT ORDERED)
DNA  = $50 (JUDGMENT ORDERED)
SURCHARGE = $250 (JUDGMENT ORDERED)



IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 10/23/2014.

                                    COURT CLERK

# Exhibit G

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATE OF DISPOSITION
NUMBER: 381012

THE PEOPLE OF THE STATE OF NEW YORK
VS

RODRIGUEZ,RAMON A
Defendant

3675 BROADWAY
Address

MANHATTAN            NY   10031
City              State    Zip

Docket Number: 2007NY082624

_____/1982
Date of Birth

2090204L
NYSID Number

10/31/2007
Date of Arrest/Issue

Summons No:

221.10
Arraignment Charges

Case Disposition Information:

| Date | Court Action | Judge | Part |
|------|--------------|-------|------|
| 11/01/2007 | PLED GUILTY & SENTENCE IMPOSED<br>PG 221.10<br>IMPRISONMENT=5D<br>LICENSE SUSPENDED=6M | KOENDERMAN,E | APAR2 |

NO FEE CERTIFICATION

_ GOVERNMENT AGENCY        _ COUNSEL ASSIGNED

_ NO RECORD OF ATTORNEY READILY AVAILABLE. DEFENDANT STATES COUNSEL WAS ASSIGNED

SOURCE  _ ACCUSATORY INSTRUMENT  _ DOCKET BOOK/CRIMS  _ CRC3030[CRS963]

        I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN
THIS COURT.

FANELLI,R
COURT OFFICIAL SIGNATURE AND SEAL

10/23/2014
DATE          FEE: NONE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT
          SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

# Exhibit H

NRI GROUP LLC
301 W. 37TH
4TH FLOOR
New York, NY 10018
212-967-0770


October 27, 2014


Ms. Stephanie Lopez,

Regarding our conversation today of the treatment history of Mr. Ramon Rodriquez.
Our records indicate he was a client in our Outpatient Treatment Unit on W.51<sup>st.</sup> He was
enrolled from 9/5/2008 to 4/8/2009 and successfully completed.

That unit has since closed and the actual records are not available,

If I can be of further assistance contact me at the address or number below.




Joseph Ripple

Medical Records
NRI GROUP LLC
212-967-0770

# Exhibit I

Case 1:14-cv-09838-SN Document 1 Filed 10/01/14 Page 88 of 130



The University of the State of New York
The Education Department

Be it known that

Ramon A Rodriguez

having satisfactorily completed the requirements prescribed by
the Commissioner of Education is thereby entitled to this

High School Equivalency Diploma

In Witness Whereof the Regents issue this diploma
under seal of the University at Albany in

August 2009

Interim Commissioner of Education
and President of the University

W02584579

University of the State of New York
THE STATE EDUCATION DEPARTMENT
High School Equivalency Programs & GED Testing
P.O.Box 7348
Albany, New York 12224-0348

## NEW YORK STATE HIGH SCHOOL EQUIVALENCY DIPLOMA TRANSCRIPT

You have earned satisfactory scores * on the GED Tests and have been awarded a New York State
High School Equivalency diploma.

| | Test Center Number | 055 |
| | Test Date | 07/21/2009 |
| | GED ID Number | 348294 |
| | Provided ID Number | 079761124 |
| | Date of Birth | 1982 |
| | Diploma Number | W02584579 |
| | Date Issued | 08/12/2009 |

Ramon A Rodriguez

3675 Broadway  Apt 4H
New York NY 10031

|  | Test Scores |
|---|---|
| Language Arts - Writing | 500 |
| Social Studies | 490 |
| Science | 490 |
| Language Arts - Reading | 480 |
| Mathematics | 420 |
| Total | 2380 |

* 410 minimum score for each subject  and 2250
minimum total score required

This transcript is produced for:   **Ramon A Rodriguez**

ISSI) 199 (13TC)

# Exhibit J

# Office of the Registrar

2001 Oriental Boulevard Brooklyn New York 11235
www.kbcc.cuny.edu

THIS RECORD MAY NOT BE RELEASED TO ANY OTHER PARTY WITHOUT
THE WRITTEN CONSENT OF THE STUDENT. PURSUANT TO THE FAMILY
EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974 AS AMENDED.

Page 1 of 1

## Official Undergraduate Transcript

Name:  Ramon Rodriguez
Student ID:

Print Date:  12/04/2014
SSN:  XXX-XX-1124
Birthdate:  08/21

Send To:  STEPHANIE, ESQ THE BRONX DEFENDERS
STEPHANIE LOPEZ, ESQ
360 E. 161ST STREET
BRONX, NY 10451

------ Beginning of Undergraduate Kingsborough CC Record ------

### 2010 SP
Business Administration Major
Regular Academic Session (03/01/2010 - 05/31/2010)

| Course | | Description | Attempt | Earn | Grd |
|---|---|---|---|---|---|
| ART | 3100 | Visual Experience | 3.00 | 3.00 | B |
| Req Designation: | | Flexible Core - Creative Expression | | | |
| ENG | 93A9 | Dev Comp In Writing | 0.00 | 0.00 | B |
| HPE | 1200 | Concepts/Wellness | 3.00 | 3.00 | B |
| POL | 5100 | American Government | 3.00 | 3.00 | C |
| Req Designation: | | Flexible Core - US Experience in its Diversity | | | |

Second Session (06/01/2010 - 08/15/2010)

| Course | | Description | Attempt | Earn | Grd |
|---|---|---|---|---|---|
| MAT | M100 | Basic Mathematics | 0.00 | 0.00 | W |
| PSY | 1100 | General Psychology | 3.00 | 3.00 | B |
| Req Designation: | | Flexible Core - Scientific World | | | |

| | | Attempt | Earn |
|---|---|---|---|
| Term GPA: | 2.250 | Term Total: | 12.00 | 12.00 |

### 2010 FA
Business Administration Major
Regular Academic Session (09/01/2010 - 12/22/2010)

| Course | | Description | Attempt | Earn | Grd |
|---|---|---|---|---|---|
| BA | 1100 | Fndmtls Of Business | 3.00 | 3.00 | C+ |
| BA | 6000 | Intro Comp Concepts | 3.00 | 3.00 | O+ |
| BEH | 8200 | Beh Career Seminar | 1.00 | 1.00 | B |

Second Session (01/02/2011 - 02/28/2011)

| Course | | Description | Attempt | Earn | Grd |
|---|---|---|---|---|---|
| ENG | 1200 | English I | 3.00 | 3.00 | B |
| Req Designation: | | Required Core - English Composition | | | |

| | | Attempt | Earn |
|---|---|---|---|
| Term GPA: | 2.280 | Term Total: | 10.00 | 10.00 |

------ Cumulative Totals ------

| | | | | Attempt | Earn |
|---|---|---|---|---|---|
| Cum GPA: | 2.263 | | Cum Total: | 22.00 | 22.00 |
| Transfer Cum GPA: | 0.000 | | Transfer Total: | 0.00 | 0.00 |
| Comb Cum GPA: | 2.263 | | Comb Total: | 22.00 | 22.00 |

End of Official Undergraduate Transcript

The official transcript does not require a raised seal.

Registrar

# Exhibit K

U.S. Department of Homeland Security

**Notice to Appear**

## In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID : 283001030

DOB: ~~~~~/1982

File No: ~~~~~ 05 073

Event No: NYC1002001137

In the Matter of:
Ramon A. RODRIGUEZ

Respondent: _____ currently residing at:

3675 BROADWAY Apt 4H , NEW YORK NEW YORK 10031

(Number, street, city and ZIP code)                    (Area code and phone number)

☐ 1. You are an arriving alien.

☐ 2. You are an alien present in the United States who has not been admitted or paroled.

☒ 3. You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:
   See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:
   See Continuation Page Made a Part Hereof

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:  ☐ 8CFR 208.30(f)(2)  ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:
TO BE CALENDARED AND NOTICE PROVIDED BY THE OFFICE OF THE IMMIGRATION COURT.

_____
(Complete Address of Immigration Court, including Room Number, if any)

on  a date to be set   at  a time to be set  to show why you should not be removed from the United States based on the
      (Date)                (Time)

charge(s) set forth above.                 M 4524 MCGINNITY        Supervisory Deportation Officer
                                           (Signature and Title of Issuing Officer)

Date:  September 30, 2013        New York, NY

                                           (City and State)

See reverse for important information

Form I-862 (Rev. 08/01/07)

U.S. Department of Homeland Security

Continuation ⟶ ge for Form ___1862___

| Alien's Name | File Number | Date |
|---|---|---|
| Ramon A. RODRIGUEZ | A⬛⬛⬛5 073<br>Event No: NYC1002001137 | September 30, 2013 |

THE SERVICE ALLEGES THAT YOU:
===============================
1. You are not a citizen or national of the United States;
2. You are a native of DOMINICAN REPUBLIC and a citizen of DOMINICAN REPUBLIC;
3. You were admitted to the United States at NEW YORK CITY, NEW YORK on or about November 1, 1989, as a LAWFUL PERMANENT RESIDENT;
4. You were convicted of the crime of Attempted Criminal Possession of a Controlled Substance in the Fourth Degree, to-wit: Crack Cocaine in violation of Section 110-220.09 of the New York State Penal Law pursuant to a judgment entered on or about September 19, 2007 in Supreme Court of the State of New York, County of New York under case number 04731-2006.
5. You were convicted of the crime of Criminal Possession of Marijuana in the Fifth Degree, in violation of Section 221.10 of the New York State Penal Law pursuant to a judgment entered on or about November 1, 2007 in Criminal Court in the City of New York, County of New York under docket number 2007NY082624.

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
===============================================================================

Section 237(a)(2)(B)(i) of the Immigration and Nationality Act, as amended, in that, at any time after admission, you have been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in Section 102 of the Controlled Substances Act, 21 U.S.C. 802), other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

| Signature<br>M 4524 MCGINNITY | Title<br>Supervisory Deportation Officer |
|---|---|

___3___ of ___3___ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents, which you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or removable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of departure voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the DHS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to one of the offices listed in 8 CFR 241.16(a). Specific addresses on locations for surrender can be obtained from your local DHS office or over the internet at http://www.ice.gov/about/dro/contact.htm. You must surrender within 30 days from the date the order becomes administratively final, unless you obtain an order from a Federal court, immigration court, or the Board of Immigration Appeals staying execution of the removal order. Immigration regulations at 8 CFR 241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Act.

### Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to a 10-day period prior to appearing before an immigration judge.

Before: _(Signature and Title of Immigration Officer)_ DO 4248

_(Signature of Respondent)_

Date: 9/26/14

### Certificate of Service

This Notice To Appear was served on the respondent by me on 9/26/14 , in the following manner and in compliance with section 239(a)(1)(F) of the Act.

[X] in person   [ ] by certified mail, returned receipt requested   [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _English_ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_(Signature of Respondent if Personally Served)_   _(Signature and Title of Officer)_

DEPARTMENT OF HOMELAND SECURITY
**NOTICE OF CUSTODY DETERMINATION**

Alien's Name:   RAMON A. RODRIGUEZ

A-File Number: ____5-073

Date: 09/26/2014

Event ID: NYC1409000559

Subject ID: 351179744

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

☒ Detained by the Department of Homeland Security.

☐ Released (check all that apply):

    ☐ Under bond in the amount of  $ _____

    ☐ On your own recognizance.

    ☐ Under other conditions. [Additional document(s) will be provided.]

M 4524  MCGINNITY
Name and Signature of Authorized Officer

SDDO
Title

09/26/2014 11:19
Date and Time of Custody Determination
ERO New York Field Office
26 FEDERAL PLAZA 9TH FLOOR
NEW YORK NY 10278
Office Location/Address

---

You may request a review of this custody determination by an immigration judge.

☒ I acknowledge receipt of this notification, and

    ☒ I do request an immigration judge review of this custody determination.

    ☐ I do not request an immigration judge review of this custody determination.

