**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

RAMON RODRIGUEZ,

                      Petitioner,

          -against-

CHRISTOPHER SHANAHAN, in his
official capacity as New York Field Office
Director for U.S. Immigration and Customs
Enforcement, et al.,

                    Respondents.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/30/2015

14-CV-09838 (SN)

<u>ORDER AND OPINION</u>

**SARAH NETBURN, United States Magistrate Judge.**

In Section 236(c) of the Immigration and Nationality Act ("INA"), Congress directed the Department of Homeland Security ("DHS") to detain certain criminal non-citizens for the duration of their removal proceedings without an opportunity for release on bail conditions. The statute provides that DHS shall execute this duty "when [such criminal non-citizens] are released, without regard to whether the alien is released on parole, supervised release, or probation . . . ." 8 U.S.C. § 1226(c)(1). The question presented by this *habeas corpus* petition, is whether DHS acted within the scope of its authority when it detained petitioner Ramon Rodriguez without providing him a bail hearing seven years after he was "released" from jail.

Because I find that the plain language of the statute prohibits the extraordinary restrictions on Rodriguez's liberty sought by the government, Rodriguez's petition is GRANTED. The government is ordered to provide Rodriguez with a bond hearing, pursuant to Section 236(a), no later than ten days from the date of this Order. If the Immigration Court fails to provide a hearing within ten days, respondents shall release Rodriguez from custody.

# BACKGROUND

## I.  Factual and Removal Proceedings Background

Rodriguez is a 32 year-old native of the Dominican Republic who came to the United States in November 1989 at the age of seven and has been a lawful permanent resident ("LPR") since that time. He grew up in New York City and has worked there as an adult. Rodriguez has a network of family and friends in the New York area, including his LPR father and his U.S. citizen sisters. (Pet. Ex. A: Jiminez Aff.; Pet. Ex. B: Ramirez Aff.; Pet. Ex. C: Rodriguez Aff.)

On August 23, 2006, at the age of 24, Rodriguez was arrested and, on April 23, 2007, pled guilty to attempted criminal possession of a controlled substance. (Pet. Ex. F: Certificate of Disposition, Case No. 2006 NY 057128.) He was sentenced to five years of probation. (Id.) On October 31, 2007, he was arrested again and, on November 1, 2007, pled guilty to possession of marijuana, for which he served a custodial sentence of five days. (Pet. Ex. G: Certificate of Disposition, Case No. 2007 NY 082624). Thereafter, he completed a rehabilitation program, obtained his GED, and began taking classes at City University of New York Kingsborough Community College. (Pet. Ex. H: Proof of Completion of NRI Outpatient Program; Pet. Ex. I: GED Certificate; Pet. Ex. J: Kingsborough Community College Transcript, Fall and Spring 2010.)

On September 26, 2014, Rodriguez was apprehended by Immigration and Customs Enforcement ("ICE") while he was submitting a job application at a local supermarket and served with a Notice to Appear ("NTA"), the charging document used to commence removal proceedings. (Pet. Ex. D: Lopez Decl.; Pet. Ex. E: Gomez Decl.; Pet. Ex. K: NTA.) The NTA alleged that Rodriguez was admitted to the United States as an LPR but his controlled substance

convictions render him removable under INA § 237(a)(2)(B)(i) and subject him to mandatory detention without bond for the pendency of his removal proceedings. (Id.)

On December 1, 2014, Rodriguez's attorney submitted a motion for a bond determination before an Immigration Judge ("IJ"). The IJ denied the request finding that Rodriguez was subject to mandatory detention without bond pursuant to INA § 236(c). (Resp. Ex. 5: Order of IJ with Respect to Custody.) The IJ scheduled a master calendar hearing for February 23, 2015, to discuss a schedule to address Rodriguez's anticipated petition for cancellation of removal.

## II.    *Habeas Corpus* Petition Background

On December 12, 2014, Rodriguez filed this petition for writ of *habeas corpus*. On December 29, 2014, the government filed their response in opposition to Rodriguez's writ. On January 5, 2015, Rodriguez filed a reply memorandum in support of his petition. The Court heard oral argument in the matter on January 14, 2015. The parties consented to the Court's jurisdiction of this case, pursuant to 28 U.S.C. § 636(c).

## DISCUSSION

## I.    Jurisdiction

The Court has subject matter jurisdiction to review Rodriguez's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241(c)(3). See, e.g., Lora v. Shanahan, 15 F. Supp. 3d 478, 482 (S.D.N.Y. 2014); Louisaire v. Muller, 758 F. Supp. 2d 229, 234 (S.D.N.Y. 2010). The INA precludes judicial review of DHS's discretionary judgment regarding a non-citizen's detention or release. 8 U.S.C. § 1226(e). But the statute does not preclude courts from conducting *habeas* review based on an interpretation of the statutory framework governing immigration detention. Demore v. Kim, 538 U.S. 510, 517 (2003). See also Henderson v. I.N.S.,

157 F.3d 106, 119-22 (2d Cir. 1998) (*habeas* review extends to statutory questions in the context of immigration removal proceedings).

## II. Immigration Detention under INA § 236

### A. Discretionary and Mandatory Immigration Detention During Removal Proceedings

The INA provides for two types of immigration detention during the pendency of removal proceedings.[1] While the "proceedings are in progress, most aliens may be released on bond or paroled." Zadvydas v. Davis, 533 U.S. 678, 683 (2001) (citing 8 U.S.C. § 1226).