Signature of Alien

9/26/14
Date

---

The contents of this notice were read to   RAMON A. RODRIGUEZ   in the   ENGLISH   language.
                                                     (Name of Alien)                       (Name of Language)

L 3757  KUBICZ
Name and Signature of Officer

Name or Number of Interpreter (if applicable)

DO
Title

DHS Form I-286 (1/14)

Page 1 of 1

# Exhibit L

# Repository Inquiry

To: ryanr1 For: Robert Ryan Case No:042265073 FBI Number - [redacted] CRI

New York State Division of Criminal Justice Services
Alfred E. Smith Building, 80 South Swan St.
Albany, New York 12210. Tel:1-800-262-DCJS
Michael C.Green, Executive Deputy Commissioner of the NYS Division of Criminal Justice Services

Identification Summary Criminal History Job/License Wanted Missing NCIC/III

## Attention - Important Information

* See **Additional Information** at the bottom of this response for more banners pertaining to the criminal history

**This NYSID Number 2090204L was used previously and is now reassigned to this individual.**

**DNA PROFILE IS ON FILE IN THE DNA DATABANK** If more information is required call DCJS Office of Forensic Services at 1-800-262-3257

## Identification Information

Cycle 1
Arrest Date August 23, 2006

**Name:**
RAMON RODRIGUEZ

**Date of Birth:**
[redacted] 1982

**Place of Birth :**
New York Dominican Republic Unknown

**Address:**
3675 BROADWAY, MANHATTAN, NY
3675 B DWAY APT 4H, NEW YORK, NY 10031

| **Sex:** | **Race:** | **Ethnicity:** | **Skin Tone:** |
|---|---|---|---|
| Male | Black | Hispanic | Light |
| **Eye Color:** | **Hair Color:** | **Height:** | **Weight:** |
| Brown | Black | 5' 06" | 130 |

**SSN:**
[redacted]1124

**NYSID#:** [redacted] **FBI#:** [redacted] **Probation Client ID#:** [redacted] **NCIC Classification#:**

**III Status:** Criminal record in other states or in multiple FBI files for NYS

**US Citizen:** No

## Summary Information

**Total Arrests:** 2 **Date of Earliest Arrest:** August 23, 2006 **Latest Prior Arrest Date:** October 31, 2007

| | |
|---|---|
| **Total Arrests:** | 2 |
| **Felony:** | 1 |

| | |
|---|---|
| **Total Arraigned Arrests:** | 2 |
| **Felony:** | 1 |

| | | |
|---|---|---|
| **Total Open Cases:** | 0 | Cycles (max 5) |
| **Felony:** | 0 | |

| Violent Felony: | 0 | | Violent Felony: | 0 | | Violent Felony: | 0 | |
|---|---|---|---|---|---|---|---|---|
| Firearm: | 0 | | Firearm: | 0 | | Misdemeanor: | 0 | |
| Misdemeanor: | 1 | | Misdemeanor: | 1 | | Open ACD: | 0 | |
| Other: | 0 | | Other: | 0 | | Non Docketed Cases: | 0 | |
| | | | | | | Other: | 0 | |

| Total Convictions: | 2 | Cycles (max 5) | Warrant Information: | | Cycles (max 5) | DOC Classification: | | Cycles (max 5) |
|---|---|---|---|---|---|---|---|---|
| Felony: | 1 | 1 | Failure to Appear Counts: | 0 | | Escape Charges: | 0 | |
| Violent Felony: | 0 | | Total Open: | 0 | | Sex Offender Convictions: | 0 | |
| Firearm: | 0 | | Active NYC: | 0 | | Probation Revoc: | 0 | |
| Misdemeanor: | 1 | 2 | | | | Parole Revoc: | 0 | |
| Other: | 0 | | | | | | | |
| YO Adjud.: | 0 | | | | | | | |

## ◉ NYS Criminal History Information

### ⬇ Cycle 2

## Arrest/Charge Information
Arrest Date: October 31, 2007 02:20 pm (14:20:00)

| | |
|---|---|
| Name: | RAMON RODRIGUEZ |
| Date of Birth: | August 21, 1982 |
| Sex: | Male |
| Race: | Black |
| Ethnicity: | Hispanic |
| Age at time of crime/arrest: | 25 |
| Address: | 3675 BROADWAY, MANHATTAN, NY |
| Fax Number: | M76267 |
| Place of Arrest: | NYCPD 30 |
| Arrest Type: | Unknown |
| Date of Crime: | October 31, 2007 |
| Place of Crime: | NYCPD 30 |
| Criminal Justice Tracking No.: | 59605492J |
| Arresting Agency: | NYCPD PCT 030 |
| Arresting Officer ID: | 930588 |
| Arrest Number: | M07694411 |

Arrest Charges:

    -- Criminal Possession Of Marihuana-5th Degree:In A Public Place
        PL 221.10    Sub 01   Class B Misdemeanor Degree 5 NCIC 3562

    -- Unlawful Possession Of Marihuana
        PL 221.05                Violation      Degree 0 NCIC 3562

## Court Case Information

--Court: New York County Criminal Court   Case Number: 2007NY082624

    November 01, 2007
    **Initial Report Of Docket Number**

    November 01, 2007
    **Arraigned**
        -- Criminal Possession Of Marihuana-5th Degree:In A Public Place

PL 221.10     Sub 01    Class B   Misdemeanor    NCIC 3562

November 01, 2007
Convicted Upon Plea Of Guilty - Conviction Date: November 01, 2007
-- Criminal Possession Of Marihuana-5th Degree:In A Public Place
PL 221.10       Sub 01    Class B   Misdemeanor   NCIC 3562

Sentenced to:   Term: 5 Day(s) License Suspended 6 Month(s)
Sentence Date: November 01, 2007

November 01, 2007
Not Arraigned
-- Unlawful Possession Of Marihuana
PL 221.05    Violation NCIC 3562

## Cycle 1 ⬆

**Arrest/Charge Information**
Arrest Date: August 23, 2006 02:55 pm (14:55:00)

| | |
|---|---|
| Name: | RAMON RODRIGUEZ |
| Date of Birth: | August 21, 1982 |
| Sex: | Male |
| Race: | Black |
| Ethnicity: | Hispanic |
| Age at time of crime/arrest: | 24 |
| Address: | 3675 BROADWAY, MANHATTAN, NY |
| Fax Number: | M54447 |
| Place of Arrest: | NYCPD 30 |
| Arrest Type: | Unknown |
| Date of Crime: | August 23, 2006 |
| Place of Crime: | NYCPD 30 |
| Criminal Justice Tracking No.: | 58282943J |
| Arresting Agency: | NYCPD PCT 030 |
| Arresting Officer ID: | 906780 |
| Arrest Number: | M06666382 |

Arrest Charges:
-- Criminal Possession Contr Sub-3rd:Narc Drug Intent To Sell
PL 220.16    Sub 01   Class B Felony Degree 3  NCIC 3599

**Court Case Information**

--Court: New York County Criminal Court   Case Number: 2006NY057128

August 24, 2006
Initial Report Of Docket Number

August 24, 2006
Arraigned
-- Criminal Possession Narcotic Drug-4th Degree
PL 220.09    Sub 01   Class C Felony NCIC 3599

September 12, 2006

Transferred To Superior Court
    -- Criminal Possession Narcotic Drug-4th Degree
       PL 220.09    Sub 01  Class C Felony NCIC 3599

September 12, 2006
 Not Arraigned
    -- Criminal Possession Contr Sub-3rd:Narc Drug Intent To Sell
       PL 220.16        Sub 01     Class B  Felony  NCIC 3599

September 15, 2006
 Transferred To New York Special Narcotics Court
--Court: New York County Supreme Court    Case Number: 04731-2006

September 13, 2006
 Initial Report Of Docket Number

September 27, 2006
 Arraigned
    -- Criminal Possession Narcotic Drug-4th Degree
       PL 220.09   Sub 01  Class C Felony NCIC 3532

April 23, 2007
 Convicted Upon Plea Of Guilty - Conviction Date: April 23, 2007
    -- Attempted Criminal Possession Narcotic Drug-4th Degree
       PL 220.09        Sub 01     Class D   Felony   NCIC 3599

      In Full Satisfaction of:
    -- Criminal Possession Narcotic Drug-4th Degree
       PL 220.09 Sub01  Class C Felony NCIC 3532

   Sentenced to:  Probation: 5 Year(s) License Suspended 6 Month(s)
   Sentence Date: September 19, 2007

Interim release Status: Released on own recognizance (ROR)

Incarceration/Supervision Information

**Probation Information**

| | |
|---|---|
| Name: | RAMON RODRIGUEZ |
| Sex: | Male |
| Race: | White |
| Ethnicity: | Not Hispanic |
| Address: | 3675 B DWAY APT 4H, NEW YORK, NY 10031 |
| Placed on Probation: | September 19, 2007 |
| Max Expiration Date: | September 18, 2012 |
| Supervision Agency: | New York County Probation Adult Investigations |
| Jurisdiction Agency: | New York County Probation Adult Investigations |
| Probation Officer ID: | COMPLETE |
| Probation Registration Number: | 3415768 |
| Probation Case Number: | NS0772290 |
| Probation Discharge Date: | September 18, 2012 |
| Discharge Type: | Maximum Expiration |

Certificate of Relief

| | |
|---|---|
| **Certificate of Relief** | |
| **Agency:** | New York County Supreme Court |
| **Date:** | September 19, 2007 |
| **Permanency Date:** | September 18, 2012 |
| **Issue Type:** | A |
| **Relief Description:** | Relieves holder of all forfeitures, all disabilities and bars to employment, excluding right to retain or be eligible for public office; certificate issued at time of sentence. |

**◉ Other History Related Information**

There is no Other History Related Information associated with this history.

**◉ Job/License Information**

There is no Job/License Information associated with this history.

**◉ Wanted Information**

There is no NYS Wanted Information associated with this history.

**◉ Missing Person Information**

There is no NYS Missing Information associated with this history.

**◉ Additional Information**

Sentencing - Where an individual is sentenced June 1, 1981 or later on more than one charge within a docket, the sentence may be considered to be concurrent unless identified as consecutive.

Caution: Identification not based on fingerprint comparison. This record was produced as the result of an inquiry.

Multi-Source - Subject has information maintained by other states or in multiple NYS files maintained by the FBI available through the Interstate Identification Index. Refer to FBI Number: ▇▇▇▇▇▇

*Federal NCIC, III and/or FBI Response*

The outstanding response(s) indicated below will be forwarded to your in-box upon receipt by DCJS. If you do not receive one or more of the indicated responses, please contact that state or agency directly.

New York

FBI - Criminal Justice

**◉ NCIC Information**

The following information is provided in response to your request for a search of the NCIC - Person Files based on:

| | |
|---|---|
| Name: | RODRIGUEZ, RAMON |
| Sex: | Male |
| Race: | Black |
| Date of Birth: | August 21, 1982 |
| Social Security number: | ▇▇▇▇124 |
| FBI number: | ▇▇▇▇▇▇ |

NYICE07S0

NO NCIC WANT FBI ▇▇▇▇▇▇
NO NCIC WANT SOC ▇▇▇▇124

```
NO NCIC WANT NAM/RODRIGUEZ,RAMON DOB/███████ RAC/B SEX/M
***MESSAGE KEY QWA SEARCHES ALL NCIC PERSONS FILES WITHOUT LIMITATIONS.
```

## o NCIC Protection Order

The following information is provided in response to your request for a search of the NCIC - Protection Order File based on:

| | |
|---|---|
| Name: | **RODRIGUEZ, RAMON** |
| Sex: | **Male** |
| Race: | **Black** |
| Date of Birth: | ████1982 |
| Social Security number: | ███124 |
| FBI number: | ██████ |

```
NYICE07S0

NO NCIC PROTECTION ORDER FILE RECORD FBI/███████████
NO NCIC PROTECTION ORDER FILE RECORD SOC/██████124
NO NCIC PROTECTION ORDER FILE RECORD NAM/RODRIGUEZ,RAMON DOB/███████ RAC/B
SEX/M
```

## o III Information

The following information is provided in response to your request for a search of the III based on:

| | |
|---|---|
| FBI number: | ██████ |
| Name: | **RODRIGUEZ, RAMON** |

```
NYICE07S0
THIS INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
RECORD REQUEST FOR FBI/███████INDIVIDUAL'S RECORD WILL BE
COMPLETE WHEN ALL RESPONSES ARE RECEIVED FROM THE FOLLOWING SOURCES:
  FBI           - FBI/████████████
  NEW YORK      - STATE ID/██████
END
```

**WARNING:** Release of any of the information presented in this computerized Case History to unauthorized individuals or agencies is prohibited by federal law TITLE 42 USC 3771b.
This report is to be used for this one specific purpose as described in the Use and Dissemination Agreement your agency has on file with DCJS. **Destroy after use and request an updated rap sheet for subsequent needs.**
All information presented herein is as complete as the data furnished to DCJS.

# Exhibit M

Stephanie F. Lopez, Esq.                                    DETAINED
EOIR# RM166841
The Bronx Defenders
360 East 161st Street
Bronx NY 10451


## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## OFFICE OF THE IMMIGRATION JUDGE
## NEW YORK, NEW YORK

------------------------------------------------
                                        )
In the Matter of                        )
                                        )
   **RODRIGUEZ, RAMON**                  )        A#█████5-073
                                        )
- Respondent                            )
------------------------------------------------


**Immigration Judge Page**            Next Hearing:  **December 12, 2014**

**Respondent's Motion for Bond Redetermination and Supporting Exhibits**

DHS/ICE
OFFICE OF CHIEF COUNSEL
201 VARICK ST. N.Y.
2014 DEC - 1  PM 12: 56

## MOTION FOR BOND HEARING AND MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

Respondent Ramon Rodriguez, by undersigned counsel, hereby respectfully moves this Court to set a bond of $1500 so that he may continue to fight these removal proceedings while at liberty. Mr. Rodriguez was taken into Immigration and Customs Enforcement ("ICE") custody on or about September 26, 2014 from his home. *See* Notice of Custody Determination, Exhibit A. He is currently detained at Hudson County Jail. Mr. Rodriguez has two criminal convictions. Exhibit B, Certificates of Disposition. On August 23, 2006 he was arrested and on April 23, 2007 he pled to Attempted Criminal Possession of a Controlled Substance in the fourth degree NYPL § 110/220.09 and on October 31, 2007, he was arrested and pled to criminal possession of marijuana in the fifth degree NYPL § 221.10 on November 1, 2007. *See id.* For the attempted criminal possession of a controlled substance he was given five years probation, which he completed and for the possession of marijuana conviction he was sentenced to five days of imprisonment. *See id.* More than seven years after his conviction, Mr. Rodriguez was taken into ICE custody after having fully reintegrated into society. Ex. A. The government's position is apparently that his convictions make him ineligible for bond. Since 2007, Mr. Rodriguez was able to successfully re-integrate into society, primarily getting his High School Equivalency ("GED") degree, attending an out-patient drug rehabilitation program for seven months and enrolling and attending college and also working throughout these years. *See* Exhibit C, Certificate for High school Equivalency degree, Exhibit D, Letter from NRI showing completion of out-patient program, Exhibit E, Interboro Institute transcript, Exhibit F, Respondent's tax transcripts from 2009- 2013, Exhibit G- Affidavit from Ramon Rodriguez Sr., ¶¶ 10-14, Exhibit

H, Affidavit from Richard Ramirez, ¶¶ 7-22, Exhibit I, Affidavit from Zoraida Rodriguez, ¶¶10-11; Exhibti J, Affidavit from Eduardo Ramirez, ¶¶ 4-7.