First, Section 236(a) provides for the general immigration detention, "except as provided in subsection (c)," of non-citizens in removal proceedings. DHS has discretion over whether to detain or release non-citizens and, under this subsection, must provide all non-citizens an individualized bond hearing. 8 U.S.C. § 1226(a). At the bond hearing, the IJ must determine whether the non-citizen's release would endanger other persons or property and whether he is likely to appear for future proceedings. See Castaneda v. Souza, 769 F.3d 32, 36-37 (1st Cir. 2014) ("Castaneda I") (citing 8 C.F.R. § 1236.1). See also Matter of Patel, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) (A non-citizen "generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security, . . . or that he is a poor bail risk.") (citations omitted). To determine if a non-citizen poses a danger to the community or a flight risk, an IJ may consider the non-citizen's "stable employment history, the length of residence in the community, the existence of family ties," Matter of Andrade, 19 I. & N. Dec. 488, 489 (B.I.A. 1987), and any "criminal record, including . . . the recency of such activity."

---

[1] Congress separately provided for the immigration detention of non-citizens after a removal order against them becomes "administratively final." 8 U.S.C. § 1231(a)(1)(B)(i). See Guerra v. Shanahan, 14 Civ. 4203 (KMW) (S.D.N.Y. Dec. 23, 2014) (discussing when a petitioner may be detained pursuant to 8 U.S.C. § 1231 as compared to 8 U.S.C. § 1226).

In re Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006). See generally Matter of Urena, 25 I. & N.

Dec. 140 (B.I.A. 2009). If the IJ grants a non-citizen's release, the IJ can revoke it "at any time

[at her] discretion." 8 C.F.R. § 1236.1(c)(9).

Second, Section 236(c) carves out an exception to Section 236(a)'s general immigration

detention and provides for the mandatory detention, without an individualized bond hearing, of a

narrow category of criminal non-citizens. 8 U.S.C. § 1226(c). Paragraph (1) of Section 236(c)

provides in relevant part that:

> The Attorney General shall take into custody any alien who [is
> inadmissible or deportable by reason of having committed a
> qualifying offense under § 236(c)(1)(A)-(D)] *when the alien is
> released*, without regard to whether the alien is released on parole,
> supervised release, or probation, and without regard to whether the
> alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (emphasis supplied).[2] The predicate crimes listed in Section 236(c)(1)(A)-

(D) include aggravated felonies, crimes of moral turpitude, certain firearm offenses, violations of

law relating to controlled substances, and various others. See Castaneda I, 769 F.3d at 37 (citing

8 U.S.C. § 1226(c)(1)(A)-(D)). Paragraph (2) of Section 236 provides that DHS "may release" a

non-citizen described in paragraph (1) in certain limited circumstances (not relevant here). 8

U.S.C. § 1226(c)(2). The Supreme Court has upheld the constitutionality of Section 236(c)'s

mandatory detention scheme against a facial challenge. Demore, 538 U.S. at 513 (concluding

that the narrow subset of non-citizens detained under Section 236(c) may constitutionally be

---

[2] "Originally, the authority and duties imposed by [Section 236(c)] were those of the Attorney General; today, they belong to DHS." Straker v. Jones, 986 F. Supp. 2d 345, 351 (S.D.N.Y. 2013) (citing 6 U.S.C. §§ 202, 251, 557; Vasquez v. Holder, 602 F.3d 1003, 1006 (9th Cir. 2010); United States v. Rios-Zamora, 153 F. App'x 517, 520-21 (10th Cir. 2005) ("With the transfer of authority under 6 U.S.C. § 557, as of March 1, 2003, the title 'Attorney General' is synonymous with the Secretary of Homeland Security.)).

detained without an individual hearing "for the brief period necessary for their removal proceedings").

**B.**     ***Matter of Rojas*, 23 I. & N. Dec. 117 (BIA, 2001)**

In <u>Matter of Rojas</u>, the Board of Immigration Appeals ("BIA") considered whether the phrase "when the alien is released" was necessary in identifying who was subject to mandatory detention. 23 I. & N. Dec. 117, 119 (BIA, 2001). As discussed above, paragraph (1) of Section 236(c) provides that DHS "shall take into custody" a non-citizen who has committed certain offenses "when the alien is released." Paragraph (2) provides that "an alien described in paragraph (1)" is subject to mandatory detention unless certain exceptions apply (not relevant here). Rojas was taken into DHS custody two days after he was released from state custody for a crime rendering him subject to mandatory detention. He challenged his mandatory detention, arguing that "an alien described in paragraph (1)" encompassed non-citizens convicted of certain crimes *and* who had been detained "when . . . released" from criminal custody. Because he was not immediately detained from state custody, he argued that he did not fit the statutory definition.

The BIA rejected this argument. It concluded that "an alien described in paragraph (1)" references only a non-citizen who has committed a qualifying offense, and that the definition does not include the "when . . . released" clause. <u>Id.</u> at 121, 125. That clause, it concluded, merely modifies the command, "the Attorney General shall take into custody," by specifying that it be done "when the alien is released" from criminal custody. <u>Id.</u> at 121. Thus, because "an alien described in paragraph (1)" is subject to mandatory detention (absent certain exceptions), and because that description requires only the fact of the qualifying conviction, DHS's delay in taking Rojas into custody did not remove him from the mandatory detention scheme.

Relevant to this case, the BIA did not interpret the "when . . . released" clause to authorize DHS to seize a non-citizen at any time after his release from criminal custody – the position advanced by the government here. To the contrary, it interpreted the plain language of the statute as having "imposed a duty on the Service to assume custody of certain criminal aliens and *specified the point in time* at which that duty arises." Id. at 121 (emphasis supplied). See also id. at 122 (Section 236(c) "direct[s DHS] to take custody of aliens *immediately upon* their release from criminal confinement.") (emphasis supplied). Indeed, the BIA recognized that DHS did not comply with its statutory mandate when it concluded that Rojas was subject to mandatory detention "*despite the fact* that he was not taken into Service custody immediately upon his release from state custody." Id. at 127 (emphasis supplied).