After Mr. Rodriguez's most recent conviction in 2007, he was released into the community, where he went to school, worked and integrated fully into society. *See id.* While this Court is bound to apply the BIA's holding in *Matter of Rojas*, 23 I & N Dec. 117 (BIA 2001), Respondent wishes to preserve for appellate review his contention that *Rojas* was wrongly decided, as numerous courts have found. As detailed below, the government's application of mandatory detention in this case is plainly contrary to their statutory authority. Moreover, Mr. Rodriguez's continued detention raises serious constitutional concerns.

The Immigration and Nationality Act ("INA") authorizes immigration officials to arrest, detain, and release immigrants pending their removal proceedings upon an individualized assessment for bond, parole, or other forms of supervised release. *See* INA § 236(a). An exception to this general authority to release applies to a narrow subset of immigrants who are detained by immigration officials "when . . . released" from criminal custody for certain enumerated offenses. INA § 236(c) (commonly referred to as "mandatory detention"). DHS apparently alleges that Respondent is among the limited class of persons who are subject to mandatory detention under INA § 236(c).

Mandatory detention is unlawful as applied to Mr. Rodriguez because he was plainly not detained by immigration officials "when . . . released" from criminal custody what was related to the basis for mandatory detention, as the INA requires. *See* INA § 236(c). The statute contemplates release from criminal custody that is "directly tied to the basis for detention under sections 236(c)(1)(A)-(D) of the Act." *Matter of Garcia-Arreola*, 25 I. & N. Dec. 267 (BIA 2010). Instead, Mr. Rodriguez came into ICE custody seven years months after his alleged

conviction for offenses included in § 236(c)(1)(B). His mandatory detention also raises serious constitutional concerns, given his substantial challenges to removability because of his eligibility for cancellation of removal and the strong possibility of prolonged detention beyond constitutional limits. Given that Mr. Rodriguez's continued detention is not in the public interest, he should be released.

For any or all of these reasons, this Court should grant Mr. Rodriguez a nominal bond so that he may pursue his immigration case while at liberty.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I. Mr. Rodriguez's Life Before Detention

Mr. Rodriguez first came to the United States when he was seven years old as a legal permanent resident from the Dominican Republic. He had a challenging childhood. In his early adulthood, his mother was deported. Many close friends and family noticed a big difference in him. Ex. G, ¶ 9, Ex. H, ¶ 12. On August 23, 2006 he was arrested and he pled to attempted criminal possession of a controlled substance NYPL § 110/220.09. Additionally, on October 31, 2007 he was arrested and he pled to possession of marijuana NYPL § 221.10. After his release in 2007, Mr. Rodriguez enrolled and completed a drug rehabilitation program voluntarily. *See* Ex. D. He successfully completed probation for five years. Although he dropped out of High School, he obtained his High School Equivalent degree in 2009, *See* Exhibit K, Respondent's school transcript of Park West High School; Exh. C. He also enrolled in a college program at Interboro Institute and Kingsborough but was unable to complete the program. *See* Exh. E. Moreover, he lived in the community worked and filed taxes and also cared for his family and friends. *See* Ex. F.

3

## II. Mr. Rodriguez's Detention and Procedural History

On or about September 26, 2014, DHS took custody of Mr. Rodriguez in his home in Staten Island, seven years after his last conviction and years after successfully completing probation. He has been detained since then, as ICE appears to assert that Mr. Rodriguez is subject to mandatory detention under § 236(c). Mr. Rodriguez faces removal proceedings at Varick Street Immigration Court, 201 Varick Street, New York, New York, for which he has retained undersigned counsel.

Mr. Rodriguez's first immigration court hearing took place on October 7, 2014 at Varick Street Immigration Court and the case was adjourned to December 12, 2014 for another master calendar hearing and bond hearing.

## STATUTORY BACKGROUND

The primary issue in this case involves the proper reading of the detention statute, INA § 236. Section INA § 236 (a) provides in relevant part:

(a) Arrest, detention, and release. On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. *Except as provided in subsection (c)* and pending such decision, the Attorney General—
    (1) may continue to detain the arrested alien; and
    (2) may release the alien on—
        (A) bond of at least $ 1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
        (B) conditional parole . . . .

INA § 236 (a) (emphasis added). INA § 236 (c)(1) provides:

(c) Detention of criminal aliens.
    (1) The Attorney General shall take into custody any alien who
        (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
        (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii),(B), (C), or (D) of this title,
        (C) is deportable under section 1227(a)(2)(A)(I) of this title on the basis of an offense for which the alien has been sentence to a term of

4

imprisonment of at least 1 year, or
(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

INA § 236 (c)(1) (emphasis added). INA § 236(c)(2) states that the Attorney General may only release noncitizens "described in paragraph [INA § 236(c)(1)]" if the release is "necessary to provide protection to a witnesses," and other witness-related provisions. INA § 236(c)(2).

Read in total, INA § 236 provides the Attorney General with the authority to arrest, detain, and release immigrants pending removal proceedings, except for a specified class who are detained when released from custody for certain enumerated offenses. Those individuals, described in INA § 236(c)(1), are subject to mandatory, no-bond detention pending their removal.

In this case, Respondent does not contest DHS's authority to detain him under INA § 236(a) which would permit them to provide him a bond hearing to determine whether he should be released on bond, conditional parole, or reasonable release conditions. Respondent contests his classification as a noncitizen subject to mandatory detention under § INA § 236(c).

## ARGUMENT

### I. DHS' Mandatory Detention of Respondent Violates INA § 236.

Statutorily, Mr. Rodriguez is not subject to mandatory detention under 236(c). Mr. Rodriguez was not detained by immigration officials "when . . . released" from criminal custody for a removable offense enumerated in the statute. *See* INA 236(c). Instead, he was detained by officials from the Department of Homeland Security (DHS) seven years after his most recent conviction in his home in Staten Island. At the time he was arrested by ICE, he had completed

5

probation, completed a drug treatment program, obtained a GED diploma, obtained college credits as well as worked in the community.

## A. Mr. Rodriguez Is Not Subject to Mandatory Detention Because He Was Not Detained "When . . . Released" From Criminal Custody.

The primary issue in this case involves DHS's misreading of the "when . . . released" clause. The mandatory detention statute provides in relevant part that the Attorney General "shall take into custody an alien who is deportable by reason of having committed any [enumerated offense] *when the alien is released* . . . . for the same offense." INA § 236(c) (emphasis added). The majority of federal courts have held that the statute limits mandatory detention to individuals who are detained at or around the time they are released from criminal custody for their removable offenses. *See, e.g., Anderson v. ICE Field Office Dir.*, No. C13–281 MJP, 2013 WL 4049007, at *2 (W.D. Wash. Aug. 9, 2013) (noting "an avalanche of district court rulings" in line with this interpretation (quoting *Burns v. Cicchi*, 702 F. Supp. 2d 281, 287 (D.N.J. 2010)); *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180-181 (S.D.N.Y. 2009); *see also* Point II.A.1, *infra*. DHS, however, takes the position that individuals may be subject to mandatory detention any time after release from criminal custody for a removable offense.

DHS presumably bases its contrary view on *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001). In *Matter of Rojas*, the Board of Immigration Appeals ("BIA") held that the mandatory detention statute applies regardless of how long ago an immigrant was released from criminal custody for a removable offense. *See id.* at 127. Though the BIA held that the "when . . . released" clause in § 236(c) "does direct the Attorney General to take custody of aliens immediately upon their release from criminal confinement," *id.* at 122, it determined the clause was a "statutory command" rather than a "description of an alien who is subject to detention." Therefore, mandatory detention could apply to noncitizens days, months, or even years their

6

release from criminal custody. *See id.* at 121, 122. Seven BIA members dissented in *Matter of Rojas*, finding this distinction implausible. *See id.* at 134 (Rosenberg, Member, dissenting).

DHS now seeks to apply the BIA's flawed reasoning to deprive Respondent of any bond hearing, despite detaining him even years after this most recent conviction. *See* Ex B. Respondent respectfully submits that the BIA's reasoning is contrary to the plain, unambiguous language and proper statutory interpretation of INA. § 236; and alternatively submits that to the extent the statute is ambiguous the BIA's interpretation of it is unreasonable and leads to arbitrary and unjust results. Respondent had successfully reintegrated into society before he was taken into ICE custody. *See generally* Ex. C - J. Mr. Rodriguez is simply not the type of person Congress contemplated with it created the detention mandate after having been out in the community without any incidents.

1. **The plain language of the statute unambiguously provides that mandatory detention applies only to individuals who are detained on or about the time they are released from criminal custody for an enumerated offense.**

Congress used unambiguous language to limit mandatory detention to noncitizens who have been detained "when . . . released" from criminal custody for an enumerated offense. Several federal district courts in this Circuit have held that the plain meaning of § 236(c)(1) applies mandatory detention only if an immigrant is detained *"on or about the time* he is released from custody for the offense that renders him removable." *Monestime v. Reilly*, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010) (emphasis added) (quoting *Garcia v. Shanahan*, 615 F. Supp. 2d 175,

7

180-181 (S.D.N.Y. 2009)).[1] Similarly, the majority of federal courts have rejected *Matter of Rojas* as contrary to Congress's unambiguous intent in laying out the detention scheme.[2]

Courts have reached this conclusion in part because of the plain language of the mandatory detention statute. In *Scarlett v. U.S. Dep't of Homeland Sec.*, the court explained:

> [T]he clear language of the statute indicates that the mandatory detention of aliens 'when' they are released requires that they be detained at the time of release. [I]f Congress had intended for mandatory detention to apply any time after they were released, it could easily have used the language 'after the alien is released,' 'regardless of when the alien is released,' or other words to that effect.

632 F. Supp. 2d 214, 219 (W.D.N.Y. 2009) (quoting *Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1224 (W.D. Wash. 2004)); *see also Deluis-Morelos v. ICE Field Office Dir*, No. 12CV–1905JLR, 2013 WL 1914390, at *6 (W.D. Wash. May 8, 2013) ("'When' is not subject to multiple constructions. . . . the term 'when the alien is released' implies a certain immediacy); *Aparicio v. Muller*, No. 11-cv-0437 (RJH) (S.D.N.Y. Apr. 7, 2011).

Based on this plain reading, Respondent does not fall within § 236(c) because he was not

---

[1] *See also Jean v. Orsino*, No. 11 Civ. 3682 (LTS) (S.D.N.Y. June 30, 2011) (attached as Appendix A); *Aparicia v. Muller*, No. 11–cv–0437 (RJH) (S.D.N.Y. Apr. 7, 2011) (attached as Appendix A); *Lauisaire v. Muller*, 758 F. Supp. 2d 229, 236 (S.D.N.Y. 2010); *Manestime v. Reilly*, 704 F. Supp. 2d at 458; *Scarlett v. U.S. Dep't af Homeland Sec.*, 632 F. Supp. 2d 214 (W.D.N.Y. 2009). *But see, e.g., Jahnson v. Orsino*, No. 12 Civ. 6913(PKC), 2013 WL 1767740, at * 6 (S.D.N.Y. Apr. 24, 2013); *Santana v. Muller*, No. 12 Civ. 430(PAC), 2012 WL 951768, at *4 (S.D.N.Y. Mar. 21, 2012); *Mendozo v. Muller*, No. 11 Civ. 7857(RJS), 2012 WL 252188, at *3 (S.D.N.Y. Jan. 25, 2012); *Gomez v. Napolitano*, No. 11-cv-1350(JSR), 2011 WL 2224768, at *3 (S.D.N.Y. May 31, 2011); *Sulayao v. Shanahan*, No. 09 Civ. 7347(PKC), 2009 WL 3003188, at *5 (S.D.N.Y. Sept. 15, 2009).

[2] *See, e.g., Castañeda v. Sauza*, 952 F. Supp. 3d 307 (1st Cir. 2014) (finding that mandatory detention did not apply to aliens already released); *Gomez-Romirez v. Asher*, No. C13–196–RAJ, 2013 WL 2458756, at *3 (W.D. Wash. June 5, 2013) (same); *Bacquera v. Longshore*, No. 13–cv–00543–RM–MEH, 2013 WL 2423178, at *4 (D. Colo. June 4, 2013) (same); *Deluis-Morelos v. ICE Field Office Dir.*, No. 12CV–1905JLR, 2013 WL 1914390, at *5 (W.D. Wash. May 8, 2013); (same); *Dighera-Castaneda v. Napolitano*, No. 2:12–cv–2367 DAD, 2013 WL 1091230, at *7 (E.D. Cal. Mar. 15, 2013) (same); *Bogarin-Flores v. Napolitano*, No. 12cv0399 JAH(WMc), 2012 WL 3283287, at *3 (S.D. Cal. Aug. 10, 2012) (same); *Ortiz v. Holder*, No. 2:11CV1146 DAK, 2012 WL 893154, at *3 (D. Utah Mar. 14, 2012) (same); *Scarlett v. U.S. Dep't af Homeland Sec.*, 632 F. Supp. 2d 214, 219 (W.D.N.Y. 2009) (same). *But see Sylvain v. Atty. Gen. of the United States*, 714 F.3d 150, 161 (3d Cir. 2013) (refusing to decide whether the statute is ambiguous and finding mandatory detention applicable to those not detained "when . . . . released"); *Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012) (finding the word "when" ambiguous and deferring to *Motter af Rojas*).