Several courts have found the "when . . . released" clause ambiguous and deferred to the BIA's decision in Rojas to conclude that the clause authorizes DHS to take certain non-citizens into custody without a bail hearing *at any time*. See, e.g., Straker, 986 F. Supp. 2d at 360-61; Johnson v. Orsino, 942 F. Supp. 2d 396, 405 (S.D.N.Y. 2013); Hosh, 680 F.3d at 379-80. Although I do not believe deference to the BIA is required here, I also does not read Rojas as endorsing such an expansive reading of the word "when." See also Martinez-Done, 2014 WL 5032438, at *7 (holding that Chevron deference is not required because the BIA did not address the question of a non-citizen picked up by ICE after a years-long delay); Araujo-Cortes, 2014 WL 3843862, at *9 & n. 7 (same); Zabadi v. Chertoff, 05 Civ. 3335 (WHA), 2005 WL 3157377, at *4 (N.D. Cal. Nov. 22, 2005) (same).

## C.      Due Process

Although constitutional protections for non-citizens are more limited than they are for citizens, "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in

deportation proceedings." Demore, 538 U.S. at 523 (citing Reno v. Flores, 507 U.S. 292, 306

(1993)). See also Zadvydas, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons'

within the United States, including aliens, whether their presence here is lawful, unlawful,

temporary, or permanent.") This is because "[f]reedom from imprisonment – from government

custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the

Due Process] Clause protects." Id. at 690.

    In Zadvydas v. Davis, the Supreme Court considered a due process challenge brought by

non-citizens detained under INA § 241, a statute that governs the detention of non-citizens

following a final order of removal. 533 U.S. 678. The Supreme Court noted that detention

violates the Due Process Clause "unless the detention is ordered in a criminal proceeding with

adequate procedural protections or, in certain special and narrow nonpunitive circumstances,

where a special justification . . . outweighs the individual's constitutionally protected interest in

avoiding physical restraint." Id. at 690 (emphasis and quotations omitted) (citing Kansas v.

Hendricks, 521 U.S. 346, 356 (1997); Foucha v. Louisiana, 504 U.S. 71, 80 (1992); United

States v. Salerno, 481 U.S. 739, 746 (1987)). Because the statute authorized the seemingly

"indefinite" and "potentially permanent" detention of individuals whose removal was not

foreseeable or attainable, the Court invoked the cannon of constitutional avoidance to conclude

that the statute contains "an implicit 'reasonable time' limitation." Id. at 682, 691-92.

"Recognizing the potential administrative problems associated with a case-by-case determination

of whether detention was reasonably necessary, the Supreme Court further held – 'for the sake of

uniform administration in the federal courts,' – that detention pursuant to [Section 241] for up to

six months after a removal order was presumptively reasonable." Araujo-Cortes, 2014 WL

3843862, at *10 (quoting Zadvydas, 533 U.S. at 680).

Two years later, in <u>Demore v. Kim</u>, the Supreme Court upheld the constitutionality of Section 236(c)'s mandatory detention scheme, in part because Section 236(c) detention is usually for the "limited" and "brief period necessary" for the individual's removal proceedings. 538 U.S. at 513, 523, 526, 528. There, ICE served the petitioner Kim with an NTA while he was in criminal custody and detained him on the day after he was released (based on offenses enumerated in Section 236(c)(1)(A)-(D)). <u>See</u> <u>Kim v. Schiltgen</u>, 99 Civ. 2257 (SI), 1999 WL 33944060, at *1 (N.D. Cal. Aug. 11, 2009). The Supreme Court distinguished <u>Zadvydas</u> due to the unlimited detention presented by that case whereas Section 236(c)'s detention commonly lasts "roughly a month and a half in the vast majority of cases" to "about five months in the minority of cases." <u>Id.</u> at 530 (Kennedy, J., concurring). Although the Court's decision did not articulate limits on the permissibility of mandatory detention, Justice Kennedy stated – in a concurring opinion providing the fifth vote for a majority on the judgment– that:

> due process requires individualized procedures to ensure there is at least some merit to the [INS] charge and, therefore, sufficient justification to detain [an LPR] pending a more formal hearing. . . . [S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, [an LPR] such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified. . . . Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.

<u>Id.</u> at 531-33 (Kennedy, J., concurring) (citations omitted).

## III.     Analysis

Disputes over the meaning of Section 236(c)'s "when . . . released" clause have resulted in an avalanche of litigation in this circuit and elsewhere. The debate turns on whether "when the alien is released" means (1) immediately, at or near, or within a reasonable time of release, or (2)

simply any time after release without temporal limitation. The Court of Appeals for the Second Circuit has yet to address the question.[3] The vast majority of district courts, including those in this District as well as the Court of Appeals for the First Circuit, have favored the first interpretation. See, e.g., Martinez-Done v. McConnell, 14 Civ. 3071 (SAS), 2014 WL 5032438, at *3 (S.D.N.Y. Oct. 8, 2014) (collecting cases); Araujo-Cortes v. Shanahan, 14 Civ. 4231 (AKH), 2014 WL 3843862 (S.D.N.Y. Aug. 5, 2014); Lora, 15 F. Supp. 3d 478; Castaneda I, 769 F.3d 32. Fewer courts, including those in this district as well as the Courts of Appeals for the Third and Fourth Circuits, have adopted the temporally unlimited interpretation. See, e.g., Straker, 986 F. Supp. 2d 345; Sylvain v. Att'y Gen., 714 F.3d 150 (3d Cir. 2013); Hosh v. Lucero, 680 F.3d 375 (4th Cir. 2012).

This Court joins those courts that have found the word "when" to be unambiguous. Congress commanded DHS to detain certain criminal non-citizens "when . . . released" in order to ensure a pipeline from criminal custody to immigration detention to promote important policy interests. If DHS fails to comply with this statutory directive, as it did here, DHS must present sufficient evidence at a bail hearing that the non-citizen poses a relevant threat or flight risk and should be detained. Rodriguez is entitled to such a hearing.