8

detained "when . . . released" from custody for an enumerated offense. Rather, Mr. Rodriguez

was detained seven years after his alleged deportable offense and many years after completing

probation. *See* Exh. B.

2. **The traditional tools of statutory construction confirm that mandatory detention applies only to individuals detained on or about the time of their release from criminal custody for an enumerated offense.**

Principles of statutory construction also point to Congress's unambiguous intent to

restrict mandatory detention only to individuals taken into DHS custody at or around the time of

their release from criminal custody.[3]  By contrast, the government's interpretation gives the

"when . . . released" clause no meaning, ignores the overall statutory scheme which generally

provides for individualized bond hearings for noncitizens pending removal proceedings, and

leads to absurd results that are antithetical to Congressional intent.

First, DHS' interpretation is contrary to "a cardinal principle of statutory construction

that a statute should, upon the whole, be construed so that, if possible, no clause, sentence or

word is rendered superfluous, void or insignificant." *TRW v. Andrews*, 534 U.S. 19, 31 (2001)

(internal quotation marks omitted).  If § 236(c) is read to apply regardless of whether the

immediacy requirement is satisfied, the phrase is superfluous. *See Scarlett*, 632 F. Supp. 2d at

219. As one court explained:

> [DHS's reading] would doom the clause to 'removable surplus' . . . To read the statute in
> a manner that allows the Attorney General to take a criminal alien into custody without
> regard to the timing of the alien's release from custody would render the 'when the alien
> is released' clause redundant and therefore null.

*Khodr*, 697 F. Supp. 2d at 779; *see also Deluis-Morelos*, 2013 WL 1914390, at *6; *Aparicio v.*

*Muller*, No. 11-cv-0437 (RJH) (S.D.N.Y. Apr. 7, 2011)

---

[3] Under step one of *Chevron*, a court must analyze the plain language of a statute *and* apply the "traditional tools of statutory construction" to determine if the intent of Congress is clear.  467 U.S. at 842-843.  Thus, assuming the *Chevron* analysis applies in the habeas context, DHSs' position does not survive step one of the *Chevron* test.

9

Second, DHS's interpretation fails to consider the phrase "when . . . released" within the context of the statutory provision and the statutory scheme as a whole. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998) ("A statute is to be considered in all its parts when construing any one of them."). DHS asserts that the "when . . . released" clause is not part of the description of individuals subject to mandatory detention. *See Matter of Rojas*, 23 I&N Dec. at 121-122. However, § 236(c) contains two paragraphs that together outline the mandatory detention scheme. INA §236(c). Paragraph (2) ("Release") permits the release of "an alien described in paragraph (1)" only in limited circumstances. Paragraph (1), in turn, is one long sentence that as a whole describes those noncitizens who may not be released. The "when . . . released" clause is a temporal element of the description in paragraph (1) that modifies the enumerated "offenses" triggering mandatory detention. *See Castillo v. ICE Field Office Dir.*, 907 F. Supp. 2d 1235, 1240 (W.D. Wash. 2012) ("The 'when released' provision immediately follows the list of enumerated offenses, indicating that the former modifies the latter." (quoting *Saysana v. Gillen*, 590 F.3d 7, 14 (1st Cir. 2009)). One cannot stop reading the statute just before the "when" clause and still give full meaning to the provision. Thus, "an alien described in section (c)(1)" must mean one who has been detained "when . . . released" from physical criminal custody. INA 236(c)(2).

Moreover, the narrow construction of INA §236(c) is consistent with the overall immigration detention scheme. Congress gave immigration officials the broad authority under INA §236(a) to detain *and release* noncitizens facing removal, including people with past criminal convictions. Section 236(c) is an exception to this general rule. *See* INA §236(a) ("Except as provided in paragraph (1) . . ."); *see Castaneda*, 952 F. Supp. 3d 307, 315 ("Congress intended that aliens taken into custody typically receive a bond hearing; it then

10

provided an exception in certain cases—certain criminal aliens who have been picked up by ICE immediately upon release from their custodial sentence should not be bonded out or paroled into our communities no matter the circumstances.") (*aff'd*, 952 F. Supp. 3d 307 (1st Cir. 2014)). Essentially eliminating any substantive meaning for the "when . . . released" clause permits the exception—mandatory detention under discrete circumstances—to swallow the rule: immigration officials' general discretion to detain and release based on individualized assessment. *See Gomez-Ramirez*, 2013 WL 2458756, at *3; *Matter of Patel*, 15 I. & N. Dec. (BIA 1976) (setting forth the general rule that noncitizens should not be detained unless they are flight risks or dangerous).

By ignoring this statutory scheme, DHS's advance a reading of the statute that is contrary to its purpose. Congress enacted mandatory detention to prevent incarcerated immigrants from being released and evading removal proceedings for that offense, not to deny bond hearings to individuals who reintegrate into the community and are later placed in removal proceedings for a past offense. As the First Circuit explained:

> The mandatory detention provision does not reflect a general policy in favor of detention; instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply. . . . When the government has delayed several years before arresting an alien, the presumption of dangerousness and flight risk is eroded by the years in which the alien lived peaceably in the community.

*Casataneda v. Souza*, 769 F.3d 32, 43 (1st Cir. 2014) *(Citing Saysana v. Gillen*, 590 F.3d 7, 17 (1st Cir. 2009)). Mandatory detention fails to serve Congress's "focused purpose" when applied to individuals who have long since been released from their allegedly removable offenses. *See Saysana v. Gillen*, 590 F.3d 7, 17 (1st Cir. 2009). This view of Congress's more limited purpose for mandatory detention is reflected in its legislative history. *See Quezada-Bucio*, 317 F. Supp. 2d at 1229; *see also* S. Rep. No.104-48, at 21 (1995) (discussing a concern with removable

11

immigrants about to be released from incarceration).[4]

Third, DHS's reading of the statute is also contrary to the rule that statutes must be construed to avoid "absurd results." *See Lockhart v. Napolitano*, 573 F.3d 251, 260 (6th Cir. 2009) (citing *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509–10 (1989). Under DHS's reading of the statute, if a person spends one day in physical custody for an enumerated offense after the statute's effective date of October 9, 1998, the government would be *required* to detain the individual without bond at taxpayers' expense for as long as it takes to resolve their immigration case, even if removal proceedings commenced as much as sixteen years after criminal custody terminated. The statute should be construed to avoid such absurdities.

Fourth, the statute should be construed to avoid serious constitutional concerns. Incarcerating noncitizens years after their release from criminal custody after they have reintegrated into the community severs the link between mandatory detention and its purpose of preventing flight and protecting public safety, leading to due process concerns. *See* Point I.A, *supra*. The statute should be construed to avoid such results. *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). Fifth, if the statute is susceptible to multiple constructions, courts should apply the immigration rule of lenity, "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987).

All of the ordinary tools of statutory construction thus point to the unambiguous meaning of the mandatory detention statute: it applies only to noncitizens who are detained by immigration officials on or around their release from criminal custody for enumerated offenses.

---

[4] Had Congress intended to predicate mandatory detention only on whether a person has been convicted of certain removable offenses it could have easily done so. Indeed, Congress has authorized mandatory detention without any "when . . . released" requirement in other parts of the INA. *See* INA § 236A(a) (requiring the detention of terrorist noncitizens pending removal proceeding).

12

Those who have returned to their communities and are detained years later are instead subject to discretionary detention and release under INA § 236(a). In this case, Mr. Rodriguez was detained seven years after his last alleged conviction for a removable offense. As such, he properly falls under INA§ 236(a), not INA § 236(c).

### 3. The Third and Fourth Circuits' contrary decisions rely on a fundamental misconception of the statue and the government's authority to detain.

Though the First Circuit and the majority of district courts have rejected the government's reasoning, the Third and Fourth Circuits have adopted the government's position. The arguments of these courts are unpersuasive in light of the analysis above.

First, in *Hosh v. Lucero*, the Fourth Circuit deferred to *Matter of Rojas* based on its view that § 236 (c) was ambiguous. 680 F.3d 375, 379–380 (4th Cir. 2012). However, as courts outside the Fourth Circuit have pointed out, the *Hosh* court misapplied *Chevron*; it considered "when," in the phrase "when. . . released," to be the ambiguous word that triggered deference, but then invoked *Chevron* to defer to the BIA's interpretation of the language "described in paragraph (1)" as used in § 236(c)(2). *Bacquera*, 2013 WL 2423178, at *5. However, *Chevron* "requires deference to an agency's interpretation of *specific* ambiguous terms." *Id*. Furthermore, *Hosh* omits discussion of the statutory context and fails to apply the "traditional tools of statutory construction" required under *Chevron* step one. *Chevron*, 467 U.S. at 843 n.9; *see Hosh*, 680 F.3d at 381 n.7 (refusing to address arguments about the "surplussage" canon). Given the lack of persuasive reasoning in the *Hosh* opinion, courts elsewhere have largely rejected it. *See, e.g., Bacquera*, 2013 WL 2423178, at *5 ("Presumably because of the inadequacy of the analysis in

13

*Matter of Rojas* and the dearth of analysis in *Hosh* itself, *Hosh* has had little persuasive impact beyond the Fourth Circuit, where it is binding precedent").[5]

More recently, a panel of the Third Circuit adopted the government's position without resolving the statutory meaning. *Sylvain v. Atty. Gen. of the United States*, 714 F.3d 150, 157 (3d Cir. 2013). In *Sylvain*, the panel held that regardless of the language of the statute, the government does not lose its authority to subject a noncitizen to mandatory detention due to its delay in pursuing such detention. *Id.* at 158-61. The court relied on *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990), where the Supreme Court held that the government's failure to comply with a first appearance requirement for a criminal defendant "did not defeat the Government's authority to seek detention of the person charged." *Id.* at 717. Analogizing to the instant issue, the Third Circuit held that the government should not suffer a "severe penalty"— losing the authority to mandatorily detain—because its failure to detain at the time of release. *Sylvain*, 714 F.3d at 159 (citing *Montalvo-Murillo*, 495 U.S. at 720).

In the short period since the decision, *Sylvain*'s reasoning has been sharply criticized by district courts in other circuits. *See, e.g., Deluis-Morelos*, 2013 WL 1914390, at *6 ("[T]he case the Third Circuit relied on in *Sylvain* does not support ICE's argument . . ."). These courts have rightly declared *Montalvo-Murillo* "completely inapposite" to § 236 because the government here does not lose its authority to detain. *Gomez-Ramirez*, 2013 WL 2458756, at *5. Rather, the government *retains* its authority to detain while *gaining* authority to release, in the government's own discretion through a bond hearing. *See Castaneda*, 769 F.3d at 49. If the government holds a

---

[5] *See also Castaneda*, 2013 WL 3353747, at *8 (rejecting the reasoning in *Hosh*); *Gamez-Ramirez v. Asher*, 2013 WL 2458756 (W.D. Wash. June 5, 2013) (same); *Dighero-Castaneda v. Napolitana*, No. 2:12–cv–2367 DAD, 2013 WL 1091230 (E.D. Cal. Mar. 15, 2013) (same); *Espinoza v. Aitken*, No. 5:13–cv–00512 EJD, 2013 WL 1087492 (N.D. Cal. Mar. 13, 2013) (same); *Snegirev v. Asher*, No. C12–1606MJP, 2013 WL 942607 (W.D. Wash. Mar. 9, 2013) (same). *But see Cisneras v. Napolitana*, No. 13–700 (JNE/JJK), 2013 WL 3353939 (D. Minn. July 3, 2013); *Johnson* 2013 WL 1767740; *Silent v. Halder*, No. 4:12–cv–00075–IPJ–HGD, 2012 WL 4735574 (N.D. Ala. Sep. 27, 2012).

14

bond hearing and concludes that the Respondent is a flight risk or danger, the government need not release him. *See Matter of Urena*, 25 I. & N. Dec. 140, 141 (BIA 2009); *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). Thus, the underlying concern in *Montalvo-Murillo* that a detainee would be released despite a conclusion that the person was a flight risk or danger to community would not materialize in this scenario. *See Marin-Salazar v. Asher*, No. C13–96–MJP–BAT, 2013 WL 1499047, at *5 (W.D. Wash. Mar. 21, 2013).

Here, Respondent does not challenge DHS's authority to hold him, but simply requests an individualized determination of whether or not he is a flight risk or danger to the community. *See Castillo*, 907 F. Supp. 2d 1235, 1240 ("[T]his case is about providing due process to an individual, not taking away a benefit from the government").