A.    Interpreting INA § 236's Mandatory Detention Scheme

To interpret a statute, the Court first looks to the "plain language" used by Congress. In re Ames Dep't Stores, Inc., 582 F.3d 422, 427 (2d Cir. 2009) (citing Universal Church v. Geltzer, 463 F.3d 218, 223 (2d Cir. 2006)). See, e.g., I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 431-33

---

[3] Araujo-Cortes v. Shanahan, however, is pending before the Court of Appeals for the Second Circuit. See 14-3719 (2d Cir. filed Oct. 3, 2014). See also Gomez v. Napolitano, 11 Civ. 2682, 2012 U.S. App. LEXIS 27076, at *1-2 (2d Cir. June 5, 2012) (recognizing that "the proper interpretation of [Section 236(c)] is a weighty question, unresolved in this Circuit" but dismissing the appeal as moot because a final order of removal had been issued against the petitioner, rendering him detainable under a different provision).

(1987); Nwozuzu v. Holder, 726 F.3d 323, 327 (2d Cir. 2013). Where a statute does not define

its terms, the Court applies their "ordinary meaning." Scialabba v. Cuellar de Osorio, 134 S. Ct.

2191, 2223 (2014) (citing Burrage v. United States, 134 S. Ct. 881, 887-88 (2014)). Where the

language of the statute is clear, the Court's inquiry ends because "the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A.,

Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). If ambiguity persists,

however, the Court should consider the statute's language in connection with "the design of the

statute as a whole and [ ] its object and policy." Dada v. Mukasey, 554 U.S. 1, 16 (2008)

(quotations and citations omitted). See also Robinson v. Shell Oil Co., 519 U.S. 337, 351 (1997)

("The plainness or ambiguity of statutory language is determined by reference to the language

itself, the specific context in which that language is used, and the broader context of the statute

as a whole."). "[A] statute should . . . be construed so that, if possible, no clause, sentence or

word is rendered superfluous, void or insignificant." Garcia v. Shanahan, 615 F. Supp. 175, 183

(S.D.N.Y. 2009) (citation omitted). "[W]hen, after the application of ordinary textual analysis,

the statute is found to be susceptible of more than one construction," the cannon of constitutional

avoidance "functions as a *means of choosing between them.*" Clark v. Martinez, 543 U.S. 371,

385 (2005) (emphasis in original). "[A] restrictive meaning must be given if a broader meaning

would generate constitutional doubts." Reno, 507 U.S. at 334 (citing United States v. Witkovich,

353 U.S. 194, 199 (1957)).

> **1.** **The Plain Meaning of "When"**

The Court's analysis begins with the text of the statute. The Oxford English Dictionary's

first definition of "when" (in its non-interrogative use) is "at the (or a) time at which; on the (or

an) occasion on which." The Oxford English Dictionary,

http://www.oed.com/view/Entry/228192?rskey=16SAe9&result=1&isAdvanced=false#eid (last visited January 14, 2015). Supplementing its definition, the dictionary provides: "in reference to a definite actual occurrence or fact, chiefly with verb in past tense: *At the time that*, *on the occasion that*. . . ." <u>Id.</u> (emphasis supplied). "'[W]hen' includes the characteristic of 'immediacy,' referring in its primary conjunctive sense, to action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun." <u>Waffi v. Loiselle</u>, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) (citing 20 The Oxford English Dictionary 209 (2d ed. 1989); The American Heritage Dictionary of the English Language (4th ed. 2000)), <u>abrogated by</u> <u>Hosh</u>, 680 F.3d 375. <u>See also</u> <u>Martinez-Done</u>, 2014 WL 5032438, at *7 ("In everyday English, 'when' clearly 'connote[s] immediacy.'") (alteration in original) (citing <u>Straker</u>, 986 F. Supp. 2d at 354); <u>Castaneda I</u>, 769 F.3d at 44 (noting that "when" means "as soon as," as in, "I'll call you when I get there") (citing American Heritage Dictionary 2032 (3d ed. 1992)).

The government argues that "when" does not limit DHS's obligation to a precise point in time but rather that it triggers a duty to act "after" or "at any time" following a non-citizen's release. Such an interpretation, however, reaches beyond society's common understanding of the word. <u>See, e.g.</u>, <u>Khoury v. Asher</u>, 3 F. Supp. 3d 877, 887 (W.D. Wash. 2014) (The statement "'take out the trash when you get home,' is not at all the same as 'take out the trash at any time after you get home, even months or years later.'"); <u>Sanchez-Penunuri v. Longshore</u>, 7 F. Supp. 3d 1136, 1155 (D. Colo. 2013) ("[I]f a wife tells her husband to pick up the kids when they finish school, implicit in this command . . . is the expectation that [he] is waiting at the moment the event in question occurs.").

In everyday parlance, people routinely direct others to take action when an event occurs. In so doing, the actor is provided with the precise time to act: *when* the event occurs. It is never

understood that the actor is, instead, free to take such action anytime thereafter, even if it means years later. Thus, under a plain language analysis, Congress's directive to DHS to detain without a hearing certain non-citizens "when . . . released" from criminal custody, means that such duty to detain must be performed at or very soon after the time of release.

The government argues that because "when" can also mean "at any time," this alternative interpretation is the meaning that Congress must have intended and that the Court should adopt. "Rather than taking the plain meaning of the statute, the government has re-written the statute." Kporlor v. Hendricks, 12 Civ.A. 2755 (DMC), 2012 WL 4900918, at *6 (D.N.J. Oct. 9, 2012). To read the statute as the government suggests would be to assume that Congress meant to use the word "after" rather than the word "when." The Court rejects the government's invitation to follow suit.