### 4. Even if the "when . . . released" clause were ambiguous, DHS's position is unreasonable.

Even Courts that have found the statute ambiguous and reviewed the government's interpretation under the lenient standard of *Chevron* have found the agency's interpretation unreasonable. *See, e.g., Louisaire*, 758 F. Supp. 2d at 238; *see also Garcia*, 615 F. Supp. 2d at 183.[6]

First, the agency's implausible interpretation arbitrarily draws a line through § 236(c)(1). The agency's view is that the "when . . . released" clause is not part of the "description" of noncitizens subject to mandatory detention. *See Matter of Rojas*, 23 I&N Dec. at 121, 122. As the numerous dissenters in *Matter of Rojas* noted, such a distinction is unsupported. *See id.* at 134 (Rosenberg, dissenting). If Congress wanted to ensure that the "when . . . released" clause

---

[6] It is also clear that *Chevron* deference does not apply to agency constructions of statutes that define the bounds of the agency's scope of authority or would otherwise create serious constitutional concerns. *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 227 & n.6 (2001). Judicial deference is unwarranted in the detention context due to the historic significance of the writ of habeas corpus as a check on executive detention power. *See Zadvydas v. Davis*, 533 U.S. at 700.

15

was not part of the "description" of noncitizens subject to mandatory detention, it could have done so by referring in § 236(c)(2) to immigrants "described in paragraph (1)(A)-(D)" rather than immigrants "described in paragraph (1)"). *See Aparicio v. Muller*, No. 11-cv-0437 (RJH) (S.D.N.Y. Apr. 7, 2011).

Second, the agency's interpretation leads to arbitrary and capricious results. Under the agency's view, anyone who at any time has been in custody for an enumerated offense within the last fifteen years is subject to mandatory detention at whatever point in the future DHS chooses to detain them. Thus, individuals who have long ago reintegrated into their communities would be subjected to the harshest form of detention. This runs contrary to the Congressional purpose of mandatorily detaining those who are categorical "bail risks." *See Saysana*, 590 F.3d at 17-18 ("[I]t is counter-intuitive to say that aliens with potentially longstanding community ties are, as a class, poor bail risks. . . . By any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be.").

## II. DHS's Mandatory Detention of Respondent Violates the U.S. Constitution.

As described below, DHS's mandatory detention of Mr. Rodriguez violates his right to due process under the Fifth Amendment, which prohibits deprivation of liberty absent due process of law, in several respects. U.S. CONST. amend. V. Courts have long recognized that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas* 533 U.S. at 690 (2001).

Several aspects of Mr. Rodriguez's mandatory detention raise serious due process concerns. First, the circumstances of Mr. Rodriguez's detention violate the Due Process Clause, his seven years as a valuable member of the community, render his mandatory detention

unrelated to the narrow purpose of § 236(c). Second, Mr. Rodriguez's detention raises constitutional concerns because he has a substantial challenge to removability. Third, Mr. Rodriguez's strong likelihood of additional months of detention render his mandatory detention unreasonable and thus unconstitutional under the Due Process Clause.

### A. Mr. Rodriguez's Detention Does Not Bear A Reasonable Relationship To The Purpose Of § 236(c), And Thus Violates The Due Process Clause.

The Due Process Clause permits detention when it bears a reasonable relationship to its twin regulatory aims of ensuring the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690–691 (2001) ("Where detention's goal is no longer practically attainable, detention no longer bear[s] [a] reasonable relation to its purpose for which the individual [was] committed." (citations omitted)); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 233–234 (3d Cir. 2011). In *Demore v. Kim*, the Supreme Court held that mandatory detention of an individual who had conceded removability was constitutional for the brief period necessary to complete the individual's removal proceedings. 538 U.S. 510, 531 (2003). However, the Supreme Court has never authorized a reading of the statute that would permit DHS to detain noncitizens without bond in cases where flight risk and danger cannot be reasonably presumed. *See id.* at 533 (Kennedy, J., concurring) ("If the government cannot satisfy [the threshold burden of showing the relationship between detention and its purpose] then permissibility of continued detention . . . turns solely upon the alien's ability to satisfy ordinary bond procedures . . . ."); *Diop*, 656 F.3d. at 232 n.10. Arguably, categorical detention of some noncitizens without bond under § 236(c) is reasonable because by virtue of being held in criminal custody they are presumably deportable and a flight risk. In contrast, noncitizens such as Mr. Rodriguez, who have spent years building local community ties after convictions of alleged removable offenses, are no longer obviously

17

dangerous to the community or at risk of flight. *See* Exh. E-K. When, as in this case, detention

occurs nearly a year after a conviction, "DHS can only determine whether [the respondent] poses

a risk of flight or danger to the community through an individualized bond hearing." *Monestime*

704 F. Supp. 2d at 458 (citing *Zadvydas*, 533 U.S., at 690). Denying individualized

determinations to those not detained "when. . .released" from criminal custody is a radical

expansion of no-bond categorical detention, which threatens the due process interests of many

noncitizens.

**B.    Mr. Rodriguez Has a Substantial Challenge to Removability and Thus His
         Mandatory Detention Violates the Due Process Clause.**

As described *Infra* Section III, Mr. Rodriguez has a substantial challenge to his

removability as he is likely eligible for relief for cancellation of removal for legal permanent

residents. In *Demore v. Kim*, Justices expressed due process concerns with the mandatory

detention of individuals who had substantial claims against their removability. *See, e.g., id.* at

532 (Kennedy, J., concurring); *id.* at 577 (Breyer, J., concurring in part and dissenting in part)

(stating that due process concerns would arise if the detainee had substantial challenges to

removability). This flows from the purpose of § 236(c): to ensure that incarcerated individuals

are not released into the public when their ultimate deportation is nearly certain.

Since *Demore*, several federal courts have recognized that the mandatory detention of

individuals with substantial challenges to removability would raise due process concerns. *See,*

*e.g., Tijani v. Willis*, 430 F.3d 1241, 1247 (9th Cir. 2005) (Tashima, J., concurring; *Gonzales v.*

*O'Connell*, 355 F.3d 1010, 1020 (7th Cir. 2004); *Bourguignon v. MacDonald*, 667 F. Supp. 2d

175 (D. Mass 2009). Because he has a claim for relief, subjecting Respondent to mandatory

detention denies him his liberty without due process of law.

18

### III.   Mr. Rodriguez Is Neither a Flight Risk nor Danger to the Community

At his bond hearing Mr. Rodriguez will demonstrate that he should be released on his own recognizance or on a nominal bond because he is neither a flight risk nor a danger to the community. Mr. Rodriguez has continuously resided in the United States for most of his life-- approximately twenty five years and calls no other country home.

Mr. Rodriguez has many family members, friends and community ties in the United States who continue to support him. His father and his six sisters are in the United States and have proven to be a source of support for Mr. Rodriguez despite a difficult upbringing. Since his 2007 convictions, Mr. Rodriguez enrolled in a drug treatment program voluntarily and successfully completed five years of probation. Additionally, he obtained his GED and college credits at Interboro Institute and Kingsborough Community College. He has worked at many jobs in the service industry interacting with people to support himself economically. After working, Mr. Rodriguez filed taxes from 2009 through 2013. Moreover, he has sustained himself economically since he moved out of his family's home after the turmoil they faced when his mother was deported. Despite the challenges he has confronted because of his convictions, Mr. Rodriguez was determined to change his life around and in past seven years has successfully obtained a better life for himself through education and work, incident free. His past convictions are not a reflection on who he is today. For seven years Mr. Rodriguez has successfully reintergrated into society and is therefore clearly not a danger to the community.

Furthermore, he is eligible for cancellation of removal for legal permanent residents. Mr. Rodriguez has been a legal permanent resident (he arrived as an LPR when he was seven years old) for at least five years and has seven years of continuous presence. Additionally, he has no conviction that would make him an aggravated felon and ineligible for relief. Mr. Rodriguez

19

turned his life around after his convictions and worked many years on gaining an education and work experience. There is absolutely no incentive for Mr. Rodriguez to abscond from these proceedings because (a) he is eligible for and has a strong claim to relief and (b) has the strong support of family members in the United States.

## CONCLUSION

Based on all of the foregoing reasons, Mr. Rodriguez respectfully requests that this Court grant him a minimal bond. Mr. Rodriguez is indigent and cannot afford to pay a high bond. He is neither a flight risk nor danger to the community. As such, neither continued detention nor high bond is necessary to ensure his appearance at his removal hearings or to protect the public. He respectfully requests that at the conclusion of the hearing this Court exercise its discretion to release him on his own recognizance or, in the alternative, set a bond of $1,500.

Respectfully submitted,

Stephanie F. Lopez
The Bronx Defenders

Dated: December 1, 2014
Bronx, NY

20

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK, NY

------------------------------------------------

|  |  |
|---|---|
| In the Matter of | ) IN REMOVAL<br>) PROCEEDINGS<br>) |
| **RODRIGUEZ, Ramon** | ) A#████5073<br>) |
| Respondent | ) |

------------------------------------------------

## DOCUMENTS IN SUPPORT OF MOTION FOR BOND REDETERMINATION

<u>Notices</u>
    A. Notice of Custody Determination

<u>Information Pertaining to Respondent's Criminal History</u>

    B. **Certificates of Disposition for Respondent's Arrests**
- 2006NY 057128
- 2007NY082624

<u>Information Pertaining to Respondent's Community Ties and rehabilitation</u>

    C. **Certificate granting him his High School Equivalency Diploma**
    D. **Letter from NRI confirming attendance in Drug Rehabilitation Program**
    E. **Transcript,** Interboro Institute
    F. **Respondent's Tax Transcripts, from 2009-2013**
    G. **Affidavit from Ramon Rodriguez Sr., Respondent's father**
    H. **Affidavit by Richard Ramirez, Respondent's long-time friend.**
    I. **Affidavit by Zoraida Rodriguez, Respondent's youngest sister.**
    J. **Affidavit by Eduardo Ramirez, Respondent's long-time friend.**
    K. **Respondent's high school transcript**

**Certificate of Service**

Dated: 12/1/14
Bronx, NY

Respectfully submitted,

Stephanie F. Lopez, Esq.
Counsel for Mr. Rodriguez

DEPARTMENT OF HOMELAND SECURITY
## NOTICE OF CUSTODY DETERMINATION

A-File Number: ████████5-073

Alien's Name: RAMON A. RODRIGUEZ

Date: 09/26/2014

Subject ID: ████9744

Event ID: NYC1409000559

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be

[X] Detained by the Department of Homeland Security.

[ ] Released (check all that apply)

  [ ] Under bond in the amount of $ _____

  [ ] On your own recognizance.

  [ ] Under other conditions. [Additional document(s) will be provided.]

M 4524  MCGINNITY
Name and Signature of Authorized Officer

SDDO
Title

09/26/2014 11:19
Date and Time of Custody Determination
ERO New York Field Office
26 FEDERAL PLAZA 9TH FLOOR
NEW YORK NY 10278
Office Location/Address

You may request a review of this custody determination by an immigration judge.

  [X] I acknowledge receipt of this notification, and

    [X] I do request an immigration judge review of this custody determination.

    [ ] I do not request an immigration judge review of this custody determination.

Signature of Alien

9/26/14
Date

The contents of this notice were read to    RAMON A. RODRIGUEZ    in the    ENGLISH    language.
(Name of Alien)                                              (Name of Language)

L 3757  KUBICZ
Name and Signature of Officer

Name or Number of Interpreter (if applicable)

DO
Title

DHS Form I-286 (1/14)

SUPREME COURT OF THE STATE OF NEW YORK       NO FEE
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION INDICTMENT

DATE: 10/23/2014                    CERTIFICATE OF DISPOSITION NUMBER: 40064

PEOPLE OF THE STATE OF NEW YORK       CASE NUMBER:            04731-2006
                VS.                   LOWER COURT NUMBER(S):  2006NY057128
                                      DATE OF ARREST:         08/23/2006
                                      ARREST #:               M06666382
                                      DATE OF BIRTH:          ███████/1982
RODRIGUEZ,RAMON                       DATE FILED:             09/11/2006

_____
          DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 04/23/2007 THE ABOVE NAMED DEFENDANT WAS
CONVICTED OF THE CRIME(S) BELOW BEFORE JUSTICE  WILEY,M THEN A
JUSTICE OF THIS COURT.

ATTEMPTED CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE 4th DEGREE
  PL  110-220.09 01 DF (DANGEROUS DRUG)

THAT ON 09/19/2007, UPON THE AFORESAID CONVICTION BY PLEA  THE HONORABLE
WILEY,M  THEN A JUDGE OF THIS COURT, SENTENCED THE DEFENDANT
TO

ATTEMPTED CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE 4th DEGREE
  PL  110-220.09 01 DF (DANGEROUS DRUG)
  LICENSE SUSPENDED = 6 MONTH(S)
  PROBATION = 5 YEAR(S)


CVAF = $20  (JUDGMENT ORDERED)
DNA  = $50  (JUDGMENT ORDERED)
SURCHARGE = $250 (JUDGMENT ORDERED)



IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 10/23/2014.

_____
          COURT CLERK

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATE OF DISPOSITION
NUMBER:  381012

THE PEOPLE OF THE STATE OF NEW  YORK
                    VS

RODRIGUEZ,RAMON A
Defendant

_____████/1982_____
Date of Birth

3675 BROADWAY
Address

_____2090204L_____
NYSID Number

MANHATTAN            NY  10031
City              State  Zip

_____10/31/2007_____
Date of Arrest/Issue

Docket Number: 2007NY082624

Summons No:

221.10
Arraignment Charges

Case Disposition Information:

| Date | Court Action | Judge | Part |
|---|---|---|---|
| 11/01/2007 | PLED GUILTY & SENTENCE IMPOSED | KOENDERMAN,E | APAR2 |
|  | PG 221.10 |  |  |
|  | IMPRISONMENT=5D |  |  |
|  | LICENSE SUSPENDED=6M |  |  |

O FEE CERTIFICATION

GOVERNMENT AGENCY      _ COUNSEL ASSIGNED

NO RECORD OF ATTORNEY READILY AVAILABLE. DEFENDANT STATES COUNSEL WAS ASSIGNED

SOURCE  _ ACCUSATORY INSTRUMENT  _ DOCKET BOOK/CRIMS  _ CRC3030[CRS963]

     I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN
THIS COURT.