When Congress drafts legislation, an area of the legislative branch's expertise, the Court presumes that they do so with precision and intent. Had Congress intended the "when . . . released" phrase to apply "at any time after," it "could easily have used the language 'after the alien is released,' 'regardless of when the alien is released,' or other words to that effect." Araujo-Cortes, 2014 WL 3843862, at *8 (citing Quezada-Bucio v. Ridge, 317 F. Supp. 2d 1221, 1224 (W.D. Wash. 2004)); Lora, 15 F. Supp. 3d at 488 (citing same). See also Castaneda, 952 F. Supp. 2d 307, 314 (D. Mass. 2013) ("Castaneda II") ("This Court rejects [the government's] contention because the word 'after' rather than 'when' would communicate such a meaning much more clearly."), aff'd by Castaneda I, 769 F.3d 32 (1st Cir. 2014). In other statutes, for instance, Congress included qualifying phrases with the word "when" to indicate that the word was being used in its conditional sense – describing the occurrence which shall render an action necessary "rather than 'designat[ing] the precise time when [the action] must be performed."

Castaneda I, 769 F.3d at 42 (noting how in a maritime statute, the phrases "in every such case" and "in every case" were used repeatedly in conjunction with "when" to qualify its meaning) (citing States v. Willings, 8 U.S.C. 48, 55 (1807)).

Similarly, if Congress wanted to create a mandatory detention scheme without a nexus between the timing of a non-citizen's release from criminal custody and apprehension into DHS custody, it could have left out the "when . . . released" clause altogether. In INA § 236A(a), Congress did just that: it directed DHS to detain certain non-citizens designated as terrorists without a "when . . . released" clause. 8 U.S.C. § 1226A(a). See Araujo-Cortes, 2014 WL 3843862, at *8. "Where Congress[, however,] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Nken v. Holder, 556 U.S. 418, 430 (2009) (citing Cardoza-Fonseca, 480 U.S. at 432). Here, the Court must defer to Congress's choice of words. The Court must interpret statutory language based on its plain meaning, and read the statute's provisions together. It is not the Court's role to seek out additional definitions that could make some alternative reading possible. See Prot. & Advocacy for Persons with Disabilities, Conn. v. Mental Health & Addiction Servs., 448 F.3d 119, 126 (2d Cir. 2006) ("multiple dictionary definitions of [a] word [ ] do not [necessarily] render the statutory language . . . ambiguous").

## 2. The Statute as a Whole

Having determined that the plain meaning of the "when . . . released" clause is "at or near the time of release," the Court turns to the structure of Section 236 to confirm that this reading is consistent with the statute as a whole. The "when . . . released" clause must be read both as part of Section 236(c) and also as part of the larger Section 236 detention scheme, which includes

Section 236(a). <u>See</u> <u>Lora</u>, 15 F. Supp. 3d at 484 (Courts "must interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.") (alteration in original) (citing <u>Bechtel v. Competitive Techs., Inc.</u>, 448 F.3d 469, 471 (2d Cir. 2006) (quotations and citations omitted)). Both readings support the "when . . . released" clause's plain meaning.

First, Section 236(c) is a single, cohesive sentence. Congress directed DHS to "take into custody" any non-citizen who committed one of the enumerated offenses "when" the non-citizen is released from criminal custody. The first clause of the statute imposes a duty on the government: DHS "shall take into custody any alien who" has committed one of the enumerated crimes. The clause "when the alien is released" specifies the *precise* time at which DHS must perform that duty. <u>See</u> <u>Matter of Rojas</u>, 23 I. & N. Dec. at 121 ("[T]his statutory language impose[s] a duty on the Service to assume the custody of certain criminal aliens and specified the point in time at which that duty arises.") (citing <u>Matter of Noble</u>, 21 I. & N. Dec. 672 (B.I.A. 1997)). Thus, the "when . . . released" clause does not create or "trigger" the duty.

For this reason, the Court finds the label attached by some courts to the phrase "when . . . released" as being "duty-triggering" misconstrues the statute. <u>See</u> <u>Martinez-Done</u>, 2014 WL 5032438, at *2; <u>Lora</u>, 2014 WL 1673129, at *5; <u>Straker</u>, 986 F. Supp. 2d at 353. The statute imposes a duty on DHS to detain certain criminal non-citizens. That duty is created by the statutory command, not by the non-citizen's release from criminal custody. The release from custody is when DHS must perform its duty.

Accordingly, <u>Straker v. Jones</u>, which first adopted the "duty-triggering" construction, is not persuasive. 986 F. Supp. 2d at 353. There, the court suggested that "when" "refer[s] to a duty that, although arising 'at the time that,' continues forward." 986 F. Supp. 2d at 354. The court

15

then offered a hypothetical analogy to support its conclusion: "if a person lends a book to a friend and asks her to 'return the book when you finish reading it,' the borrowing friend's duty to return the book arises once she finishes reading the book. It does not evaporate if she fails to promptly return it." Id. But this analogy does not support that court's conclusion and does not alter the meaning of the statute's plain language. A "loan" is "a grant of something for temporary use." Black's Law Dictionary 1077 (10th ed. 2014). Therefore, it is inherent in any loan that the borrower has a duty to return the borrowed item. It follows that in the Straker hypothetical, the duty of the borrowing friend to return the book arose when she accepted the loan of the book. The parties to this hypothetical book-loan agreement then separately agreed upon the time when the borrower must perform her duty to return the book: *when* she finishes reading it. These hypothetical parties therefore agreed that the friend was required to return the book at the time she finished reading it. Those parties, however, easily could have fixed the time for performance of the duty to return the book differently: by agreeing that it must be returned in, say, "two months," or instead, by choosing an open-ended time performance, such as "whenever you get around to it." But they chose the time when she finished reading it, which, as the above-described cases hold, means at the precise time she finished the book or immediately thereafter. "When you finish reading it" does not have the same meaning as "whenever you get around to it" or "at some point." Similarly, in the context of this statute, "when" cannot mean "whenever immigration authorities get around to it, even decades later." Gordon v. Johnson, 300 F.R.D. 31, 42 (D. Mass. 2014).