FANELLI,R
COURT OFFICIAL SIGNATURE AND SEAL

10/23/2014
DATE

FEE: NONE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT
     SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

The University of the

# State of New York

## Education Department

The

Be it known that

**Ramon A Rodriguez**

having satisfactorily completed the requirements prescribed by
the Commissioner of Education is thereby entitled to this

## High School Equivalency Diploma

In Witness Whereof the Regents issue this diploma
under seal of the University at Albany in

Interim Commissioner of Education
and President of the University

August 2009

W02584579

v 06 14 11:28a                        Shorty

University of the State of New York
THE STATE EDUCATION DEPARTMENT
High School Equivalency Programs & GED Testing
P.O.Box 7348
Albany, New York 12224-0348

## NEW YORK STATE HIGH SCHOOL EQUIVALENCY DIPLOMA TRANSCRIPT

You have earned satisfactory scores * on the GED Tests and have been awarded a New York State
High School Equivalency diploma.

| | Test Center Number | 055 |
| | Test Date | 07/21/2009 |
| | GED ID Number | 348294 |
| | Provided ID Number | 079761124 |
| | Date of Birth | ▆▆/1982 |
| | Diploma Number | W02584579 |
| | Date Issued | 08/12/2009 |

| | Test Scores |
|---|---|
| Language Arts - Writing | 500 |
| Social Studies | 490 |
| Science | 490 |
| Language Arts - Reading | 480 |
| Mathematics | 420 |
| **Total** | 2380 |

*Ramon A Rodriguez*
*3675 Broadway  Apt 4H*
*New York NY 10031*

* 410 minimum score for each subject  and 2250
minimum total score required

This transcript is produced for:   **Ramon A Rodriguez**

1212967?056

p.4

(2/02) 199 FISH

NRI GROUP LLC
301 W. 37TH
4TH FLOOR
New York, NY 10018
212-967-0770

October 27, 2014

Ms. Stephanie Lopez,

Regarding our conversation today of the treatment history of Mr. Ramon Rodriquez.
Our records indicate he was a client in our Outpatient Treatment Unit on W.51st. He was
enrolled from 9/5/2008 to 4/8/2009 and successfully completed.

That unit has since closed and the actual records are not available,

If I can be of further assistance contact me at the address or number below.

Joseph Ripple

Medical Records
NRI GROUP LLC
212-967-0770

# OFFICIAL ACADEMIC DOCUMENT

## Interboro Institute

450 West 56th Street
New York, NY 10019
www.interboro.com

Date: 6/26/2009

**Student:** Ramon Rodriguez   **Student ID:** ████   **DOE#:** ████   **Original Start Date:** 9/26/2005   **Student GPA:** 1.75

Page 1 of 1

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| ACC101 | Principles of Accounting I | 3.00 | 0.00 | F | 0.00 |
| BIO100 | Biology | 3.00 | 3.00 | B- | 9.96 |
| ECO121 | Principles of Microeconomics | 3.00 | 3.00 | F | 0.00 |
| EN101 | English Composition I | 3.00 | 3.00 | B+ | 9.90 |
| GS120 | | 3.00 | 3.00 | B | 9.00 |
| MA140 | College Algebra and Trigonometry | 3.00 | 3.00 | B | 9.00 |

**Program:** Management
**Enrollment #:** RO05535844
**Start Date:** 9/26/2005

**Term:** Fall 2005    Student: Withdrew   Date: 9/10/2006

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| DS140 | Introduction to Computer Technology | 3.00 | 0.00 | W | 0.00 |
| EN098 | Developmental English Writing | 0.00 | 0.00 | W | 0.00 |
| FS100 | Freshman Seminar | 0.00 | 0.00 | W | 0.00 |
| MA099 | Developmental Mathematics I | 0.00 | 0.00 | W | 0.00 |

**Term:** Spring 2006    Cum GPA: 2.00

**Term:** Summer 2007    Cum GPA: 1.75

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| ACC101 | Principles of Accounting II | 3.00 | 0.00 | W | 0.00 |
| BA205 | Principles of Marketing | 3.00 | 0.00 | W | 0.00 |
| CS241 | Introduction to Computer Technology | 3.00 | 0.00 | W | 0.00 |
| ECO122 | Principles of Macroeconomics | 3.00 | 0.00 | W | 0.00 |
| EN101 | English Composition I | 3.00 | 0.00 | W | 0.00 |

**Term:** Spring 2006

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| SPH101 | Speech Communication | 3.00 | 3.00 | B+ | 9.90 |

**Term:** Spring 2007

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| BA105 | Introduction to Business | 3.00 | 3.00 | D+ | 3.60 |
| EN098 | Developmental English – Reading | 0.00 | 0.00 | S | 0.00 |
| MA099 | Developmental Mathematics II | 0.00 | 0.00 | R | 0.00 |

**Term GPA:** 1.80    Cum GPA: 1.75

| Course Code | Course Description | Credits Attempted | Credits Earned | Grade | Quality Points |
|---|---|---|---|---|---|
| ACC100 | Principles of Accounting | 3.00 | 3.00 | C- | 6.10 |
| BA101 | Introduction to Business | 3.00 | 3.00 | C | |
| EN098 | Developmental English | 0.00 | 0.00 | | |
| BA100 | Business Law | 3.00 | 0.00 | | |

**Authorized Signature** _[signature]_   **Date** 12/12/14

### OFFICIAL TRANSCRIPT

### FOR YOUR EXCLUSIVE USE

### DO NOT FORWARD

*" Indicates Repeated Course
R Indicates Repeated Course Override

* Indicates Pass/Fail Course
# Indicates Associated Course

Not an Official unless signed by registrar.

COPY APPEARS ACROSS FACE OF ENTIRE DOCUMENT WHEN PHOTOCOPIED • LIQUID BLEACH TURNS OFFICIAL PAPER BROWN

121296730566

# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 11-14-2014
Response Date: 11-14-2014
Tracking Number: 100218925538

Account Transcript

FORM NUMBER: 1040A            TAX PERIOD: Dec. 31, 2009

TAXPAYER IDENTIFICATION NUMBER:            -1124

RAMON A RODRIGUEZ


--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---


ACCOUNT BALANCE:          0.00
ACCRUED INTEREST:         0.00          AS OF: Apr. 22, 2013
ACCRUED PENALTY:          0.00          AS OF: Apr. 22, 2013

ACCOUNT BALANCE
   PLUS ACCRUALS
   (this is not a
   payoff amount):       0.00


++ INFORMATION FROM THE RETURN OR AS ADJUSTED ++


EXEMPTIONS:               02
FILING STATUS:            Head of Household
ADJUSTED GROSS
      INCOME:             8,432.00
TAXABLE INCOME:           0.00
TAX PER RETURN:           0.00
SE TAXABLE INCOME
      TAXPAYER:           0.00
SE TAXABLE INCOME
      SPOUSE:             0.00
TOTAL SELF
      EMPLOYMENT TAX:     0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)  Apr. 15, 2010
PROCESSING DATE                                               Feb. 22, 2010

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|---------------------------|-------|------|--------|
| 150 | Tax return filed | 20100608 | 02-22-2010 | $0.00 |
|  | ▓▓▓▓▓▓▓▓▓320-0 |  |  |  |
| 806 | W-2 or 1099 withholding |  | 04-15-2010 | -$239.00 |
| 766 | Credit to your account |  | 04-15-2010 | -$400.00 |
| 766 | Credit to your account |  | 04-15-2010 | -$815.00 |
| 768 | Earned income credit |  | 04-15-2010 | -$2,865.00 |
| 846 | Refund issued |  | 02-22-2010 | $4,319.00 |

This Product Contains Sensitive Taxpayer Data

# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 11-14-2014
Response Date: 11-14-2014
Tracking Number: 100218925538

Account Transcript

FORM NUMBER: 1040          TAX PERIOD: Dec. 31, 2010

TAXPAYER IDENTIFICATION NUMBER:          ████-1124

RAMOH A RODRIGUEZ

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:          0.00
ACCRUED INTEREST:         0.00          AS OF: Apr. 22, 2013
ACCRUED PENALTY:          0.00          AS OF: Apr. 22, 2013

ACCOUNT BALANCE
    PLUS ACCRUALS
    (this is not a
    payoff amount):       0.00

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

EXEMPTIONS:               02
FILING STATUS:            Head of Household
ADJUSTED GROSS
    INCOME:               6,945.00
TAXABLE INCOME:           0.00
TAX PER RETURN:           0.00
SE TAXABLE INCOME
    TAXPAYER:             0.00
SE TAXABLE INCOME
    SPOUSE:               0.00
TOTAL SELF
    EMPLOYMENT TAX:       0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)   Apr. 15, 2011
PROCESSING DATE                                                Mar. 14, 2011

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|---------------------------|-------|------|--------|
| 150 | Tax return filed | 20110908 | 03-14-2011 | $0.00 |
|  | ████████312-1 |  |  |  |
| 806 | W-2 or 1099 withholding |  | 04-15-2011 | -$232.00 |
| 766 | Credit to your account |  | 04-15-2011 | -$400.00 |
| 766 | Credit to your account |  | 04-15-2011 | -$592.00 |
| 768 | Earned income credit |  | 04-15-2011 | -$2,355.00 |
| 846 | Refund issued |  | 03-14-2011 | $3,579.00 |

This Product Contains Sensitive Taxpayer Data

# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 11-14-2014
Response Date: 11-14-2014
Tracking Number: 100218925538

Account Transcript

FORM NUMBER: 1040                      TAX PERIOD: Dec. 31, 2011

TAXPAYER IDENTIFICATION NUMBER:              -1124

RAMON A RODRIGUEZ


--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---


ACCOUNT BALANCE:          0.00
ACCRUED INTEREST:         0.00           AS OF: Apr. 22, 2013
ACCRUED PENALTY:          0.00           AS OF: Apr. 22, 2013

ACCOUNT BALANCE
   PLUS ACCRUALS
   (this is not a
   payoff amount):       0.00


++ INFORMATION FROM THE RETURN OR AS ADJUSTED ++


EXEMPTIONS:              02
FILING STATUS:           Head of Household
ADJUSTED GROSS
   INCOME:               7,690.00
TAXABLE INCOME:          0.00
TAX PER RETURN:          270.00
SE TAXABLE INCOME
   TAXPAYER:             2,031.00
SE TAXABLE INCOME
   SPOUSE:               0.00
TOTAL SELF
   EMPLOYMENT TAX:       270.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)   Apr. 15, 2012
PROCESSING DATE                                                Feb. 20, 2012

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | Amount |
|------|---------------------------|-------|------|--------|
| 150 | Tax return filed | 20120602 | 02-20-2012 | $270.00 |
| | ████████181-2 | | | |
| 806 | W-2 or 1099 withholding | | 04-15-2012 | -$383.00 |
| 766 | Credit to your account | | 04-15-2012 | -$704.00 |
| 768 | Earned income credit | | 04-15-2012 | -$2,610.00 |
| 846 | Refund issued | | 02-20-2012 | $3,427.00 |

This Product Contains Sensitive Taxpayer Data

# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 11-14-2014
Response Date: 11-14-2014
Tracking Number: 100218925538

Account Transcript

FORM NUMBER: 1040A                  TAX PERIOD: Dec. 31, 2012

TAXPAYER IDENTIFICATION NUMBER:            -1124

RAMON RODRIGUEZ
80 BROAD ST
STATEN ISLAND, NY 10304-2610-805

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:           0.00
ACCRUED INTEREST:          0.00            AS OF: Apr. 22, 2013
ACCRUED PENALTY:           0.00            AS OF: Apr. 22, 2013

ACCOUNT BALANCE
   PLUS ACCRUALS
   (this is not a
   payoff amount):        0.00

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

EXEMPTIONS:                02
FILING STATUS:             Head of Household
ADJUSTED GROSS
   INCOME:                 12,315.00
TAXABLE INCOME:            0.00
TAX PER RETURN:            0.00
SE TAXABLE INCOME
   TAXPAYER:               0.00
SE TAXABLE INCOME
   SPOUSE:                 0.00
TOTAL SELF
   EMPLOYMENT TAX:         0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)   Apr. 15, 2013

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150 | Tax return filed | 20130805 | 03-11-2013 | $0.00 |
| | ████████████126-3 | | | |
| 806 | W-2 or 1099 withholding | | 04-15-2013 | -$1,130.00 |
| 766 | Credit to your account | | 04-15-2013 | -$1,000.00 |
| 768 | Earned income credit | | 04-15-2013 | -$3,169.00 |
| 846 | Refund issued | | 03-11-2013 | $5,299.00 |