The government argues that the Court should read the "when . . . released" clause as the BIA did in Matter of Rojas, rather than as a single, cohesive sentence. It suggests severing the "when . . . released" clause from paragraph (1) so that only subsections 236(c)(1)(A)-(D) (which

identify the qualifying convictions) describe the non-citizens that fall under INS's mandatory detention obligation. No court has "ever adopted the holding from <u>Rojas</u>" that Section 236(c) includes the non-citizens in Section 236(c)(1)(A)-(D) but does not include the "when . . . released" clause. <u>Khoury</u>, 3 F. Supp. 3d at 885-86 (citing <u>Rojas</u>, 23 I. & N. Dec. at 119). That is because this portion of the BIA's interpretation "violates the cardinal rules of statutory interpretation: as it renders the 'when . . . released' clause superfluous by giving the clause no meaning." <u>Araujo-Cortes</u>, 2014 WL 3843862, at *7 (citing <u>Castaneda II</u>, 952 F. Supp. 2d at 313-14). The Court must "give effect, if possible, to every clause and word of a statute." <u>Lora</u>, 15 F. Supp. 3d at 484 (citing <u>Bechtel</u>, 448 F.3d at 471). "When . . . released" is an integral part of Section 236(c)'s single, cohesive sentence.

In addition to reading the "when . . . released" clause as a necessary part of Section 236(c), it must also be read in conjunction with Section 236(a) – as the subsections together make up the comprehensive detention scheme enacted by Congress for non-citizens in removal proceedings. Section 236(a) provides the general rule: DHS "may continue to detain" or "may release" on bond non-citizens arrested and charged with removal. Section 236(c) is framed as an exception to Section 236(a). <u>See</u> 8 U.S.C. § 1226(a) ("Except as provided in subsection (c). . . ."). <u>See also</u> <u>Castaneda I</u>, 769 F.3d at 37. When a statute sets out exceptions to a general rule, the Court "read[s] the exception narrowly in order to preserve the primary operation of the provision." <u>C.I.R. v. Clark</u>, 489 U.S. 726, 739 (1989). <u>See, e.g.</u>, <u>United States v. Barrow</u>, 400 F.3d 109, 116 (2d Cir. 2005) (holding that because Federal Rule of Evidence 410 "is an exception to the general principle that all relevant evidence is admissible at trial, [ ] its limitations are 'not to be read broadly'") (citing <u>United States v. Griffith</u>, 385 F.3d 124, 126 (2d Cir. 2004)). By its very structure, the exception, Section 236(c), is limited. It applies to non-

17

citizens in removal proceedings, who have committed one or more of the enumerated crimes, and who were detained by DHS "when . . . released" from criminal custody. The government's interpretation of the statute – that "when . . . released" means "at any time" after or has no significance at all – would impermissibly broaden the exception to allow non-citizens who have lead lawful lives after a period of incarceration, sometimes decades earlier, to be detained without an opportunity to present evidence that they are not a flight risk or threat to the community. See, e.g., Saysana v. Gillen, 590 F.3d 7, 17 (1st Cir. 2009) ("The mandatory detention provision does not reflect a general policy in favor of detention; instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply.").

Further, reading Sections 236(a) and 236(c) together shows that if a non-citizen in removal proceedings does not meet the requirements of Section 236(c), she still may be detained pursuant to Section 236(a) and will be released only after an individualized bond hearing. The government omits this crucial fact in arguing that the plain meaning of "when . . . released" unfairly punishes DHS by taking away its authority and bestows a "windfall" on non-citizens like Rodriguez. It does no such thing.

The government relies on United States v. Montalvo-Murillo, as well as the Third and Fourth Circuits, in support of its claim.[4] United States v. Montalvo-Murillo, 495 U.S. 711, 720 (1990); Sylvain, 714 F.3d at 159; Hosh, 680 F.3d at 380. First, the government cites Hosh for the proposition that Congress could not have intended for non-citizens to fall outside of the mandatory detention provision if the non-citizen "was not immediately detained after release due

---

[4] To the extent that the government relies on the opinions of the Third and Fourth Circuits, those Circuits were mistaken in their piecemeal analysis. See Araujo-Cortes, 2014 WL 3843862, at *8; Lora, 15 F. Supp. 3d at 489; Khoury, 3 F. Supp. 3d at 888.

to an administrative oversight." 680 F.3d at 380. A seven year delay hardly qualifies as a mere "administrative oversight." Second, in <u>Montalvo-Murillo</u>, the Supreme Court held that the Government's failure to hold a bail hearing on the defendant's first appearance, in violation of the Bail Reform Act's prompt hearing provision, would "not defeat the Government's authority to seek detention of the person charged." 495 U.S. at 717. The Supreme Court noted that releasing the defendant would "expos[e] the public to an increased likelihood of violent crime by persons on bail, an evil the statute aims to prevent." <u>Id.</u> at 720. Thus, "construction of the Act must conform to the great principle of public policy . . . which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." <u>Id.</u> at 718 (quotations and citations omitted). Although the statute was silent as to the consequences of failing to meet the prompt hearing provision, the Supreme Court advised that it should not, and cannot, "invent a remedy to satisfy some perceived need to coerce the courts and the Government into complying with the statutory time limits." <u>Id.</u> at 721.