This Product Contains Sensitive Taxpayer Data

# Internal Revenue Service
## United States Department of the Treasury

This Product Contains Sensitive Taxpayer Data

Request Date: 11-14-2014
Response Date: 11-14-2014
Tracking Number: 100218925538

Account Transcript

FORM NUMBER: 1040A          TAX PERIOD: Dec. 31, 2013

TAXPAYER IDENTIFICATION NUMBER:          ██████-1124

RAMON RODRIGUEZ
80 BROAD ST
STATEN ISLAND, NY 10304-2610-805

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:        0.00
ACCRUED INTEREST:       0.00          AS OF: Mar. 03, 2014
ACCRUED PENALTY:        0.00          AS OF: Mar. 03, 2014

ACCOUNT BALANCE
   PLUS ACCRUALS
   (this is not a
   payoff amount):     0.00

++ INFORMATION FROM THE RETURN OR AS ADJUSTED ++

EXEMPTIONS:             02
FILING STATUS:          Head of Household
ADJUSTED GROSS
   INCOME:              8,548.00
TAXABLE INCOME:         0.00
TAX PER RETURN:         0.00
SE TAXABLE INCOME
   TAXPAYER:            0.00
SE TAXABLE INCOME
   SPOUSE:              0.00
TOTAL SELF
   EMPLOYMENT TAX:      0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)  Apr. 15, 2014

TRANSACTIONS

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150 | Tax return filed | 20140605 | 02-24-2014 | $0.00 |
| | ▬▬▬▬▬▬▬746-4 | | | |
| 806 | W-2 or 1099 withholding | | 04-15-2014 | -$973.00 |
| 766 | Credit to your account | | 04-15-2014 | -$832.00 |
| 768 | Earned income credit | | 04-15-2014 | -$2,899.00 |
| 846 | Refund issued | | 02-24-2014 | $4,704.00 |

This Product Contains Sensitive Taxpayer Data

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK, NY

-----------------------------------------------

In the Matter of

    **RODRIGUEZ, Ramon**

Respondent

-----------------------------------------------

)
)
)
)
)
)
)

IN REMOVAL
PROCEEDINGS

A#██████5073

## AFFIDAVIT OF RAMON RODRIGUEZ SR. IN SUPPORT OF RAMON RODRIGUEZ'S REQUEST FOR BOND REDERMINATION

1. My name is Ramon Antonio Rodriguez Jimenez. I was born on ████████████, 1945 in Vicente Noble, Barahona, Dominican Republic. I am the father of Ramon Rodriguez, as well as of his six sisters – Evelin, Celeny, Priscilla, Nancy, Angie and Zoraida. I know that my son Ramon is not a danger to the community or a flight risk, and I believe that he should be released from immigration detention while his case is ongoing.

2. I immigrated to the United States on or around 1986, and am currently a Legal Permanent Resident. I live at 1049 Grand Concourse, Apt. 2E, Bronx, NY 10452 with my daughter, Zoraida Rodriguez. I have lived in the New York City area continuously since 1986, with the exception of a brief six-month period in which I lived in Puerto Rico.

3. Ramon Rodriguez is my one and only son in the United States. I am also the father of Ramon's six sisters – Evelin, Celeny, Priscilla, Nancy, Angie and Zoraida. All of the children except Zoraida were born in the Dominican Republic, when I was in a relationship with their mother, Altagracia Rosario Paniagua. By the time I had immigrated to the United States in 1986, I was already separated from Ms. Rosario Paniagua.

4. In or around 1990, Ms. Rosario Paniagua was able to immigrate to the United States based on a family petition from her mother, Angela Paniagua, who was residing in Brooklyn at the time. She brought all of the children, including my son Ramon over with them, and they resided with Angela Paniagua in Brooklyn upon their arrival.

5. When they first arrived, I attempted to play an active role in the lives of my children, especially Ramon because he was my only son. I briefly entered into a relationship with Ms. Rosario Paniagua again, and our seventh child, Zoraida Rodriguez, was born in 1993. However, the our relationship did not work and I obtained custody over Zoraida. I raised her separately.

6. Eventually, the family moved up to 3675 Broadway, #4H, and I lived with Zoraida just a few blocks away at 611 W. 158th Street. This allowed me to stay in closer touch with my other children, including my son Ramon. I always supported him when he needed any kind of financial help with anything, such as groceries, clothes, or other necessities. I didn't see Ramon on a day-to-day basis, because he was living with his mother, but he was still important to me and I made sure that his needs were provided for.

7. I remember Ramon being a good kid growing up, and I would go to his elementary school to receive his report cards and meet with teachers. However, it was really his mother who was in charge, and I didn't get to spend as much time with Ramon as I would have liked.

8. I did take Zoraida out to see Ramon and her sisters. I remember taking Zoraida and Ramon down to the parks in Upper Manhattan, and watch as they played around me as I practiced the trumpet. Ramon really loved music, and that made me proud as a musician.

9. I am not exactly sure why Ramon decided to drop out of high school. I tried to convince him to study and finish his education, but I saw that he had grown already and was trying to become more and more independent. He worked with me doing some porter duties, but then told me that he wanted to find another job.

10. Around 2006, Ramon's mother Altagracia was arrested and eventually deported to the Dominican Republic. That was really a terrible, terrible occurrence. She was the main authority figure for all of the children, and losing her in that way at a young age was a really big blow for them. After this happened, Zoraida and I moved into their apartment, and I tried to support my children as much as I possibly could. But the rent was too much to pay and I had to move out with Zoraida.

11. After we lost that apartment, Ramon moved down to Staten Island. I know he was working down here, and that he had studied and received his GED. I would see Ramon whenever he would visit his sisters; his eyes would light up whenever he would play with his nieces and nephews, and he really liked being an "uncle" to them.

12. I think that Ramon may have had some tough times growing up, and I know that I wasn't always able to be there to give him guidance. But I know that he is a hard working young man who is always looking for work, who has tried to better himself by studying, and whose presence is important for his sisters and his nephews and nieces. The last time I saw him was at a family gathering at my daughter Celeny's house. We hugged, we talked and danced and had a great time.

13. I miss my son and do not understand why he has been arrested by immigration. To my knowledge, he has had no problems with the police for over seven years and has never committed any crime that has hurt anybody. I know he has been working, that he had obtained housing in Staten Island, and that he had achieved some stability in his life. It hurts me to know that he is all alone in detention, and that his life has been interrupted in this way.

14. Ramon would never run away from his immigration case. I am here in New York City, all of his sisters are here, all of his friends are here. All of his life is here. With God as my witness, I believe that he will prove himself before the immigration court, put all of this behind him, and be my hardworking son once again.

I, Ramon Rodriguez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

Ramon Rodriguez

Ramon Rodriguez

Sworn to before me
This 26th day of November, 2014

NOTARY PUBLIC

STEPHANIE F LOPEZ
NOTARY PUBLIC STATE OF NEW YORK
No. 3LO6296461
Qualified in Bronx County
My Commission Expires February 03, 201_

# AFFIDAVIT OF TRANSLATION

I, Stephanie F. Lopez, declare under penalty of perjury, that the following is true and correct:

1. My name is Stephanie F. Lopez. I am a staff attorney at the Bronx Defenders located at 360 E. 161st St., Bronx, NY 10451.

2. I am fluent in both English and Spanish.

3. Ramon Rodriguez, Sr. is fluent in Spanish.

4. I translated the contents of this affidavit to Mr. Rodriguez in Spanish and he verified that the contents of the affidavit were true and correct before signing it.

5. I attest that that I gave a true and accurate translation.

I, Stephanie F. Lopez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

Stephanie F. Lopez

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK, NY

---------------------------------------------------------)   IN REMOVAL
                                                         )   PROCEEDINGS
In the Matter of                                         )
                                                         )   A#_____5073
   **RODRIGUEZ, Ramon**                                  )
                                                         )
Respondent                                               )
---------------------------------------------------------)

## AFFIDAVIT OF RICHARD RAMIREZ IN SUPPORT OF RAMON RODRIGUEZ'S REQUEST FOR BOND REDERMINATION

1. My name is Richard Ramirez. I was born on _____, 1985 in New York City and am a US Citizen by birth. My current address is 3675 Broadway #5D, New York, NY 10031. I strongly believe that Ramon Rodriguez should not be detained during his immigration case because his conduct and lifestyle over the last seven years shows that he is neither a flight risk nor a danger to the community. Accordingly, I am submitting this statement in support of his request for bond.

2. I have known Ramon Rodriguez since I was eight years old, and consider him to be like a brother to me. Ramon and his family lived a floor below me in the same building, in apartment 4H. Because Ramon was raised by his mother and only had sisters in the house, he spent a lot of time at my apartment, hanging out with my brother Eduardo Ramirez and I. We were an inseparable trio, the three of us, whether we were playing video games in the apartment, playing basketball, or helping each other with our homework.

3. Ramon is about two years older than me, and that made all the difference when we were growing up. I looked up to Ramon and saw him like a big brother. Growing up he took me under his wing and looked out for me.

4. I remember family life being a little rough for Ramon. His father had separated from his mother when Ramon was just a baby, and his mother Altagracia was raising all six children in the home. It was hard for him not to have a male figure in the home, and I think that's why he spent so much time with me and Eduardo. However, I saw that Ramon loved his mother and his sisters. As he was growing up, I saw him play more of a

protector role, always making sure that the doors were locked and the windows were secure, and talking to his sisters about making sure not to hang out with the wrong guys. That was a lot of responsibility for a child his age and he took it seriously, he was very involved.

5. Ramon was also a great big brother for his youngest sister, Zoraida, who was the only one who stayed with Ramon's father. Even though they didn't live together, he would take her out around the neighborhood and make an effort to spend time with her.

6. Those were happy times for both me and Ramon; I remember coming over to his house where his mother Altagracia would be cooking over the holiday seasons and spending time with his sisters.

7. When he got older, things got more difficult for Ramon. Around high school, he started working at a local movie theater as well as going to school, just to have a little extra money. Many of us in our neighborhood did that. He always tried to have money to buy his own clothes and take care of his personal needs, and he helped take care of the nieces that were beginning to appear around the house – his sister Evelin had already had a daughter by that time.

8. I think the need to make money, and maybe the fact that he was the only boy in a household of six women and wasn't getting enough attention and support, pushed Ramon to drop out of school. He was sad to give up school, and he always told me that he wanted to go to college, but he felt that he needed to work. He would do all kinds of jobs, helping his dad out with his porter tasks, doing some carpentry – whatever kinds of jobs that he could find.

9. A lot of things changed when Ramon's mother got deported to the Dominican Republic. I don't remember when it happened, but I think I was in my early twenties, and Ramon was in his mid-twenties at the time. At first, Ramon wouldn't talk to me about it, and tried to keep quiet. But I knew that Ramon was hurting. I confronted him about it and he opened up to me. I saw Ramon have his depressed moments and cry about losing his mother. Ramon's father and sisters stepped in and tried to help out, but losing a mother is irreplaceable. All of a sudden an important support for the family wasn't there anymore and that really hurt Ramon.

10. We were still in regular touch in those years, talking every day or every other day. I was really shocked to find out, however, that Ramon had been arrested around 2006 or 2007. I don't know very much about the arrest, and I didn't push him on it, because I know that

was a stressful issue for him. While he always put on a happy exterior, I did see that his early twenties were a pretty tough time for Ramon.

11. After his arrest, Ramon told him that he felt that he had reached a certain age and needed to be more independent, and could no longer be living in the family home. He told me that he needed a change of pace and a change of scenery.

12. The first thing that I know that Ramon did was finish a rehab program. He talked to me very positively about this program, telling me that it was like a "group of people helping each other out" and that he was doing it of his own free will. He told me that they would sit down in a room to discuss the issues together and that he had access to good counselors. He told me that he needed a change, that he needed to structure himself so that he could promote a better atmosphere for himself and those around him.

13. One of the happiest moments that I spent with Ramon in this period was when he got his GED degree in 2009. Ramon was ecstatic – it was like seeing someone graduate from college. We cooked, we had a couple drinks together, and celebrated all night. I was going through a divorce at that time, so seeing Ramon advancing was really uplifting for me personally.

14. I also know that Ramon was taking college classes after he got that GED. I don't really know what exactly he was studying, but I was really happy that he was doing something positive for himself.

15. As always, Ramon was willing to do any job he could find. He really wanted to be independent and get himself to a place where he would be able to take care of a family, and support his sisters. It was difficult for him to hold down a job for a long time, though—I think that his criminal conviction hurt him in the eyes of the managers.

16. During this time, be started dating a Japanese student named Rei Itoh, who had a young daughter named Victoria. Ramon really treated Rei's daughter as if she was his own, and they stayed with him for long periods of time. It really showed how family-oriented he was.

17. I know he also loved his nieces and nephews. With so many sisters, be had more of those than I could count. He was always telling me of how he loved hang out with them and being called *tio*, and would post pictures on Facebook of him hugging them.

18. All in all, I think things were going well for Ramon. He had his GED, he had gotten some college classes under his belt, and he had stable housing for the last couple of years down

in Staten Island. Finding work was hard, but he had told me that he had just gotten another job at a Western Beef supermarket near his house. Life wasn't easy for him, but he always kept a good attitude and tried to be the best that he could for his family, and he was always there for me as well.

19. Ramon called me after he was detained by ICE, and asked me to help him contact the rest of his friends and family. He told him that he had just gotten a second job at Western Beef and was going there that morning when he got picked up.

20. Ramon was positive in his first conversations with me because he thought he was going to get out of detention soon. Since he had stayed out of trouble and had no problems with the police since his arrest in 2007, but once he realized that he couldn't get out under the law, I could feel the sadness in his voice.