Unlike the statute at issue in <u>Montalvo-Murillo</u>, however, the consequence of failing to meet the specific limitations of Section 236(c) *are* clearly provided by Congress: non-citizens are to be detained pursuant to the default, Section 236(a), instead. The government loses no authority, and the public is not prejudiced.[5] Should an immigration judge determine at an individualized bond hearing that the non-citizen poses a danger to the community or a flight risk,

---

[5] Said another way, "By failing to detain an alien subject to mandatory detention immediately after his release from non-DHS custody, DHS has *already* deprived the public of the benefits of mandatory detention. It has allowed an alien to walk free for days, weeks, months, or years, when Congress believes that alien presents such a presumptive risk of danger or flight that he should be immediately confined upon his release from non-DHS custody. Moreover, once an alien has left non-DHS custody, the need for a *presumption* of danger or risk of flight is reduced or nonexistent." <u>Khoury</u>, 3 F. Supp. 3d at 88 (emphasis in original).

the judge will detain her. And only if the IJ determines that the non-citizen poses neither risk will the IJ release her.

### 3.    Congressional Intent

Congressional intent also supports the "when . . . released" clause's plain meaning. First, Congress enacted Section 236(c) out of two primary concerns: that non-citizens convicted of specific crimes might (1) commit additional crimes, and thus pose a danger to their community, and (2) avoid appearing at their immigration proceedings to evade deportation, and thus pose a flight risk. See Demore, 538 U.S. at 518-22, 531. To address these concerns, Congress targeted a specific subset of non-citizens whom it predicted would be dangerous and elusive. And it sought to create a pipeline for their transfer "directly from jailhouse to immigration detention" to ensure that they would not return to the community. Castaneda II, 952 F. Supp. 2d at 316; Khoury, 3 F. Supp. 3d at 888. Under this detention scheme, there is an irrebuttable presumption that this specific subset of non-citizens (who have committed an enumerated offense and been detained "when . . . released" from criminal custody) are categorically dangerous and a flight risk. As a result, their detention is mandatory. For all other non-citizens in removal proceedings, however, the presumption is rebuttable – and individual bond hearings allow them their opportunity to make their case. In so drafting the statute, Congress struck a balance. Recognizing the constitutional issues at play, it prioritized a narrow subset of individuals whose Due Process rights could permissibly be encroached upon. "The evidence Congress had before it certainly supports the approach it selected . . . ." Demore, 538 U.S. at 528.

When non-citizens such as Rodriguez are apprehended seven years after their release from criminal custody, rather than "when" they are released, however, Congress's presumptions become rebuttable. In the time since the non-citizen's release, "he has either demonstrated

himself to be a danger to the community or he has not. He has, in other words, given either himself or the government the fodder for a bond hearing." <u>Khoury</u>, 3 F. Supp. 3d at 888. Further, any "presumption of dangerousness and flight risk is eroded by the years" the non-citizen "lived peaceably in the community." <u>Castaneda I</u>, 769 F.3d at 43. <u>See</u> <u>Saysana</u>, 590 F.3d at 17-18 ("[I]t stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be."). <u>See also</u> <u>infra</u> n.11 (citing <u>Khoury</u>, 3 F. Supp. 3d at 888). For Rodriguez, in the seven years since his qualifying offenses, he has not been arrested, let alone convicted of any crime. He has attended rehabilitation, obtained his GED, enrolled in college courses, and worked to support himself financially. His sisters, father, and friends are also lawfully in the United States, the place he has called home since age seven. For non-citizens like him, "DHS can only determine whether [he] poses a risk of flight or danger to the community through an individualized bond hearing." <u>Monestime v. Reilly</u>, 704 F. Supp. 2d 453, 458 (S.D.N.Y. 2010). This outcome is consistent with Due Process and Congress's intent to detain without hearing the subset of individuals who are dangerous, may recidivate, and are flight risks. Because DHS failed to comply with its duty to detain Rodriguez when he was released, he is entitled to an individualized detention hearing where an IJ can hear the evidence and decide whether or not he should remain detained.

Second, Congress enacted Section 236(c) as part of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"). Div. C, Pub. L. No. 104-208, § 303(b), 110 Stat. 3009-586 (Sept. 30, 1996). Because Congress understood that it would take time for INS to put mechanisms in place to comply with the new rules, it deferred Section 236(c)'s implementation for two years. <u>See</u> <u>Straker</u>, 986 F. Supp. 2d at 361 n.10; <u>Saysana</u>, 590 F.3d at 10 n.2; <u>Matter of Garcia Arreola</u>, 25 I. & N. Dec. 267, 268-69 (B.I.A. 2010). Congress established

another set of rules, the Transition Period Custody Rules ("TPCR"), to apply in the interim. IIRIRA § 303(b). The TPCR provided for the mandatory detention of a narrower class of non-citizens than Section 236(c).[6] <u>Matter of Garcia Arreola</u>, 25 I. & N. Dec. at 269. Section 236(c) would apply only to non-citizens who were released from criminal custody after October 8, 1998, the last day that the TPCR was in effect. <u>Id.</u> The fact that Congress delayed implementation of Section 236(c) to allow the relevant actors first to prepare, demonstrates that Congress understood Section 236(c) to require mandatory detention at the time the designated non-citizen is released from criminal custody. If, however, Congress intended the "when . . . released" clause to provide an open window to execute the mandatory detention scheme, there would have been no need for a delayed implementation; DHS would just detain certain non-citizens whenever it got around to it. Moreover, the fact that there existed a transition period demonstrates that Congress was aware that some other non-citizens who committed offenses described in Section 236(c)(1)(A)-(D) would not be held under mandatory detention but would receive a bond hearing. This shows "that Congress did not view ordinary bond hearings as an invariably unacceptable outcome" for non-citizens who committed the listed offenses in Section 236(c). <u>Khoury</u>, 3 F. Supp. 3d at 889 (citing <u>Saysana</u>, 590 F.3d at 17).