21. It hurts me personally to know that Ramon is being detained. I do not understand why someone like Ramon who was working, studying, and spending time with his family would be taken out of their community for something that he did seven years ago. I want Ramon to be able to come out, sit down, and eat with me. I always think about Ramon these days—he is like my brother. I don't even want to eat like I normally do, because I know Ramon isn't getting that in detention.

22. I know that Ramon isn't a danger to anyone. He has tried and succeeded to get his life together, and was focusing on the same things anyone else focuses on—his family, paying the bills, and working—when he was picked up by ICE. I am certain that he wouldn't try to evade his immigration proceedings. He has done everything that the government has asked of him, and all of his family and friends are in New York City. I believe that he should be eligible for bond and be out in the community with all of us who love him.

I, Richard Ramirez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

_____
Richard Ramirez


Sworn to before me
This 26th day of November, 2014

_____
NOTARY PUBLIC


STEPHANIE F LOPEZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LO6296461
Qualified in Bronx County
My Commission Expires February 03, 2018

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK, NY

| | |
|---|---|
| ----------------------------------------------------------- ) | IN REMOVAL |
| ) | PROCEEDINGS |
| In the Matter of ) | |
| ) | A#▓▓▓▓▓073 |
| **RODRIGUEZ, Ramon** ) | |
| ) | |
| Respondent ) | |
| ----------------------------------------------------------- | |

## AFFIDAVIT OF ZORAIDA RODRIGUEZ IN SUPPORT OF RAMON RODRIGUEZ'S REQUEST FOR BOND REDERMINATION

I, Zoraida Rodriguez, do hereby declare under penalty of perjury the following:

1. My name is Zoraida Rodriguez. I was born on ▓▓▓▓▓, 1993, and I am a citizen of the United States. I live at 1049 Grand Concourse, Apartment 2E, Bronx, New York now, but have lived in the New York City area all my life.

2. I am Ramon Rodriguez's youngest sister. As a child, he and my five older sisters took care of me.  We used to all live together as a family, but when I was around 2 years old, our parents separated and our dad took me to live with him while Ramon and my sisters remained with our mom. We moved only 6 blocks away therefore, I saw Ramon and my sisters everyday.

3. Ramon and my two sisters Priscilla and Evelin went to the same school, and I remember them saying that there was a lot of violence there. Priscilla and Evelin both ended up dropping out, but Ramon talked about how he would be the one to graduate from the family and who would make something of his life. His real passion was music though, and he always used to say that he would be a famous rapper someday. He was positive and upbeat like that all the time, and it is still hard for me to tell how he is actually feeling. He comes across to me as a bit of a loner, keeping to himself most of the time.

4. Ramon has always been closer to our dad than to our mom, even though they have their share of arguments and bumps on the road. Our dad used to travel and play the trumpet with a band, and Ramon got his love of music from him. So back then, when our dad only took me to live with him, I think that Ramon felt like he was being left behind. That

was also when Ramon started distancing himself from our mom as well, where he wouldn't really talk to her much

5. Our dad was the one who told me that Ramon had dropped out of school. He was disappointed in Ramon because he had thought that Ramon was going to do better. I think he was also working at the time, but he didn't really talk about it.

6. In 2006, when I was around 12 or 13 years old, our dad told me that our mom had been arrested. Afterwards, our mom was deported back to the Dominican Republic within the year. Some of my sisters still call her and send her money once in a while, but I haven't spoken to her since. Her deportation had a devastating impact on our family and we are reliving this nightmare with Ramon's detention.

   After my mother's deportation, I noticed that there was friction between my sisters and Ramon. He came more reserved with us, but went out a lot with his friends. After being evicted, my family moved into a shelter however Ramon went to live on his own. This was when we really lost contact with Ramon. He was moving around a lot, and would only call once in a while updating us on his new location

7. A long time ago, I found out Ramon was arrested. I was surprised that he was arrested, however the arrests didn't change my impression and love for my older brother whom I looked up to. Since then he has been out of touch since he lived with my sister Priscilla for a short time then lived in Staten Island. Because of the distance, I lost touch with Ramon for a while.

8. In September 2014, I got a call from a weird number. When I picked up, it was Ramon on the other line, saying that he had been arrested for something to do with immigration.

9. Even though we don't talk much anymore, Ramon has always been there for me and the family. While he doesn't like asking for help and prefers to do things on his own, he's always there when someone needs help. I know that he's been helping our sisters out financially here and there even though he can't really afford it.

10. Ramon has always been an important part of my life, and has supported me more than our mom ever did. He is the only one in the family who's ever told me he was proud of me, and that I should work hard to stay in school and be the first person in the family to graduate from high school. He was always the one encouraging me and telling me that I could be anything if I put my mind to it, and telling me about how hard he was working. I remember hearing about his GED, and how he was working and getting college credits as well. He called me to check up on me the moment I posted something depressing on

Facebook, wanting to make sure I was okay. I would be devastated if he maintains in detention and ultimately were deported.

11. Ramon is not a danger to our community. He has committed mistakes, but he is reserved and good person. He has actively tried to get his life back on track despite the many set backs he has had in his life. I respectfully ask that he be able to defend himself in the community where he has lived for the past seven years since he has been arrested.

I, Zoraida Rodriguez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Executed this 26th day of November, 2014

Bronx, NY

_Zoraida Rodriguez_
Zoraida Rodriguez

Sworn to before me
This 26th day of November, 2014

_St. L_
NOTARY PUBLIC

STEPHANIE F LOPEZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LO6296461
Qualified in Bronx County
My Commission Expires February 03, 20__

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
NEW YORK, NY

|  |  |
|---|---|
| In the Matter of<br><br>    Ramon RODRIGUEZ<br><br>Respondent | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

IN REMOVAL
PROCEEDINGS

A#&#9608;&#9608;&#9608;5-073
(DETAINED)

## AFFIDAVIT OF EDUARDO RAMIREZ IN SUPPORT OF RAMON RODRIGUEZ

I, Eduardo Ramirez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code that the following is true and correct to the best of my knowledge and belief:

1.    My name is Eduardo Ramirez. I am a U.S. citizen. I am an honorably discharged corpsman of the U.S. Navy. My address is 44 Sickle St. Apt. 3H, New York, New York 10040. My phone number is (917) 304-7254. Ramon Rodriguez and I were neighbors and close friends starting around 1989.

2.    I write this statement to ask that you permit Ramon Rodriguez to leave immigration detention to reunite with his loved ones, friends, and community members and fight his case with their direct support.

3.    I first met Ramon Rodriguez when he moved into my building about 22 years ago at 3675 Broadway, New York, New York, 10031. Our relationship was brotherly and at times my mother would babysit Ramon. Ramon's household had minimal resources. His parents were separated and his mother was struggling. Growing up he would open up and at times cry about the fighting in his household and his economic situation. When Ramon was hungry he would come over to our house for dinner.

4.    I saw Ramon every day until I left for Columbia Green College in 1999. After I left for college and went to the Navy I saw Ramon about two times a year. He is independent and moved to Staten Island to get away from all the struggles he had in the city. One time he was doing real well and was working two jobs and going to college.

5.    I am not aware of Ramon's criminal history but I am certain that whatever crimes he committed where out of desperation and hopelessness. The circumstances must have

been severe for Ramon to commit crime he had a rough upbringing and never got a break.

6.     Ramon is not a violent person and there is not a violent bone in his body. He is not a danger to the community. Growing up he would say hello to the strangers in our neighborhood and I never knew him to get into fights or violence with anyone.

7.     I know that Ramon will continue to go back to court and he will do whatever it takes to remain in the U.S. He would see his immigration case through especially because he saw the devastating impacts of his mother's deportation.

8.     Please release Ramon so that he can be reunited with his family, his friends, and his community and fight his case at liberty with their support.

I, Eduardo Ramirez, declare under penalty of perjury, pursuant to Title 28, Section 1746 of the United States Code, that the foregoing is true and correct.

Eduardo Ramirez

Nov 06 14 11:28a        Shorty                                    12129673056                    p.5

# PARK WEST HS
## PERMANENT RECORD

| STUDENT | RODRIGUEZ RAMON | ID# | BUSS | ADDRESS | 3575 BROADWAY NEW YORK NY | 10031 | PARENT | ALTAGRACIA ROSARIO | TEL | 6949850 |
|---|---|---|---|---|---|---|---|---|---|---|

ADMITTED 10/18/98   BIRTHDATE   COUNSELOR CALOVINI A   OFF'L CLASS 4H   DATE 11/08/01   DSIS#   PAGE: 2

| YEAR | OCC. EDUC. | | ART/MUSIC | | | HE/PHYS ED | | | | MISC | | | EXAMS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CODE | SUBJECT | MK | CODE | SUBJECT | MK | CODE | SUBJECT | MK | CODE | SUBJECT | MK | CODE | SUBJECT | MK |
| 98-99 | | | | | | | PGYM | PHYS ED | 20 | 2LSL | LUN/LAB | | RGTS | RCT SC1 | F |
| 98-99 | | | | | | | 0.00 | *MILLER D | 40 | 0.00 | | | | | |
| 99-00 | | | | | | | PGYM | PHYS ED | 40 | | | | RGT3 | RGT SO1 | F |
| 99-00 | | | | | | | 0.00 | *ROSS A | 39 | 2LBL | LUN/LAB | | HRS | GLOBHISTRG | ABR |
| 99-00 | | | | | | | PGYM | *BEDER R | | 0.00 | *X | | | | |
| 00-01 | | | A1 | RED ART | 55 | | PGYM | PHYS ED | 3B | | | | HRS | GLOBHISTRG | ABR |
| 00-01 | | | 1.00 | FIARMAN H | | | 0.00 | *LAWYER G | 40 | | | | | | |
| | | | | | | | PAWT | WGHT TRN | | | | | | | |
| | | | | | | | 0.00 | *GALLAROD M | | | | | | | |

| AREA SUMMARY | # OF CREDITS= 0.00 AVERAGE = 0.00 | # OF CREDITS= 0.00 AVERAGE = 95.00 | # OF CREDITS= 0.00 AVERAGE = | # OF CREDITS= 0.00 AVERAGE = 0.00 | TOT CRED= 6.00 AVERAGE = 92.82   SIZE: RANK:   HCTL:   CAA: RANK INDEX: |
|---|---|---|---|---|---|

LEGEND

(MTR/FA1 8/85)

#042-265-073
**Ramon Rodriguez**

## <u>CERTIFICATE OF SERVICE</u>

I, **Stephanie F. Lopez**, served a true and correct copy of this Documentation in Support of Bond Redetermination on Immigration and Customs Enforcement, Office of the Assistant Chief Counsel, at 201 Varick Street, Room 1130, New York, NY 10014, by hand on December 1, 2014.

December 1, 2014
Bronx, NY

Stephanie F. Lopez
The Bronx Defenders

# Exhibit N

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**Ramon RODRIGUEZ,**

   Petitioner,

  v.

**Christopher SHANAHAN, in his official
capacity as New York Field Office Director for
U.S. Immigration and Customs Enforcement;
Scott MECHKOWSKI, in his official capacity
as Assistant New York Field Office Director
for U.S. Immigration and Customs
Enforcement; Jeh JOHNSON in his official
capacity as Secretary of Homeland Security;
Eric HOLDER, in his official capacity as the
Attorney General of the United States; and the
U.S. DEPARTMENT OF HOMELAND
SECURITY**

   Respondents

Case No.:

DECLARATION OF EVA
YUNG IN SUPPORT OF
PETITION FOR WRIT OF
HABEAS CORPUS

**Declaration of Eva Yung in Support of Petition for Writ of Habeas Corpus**

  I, Eva Yung, declare under the penalty of perjury that the following is correct to the best of my knowledge:

1. My name is Eva Yung.  I am a law student in the Immigrant Rights Clinic at Washington Square Legal Services, Inc., at 245 Sullivan St., 5th Fl., New York, NY 10012.

2. I, along with my colleague Andrew Lyubarsky, represent Petitioner Mr. Ramon Rodriguez under Nancy Morawetz, our supervising attorney,  in his efforts to secure his release from immigration detention.  I submit this declaration in support of his petition for a Writ of Habeas Corpus.

1

3.   Mr. Rodriguez is a longtime lawful permanent resident from the Dominican Republic who has been detained by Respondents since September 26, 2014 without a bond hearing, seven years after his last conviction.

4.   Mr. Rodriguez faces removal proceedings at Varick Immigration Court, 201 Varick Street, New York, New York.  His case is assigned to Immigration Judge Alan Page.  He is being represented in immigration court by Stephanie Lopez, Esq., of The Bronx Defenders.

5.   On December 1, 2014, Mr. Rodriguez's immigration court attorney, Ms. Lopez, filed for a bond hearing with the Varick Immigration Court.  Ms. Lopez is also preparing Mr. Rodriguez's applications for cancellation of removal to be filed in open court.

6.   On December 12, 2014, I attended Mr. Rodriguez's immigration court hearing at Varick Immigration Court at 201 Varick Street, New York, New York.  Mr. Rodriguez and his immigration attorney, Ms. Lopez, were present in the courtroom. No bond was granted to Mr. Rodriguez at the hearing.  Mr. Rodriguez remains detained and subject to mandatory detention.

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York            Respectfully submitted,
December 12, 2014

_Eva Yung_
Eva Yung, Legal Intern
Immigrant Rights Clinic
Washington Square Legal Services, Inc.
245 Sullivan St., 5th floor
New York, New York 10012
(212) 998-6430

2