### 4. Constitutional Avoidance

Finally, the cannon of constitutional avoidance also supports the plain meaning of the "when . . . released" clause because adopting the government's interpretation would raise serious constitutional concerns. <u>See, e.g.</u>, <u>Martinez-Done</u>, 2014 WL 5032438, at *9 ("Under certain circumstances, delay in the onset of prosecution can give rise to independent due process

---

[6] Like Section 236(c), however, the TPCR required that this smaller subset of criminal non-citizens be taken into INS custody "when . . . released" from criminal custody. IIRIRA § 303(b)(3)(A) (text in historical notes following 8 U.S.C. § 1226 (Supp. 1998)).

harm. . . . . Living in the shadow of mandatory detention that could begin at any moment invariably takes its toll."). Although the cannon does not trump congressional intent, it is another tool to help the Court understand what Congress intended. See Zadvydas, 533 U.S. at 689 (applying the "cardinal principal" of constitutional avoidance to "ascertain whether a construction of the statute is fairly possible by which the question may be avoided") (citing Crowell v. Benson, 285 U.S. 22, 62 (1932)). Here, because "Congress will be presumed to have legislated against the background of our traditional legal concepts," United States v. U.S. Gypsum Co., 438 U.S. 422, 437 (1978), the plain meaning of "when . . . released" must mean "at or around the time of release."

"Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the" Due Process Clause, and infringements on that freedom must be narrowly construed. Zadvydas, 533 U.S. at 690-91 (noting that the Court has "upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections"). See Foucha, 504 U.S. at 81-82 (holding that a Louisiana statute allowing continued confinement of insanity acquittee, after hospital review committee recommended conditional discharge, violated due process because the detention scheme was "not carefully limited"); Salerno, 481 U.S. at 750-51 (upholding a pretrial detention scheme where the "government's interest in preventing crime by arrestees is both legitimate and compelling," and Congress "careful[ly] delineat[ed] the circumstances under which detention will be permitted"); Hendricks, 521 U.S. at 368 (upholding a scheme that imposes detention on "a small segment of particularly dangerous individuals" and provides "strict procedural safeguards"). Accordingly, due process requires "adequate procedural protections" and a "special justification" for physical detention that "outweigh[ ] the

23

'individual's constitutionally protected interest in avoiding physical restraint.'" <u>Zadvydas</u>, 533 U.S. at 690-91 (<u>Hendricks</u>, 521 U.S. at 356). Congress provided that special justification and narrowed the class of individuals subject to it by applying Section 236(c) to a limited number of individuals who are transferred from criminal custody into DHS custody at or around the time they are released.

That special justification, however, no longer applies for non-citizens such as Rodriguez who have, by virtue of being in his community for seven years, rebutted Congress's otherwise acceptable presumption of dangerousness, recidivism, and flight risk. Holding him without a bond hearing now raises constitutional concerns that would not have been present had he been apprehended "when . . . released." In his concurrence in <u>Demore v. Kim</u>, Justice Kennedy recognized that a statute may serve its purpose generally but still fail to justify the detention of a specific individual: particularly, "[w]ere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." 538 U.S. at 532-33 (Kennedy, J., concurring). Notably, in <u>Demore</u>, ICE served the petitioner Kim with an NTA while he was in criminal custody and detained him on the day after he was released. <u>Schiltgen</u>, 1999 WL 33944060, at *1. Similarly, in <u>Matter of Rojas</u>, the petitioner was apprehended two days after he was released from criminal custody. 23 I. & N. Dec. at 118. Unlike the detention of those non-citizens who were apprehended "when . . . released" as the phrase was understood by Congress, Rodriguez's detention falls squarely within Justice Kennedy's inquiry: his detention is unmoored from the justifications upon which Section 236(c) relies. <u>See</u> <u>Demore</u>, 538 U.S. at 532-33 (Kennedy, J., concurring). Interpreting the "when . . . released" to mean "at any time" after

release would impermissibly encroach on non-citizens' right to be free from arbitrary and capricious detention and exceeds the allowance approved by the Supreme Court in <u>Demore</u>.

The Court need not announce a bright line rule of what might be a "reasonable" delay in taking a criminal non-citizen into custody to avoid due process concerns. Whether "when" means immediately or within a reasonable time without undue delay, seven years is plainly an unreasonable delay.

For the aforementioned reasons, based on (1) the plain meaning of the "when . . . released" clause, (2) reading Section 236(c) as a whole and also as part of the larger immigration detention scheme for non-citizens in removal proceedings, (3) Congressional intent, and (4) the cannon of constitutional avoidance, the Court concludes that "when the alien is released" is unambiguous: it means "at or around the time of release" and does not include non-citizens such as Rodriguez who are taken into DHS custody *years* after release.

**B.      Violation of Due Process**

Because Rodriguez is detained under Section 236(a), he must be provided with an individualized bond hearing. The failure to provide him one violates due drocess. Although detention is a "constitutionally permissible part" of removal proceedings, the proceedings still must respect the requirements of due process. <u>Demore</u>, 538 U.S. at 559 (citing <u>Zadvydas</u>, 533 U.S. at 695). "If the government cannot satisfy [the threshold burden of showing the relationship between detention and its purpose,] then the permissibility of continued detention pending deportation proceedings turns solely upon the alien's ability to satisfy the ordinary bond procedures . . . ." <u>Id.</u> at 532 (Kennedy, J., concurring). Rodriguez's "continued detention without an individualized hearing to determine whether he is a flight risk or a danger to the community is inconsistent with the United States Constitution." <u>Araujo-Cortes</u>, 2014 WL 3843862, at *14.

## CONCLUSION

The petitioner's *habeas corpus* petition is GRANTED. The government is ordered to provide Rodriguez with an individualized bond hearing pursuant to Section 236(a) within ten days of this Order. If the Immigration Court fails to provide a hearing within ten days, respondents shall release Rodriguez from custody.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            January 30, 2015